# ORIGINAL

1  THOMAS L. SANSONETTI
   Assistant Attorney General
2  Environment & Natural Resources Division
   United States Department of Justice
3  ROBERT D. MULLANEY
   Environmental Enforcement Section
4  Environment & Natural Resources Division
   301 Howard Street, Suite 1050
5  San Francisco, CA 94105
   Tel: (415) 744-6491
6  Fax: (415) 744-6476
   LEONARDO M. RAPADAS
7  United States Attorney
   MIKEL W. SCHWAB
8  Assistant U.S. Attorney
   Suite 500, Sirena Plaza
9  108 Hernan Cortez
   Hagatna, Guam  96910
10 Tel:  (671) 472-7332
   Fax:  (671) 472-7215
11

12 Attorneys for the United States of America

13                 UNITED STATES DISTRICT COURT
14                      TERRITORY OF GUAM
15

16 UNITED STATES OF AMERICA,          )    CIVIL NO. 02-00035
                                      )
17              Plaintiff,            )    **UNITED STATES'**
18         v.                         )    **STATUS REPORT**
19 GUAM WATERWORKS AUTHORITY          )
   and the GOVERNMENT OF GUAM,        )
20                                    )
21              Defendants.           )
22 ─────────────────────────────────  )

23

24

25

26

27

28

DISTRICT COURT OF GUAM
FILED
OCT 03 2003
MARY L. M. MORAN
CLERK OF COURT

30

# TABLE OF CONTENTS

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    The Public Health Crisis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.    GWA's Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

             1.    GWA's POTW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

             2.    GWA's Public Water Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.    Description of GWA's Violations and Public Health Effects . . . . . . . . . . . . . . 4

       C.    Guam's Political Gridlock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.   The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.    The Stipulated Order for Preliminary Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.     The Impact of Bill No. 97 (COR) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI.    Options for the Court to Consider if Bill No. 97 Becomes Law . . . . . . . . . . . . . . . 10

       A.    This Court Can Determine that the Law Conflicts with the Remedial
             Scheme of the Stipulated Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       B.    This Court Can Exercise its Equitable Powers to Appoint a Receiver
             for GWA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       C.    This Court Can Order the Guam Legislature to Fund the Necessary
             Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VII.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

i

TABLE OF AUTHORITIES

FEDERAL CASES

Hook v. Ariz. Dept. of Corrections, 107 F.3d 1397 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 11

Komyatti v. Bayh, 96 F.3d 955 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Missouri v. Jenkins, 495 U.S. 33 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. v. Acadia Woods Add. #2 Sewer Co., 41 F. Supp.2d 632 (W.D. La. 1999) . . . . . . . . 11, 12

U.S. v. Alder Creek Water Co., 823 F.2d 343 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. v. Alisal Water Corp., No. C97-20099 (N.D. Cal. Apr. 9, 2002) . . . . . . . . . . . . . . . . . . 11

U.S. v. City of Detroit, 476 F. Supp. 512 (E.D. Mich. 1979) . . . . . . . . . . . . . . . . . . . . . . 11, 12

FEDERAL STATUTES

CWA Section 309(e), 33 U.S.C. § 1319(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

FEDERAL RULES

Fed.R.Civ.P. 66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1        At a status conference on September 30, 2003, the Court asked the parties to address:

2 (1) the impact of proposed Bill No. 97 on the implementation of the Stipulated Order for

3 Preliminary Relief in this case; and (2) the options available to this Court if the Bill becomes law.

4 In this Status Report, the United States responds to the Court's request.

5 **I.    Introduction**

6        The people of Guam have been exposed to severe public health risks due not only to

7 Guam Waterworks Authority's ("GWA") repeated spills and discharges of raw or inadequately

8 treated sewage, but also to its inability to provide a consistent and clean source of drinking water.

9 GWA's spills and discharges have resulted in the presence of fecal coliform and enterococci in

10 coastal waters and groundwater and led to frequent health advisories and even closures on

11 Guam's public beaches. GWA's drinking water system frequently breaks down, operates with

12 inadequate disinfection, and fails to adequately protect the public from waterborne diseases.

13        The United States filed a complaint in this case in December 2002 to address this public

14 health crisis. After months of negotiations, the United States, the Government of Guam, and

15 GWA agreed to the terms of a Stipulated Order for Preliminary Relief, which contains a complex

16 set of measures to address GWA's violations of the federal Clean Water Act ("CWA") and Safe

17 Drinking Water Act ("SDWA"). In conjunction with the Consolidated Commission on Utilities

18 ("CCU") and the Guam Public Utilities Commission ("PUC"), GWA has begun the long process

19 of complying with the terms of the Stipulated Order in order to rehabilitate its system and

20 improve the utility's performance.

21        The passage of Bill No. 97 would seriously jeopardize GWA's ability to comply with the

22 Stipulated Order. The Bill would directly conflict with the terms of the Stipulated Order by

23 blocking GWA's efforts to pay off existing debt. Moreover, by freezing a rate surcharge

24 intended to pay for GWA's past debts to the Guam Power Authority and the U.S. Navy, Bill No.

25 97 would undermine GWA's attempts to establish an investment quality rating for its bonds.

26 Without bond financing, GWA's ratepayers would face a dramatic rate increase -- a 75%

27

28                                               1

1  surcharge in 2004 -- to fund the projects needed to fix GWA's dilapidated system.

2      As explained in detail below, the Court could pursue one or more of the following

3  options if Bill No. 97 becomes law: (1) determine that the law conflicts with the remedial

4  scheme of the Stipulated Order; (2) exercise its equitable powers to appoint a receiver for GWA;

5  or (3) order the Guam Legislature to fund the projects required by the Stipulated Order.

6  **II.    The Public Health Crisis**

7          A.    GWA's Operations

8                1.    GWA's POTW

9      GWA is the owner and operator of a publicly owned treatment works ("POTW") that

10  includes sewage treatment plants ("STPs") that provide treatment for wastewater from their

11  respective areas, including the Agana, Agat, Baza Gardens, Northern District, and Umatac-

12  Merizo STPs (the "Regulated STPs").[1] The U.S. Environmental Protection Agency ("EPA")

13  issued National Pollutant Discharge Elimination System ("NPDES") permits to each of GWA's

14  Regulated STPs. The NPDES permits authorize the discharge of pollutants into waters of the

15  United States, subject to certain conditions and limitations. GWA is required to submit to EPA

16  monthly Discharge Monitoring Reports ("DMRs") for each of the Regulated STPs and is

17  required to notify EPA each time that it bypasses part of the treatment facility at its Regulated

18  STPs.

19      In addition to the Regulated STPs, GWA owns and operates wastewater collection and

20  conveyance systems, including approximately 75 pump stations, that transport raw sewage to the

21  Regulated STPs. Wastewater is collected by GWA, transported through the conveyance systems,

22  treated, and discharged from the Regulated STPs. GWA is required to provide notifications and

23  written reports to EPA for each spill and overflow event from its wastewater collection and

24  conveyance systems, in which raw sewage or inadequately treated wastewater is discharged into

25

26      [1] GWA also owns two additional STPs that do not require NPDES permits and are not

27  the subject of this action.

28                                          2

1  the receiving waters.

2        2.    GWA's Public Water Systems

3      GWA owns and operates three water systems that supply drinking water for the majority

4  of the population of Guam. According to information provided by the Guam Environmental

5  Protection Agency ("Guam EPA"), the Northern System serves approximately 142,000 people,

6  the Central System serves approximately 22,000 people, and the Southern System serves 6,000

7  people.

8      GWA collects water from approximately 110 drinking water wells located in the northern

9  groundwater system of Guam to supply water for its Northern System. The northern part of

10  Guam is composed of porous limestone that allows surface water, including untreated or

11  inadequately treated wastewater, to percolate rapidly to Guam's underground aquifers. The

12  Central System includes several drinking water wells owned by GWA, but is mainly supplied by

13  water purchased by GWA from the Navy. GWA owns and operates a surface water treatment

14  plant at Ugum to supply water for the Southern System.

15      GWA operates chlorinators at approximately 68 wellheads of its drinking water wells and

16  at its Ugum surface water treatment plant. The chlorinators are used to disinfect the water that

17  GWA supplies to the public for drinking water.

18      In order to comply with the federal Maximum Contaminant Level ("MCL") for total

19  coliforms, GWA conducts routine monitoring of water quality in its distribution system. At the

20  same time and locations that GWA collects samples for analysis for total coliform bacteria,

21  GWA is required by Guam EPA to measure chlorine residual levels in the water in its

22  distribution system. GWA and Guam EPA also periodically monitor water quality at the

23  wellheads for GWA's drinking water wells prior to chlorination. GWA also performs turbidity

24  measurements on representative samples of the Southern System's filtered water every four hours

25  that the Southern System serves water to the public. GWA is required to provide monthly reports

26  on drinking water quality in its three systems to the Guam EPA, which has primary enforcement

27

28                         3

1 | responsibility for GWA's public water systems.

2 |    B.  Description of GWA's Violations and Public Health Effects

3 |    In DMRs provided to EPA, GWA has documented hundreds of discharges from its

4 | Regulated STPs in which the effluent failed to comply with discharge limits of the NPDES

5 | permits. In addition, GWA repeatedly discharged raw sewage from its wastewater collection and

6 | conveyance systems and frequently bypassed the treatment process at its Regulated STPs,

7 | discharging partially treated or untreated wastewater to the receiving waters. Finally, GWA's

8 | spill reports show a total of approximately 500 million gallons of raw sewage that spilled from

9 | pump stations and percolated into the groundwater between November 1999 and October 2002.

10 |    The NPDES permits for the Regulated STPs set a limit of 400/100 ml for fecal coliform

11 | bacteria based on Guam Water Quality Standards. Fecal coliform is a subset of coliform bacteria

12 | often found in and generally restricted to fecal material. GWA's reports indicate dozens of gross

13 | violations of this standard in which the number of fecal coliform is either too numerous to count

14 | or ranges in the hundreds of millions per 100 ml. GWA's discharges of inadequately treated

15 | wastewater from its Regulated STPs, bypasses of its Regulated STPs, and unpermitted discharges

16 | of raw sewage have caused fecal coliform and enterococci levels in the Philippine Sea, the

17 | Togcha River, and the Toguan River that greatly exceed Guam's Water Quality Standards.

18 |    GWA's discharges of untreated or inadequately treated wastewater also contribute to

19 | elevated levels of coliform bacteria in GWA's drinking water wells. For example, untreated

20 | sewage from GWA's Chaot pump station frequently overflows into the Chaot River. Due to

21 | hydrological connections between the Chaot River and nearby drinking water wells, GWA and

22 | Guam EPA have measured elevated levels of fecal coliform bacteria in GWA's drinking water

23 | wells on multiple occasions.

24 |    The presence of fecal coliform bacteria and enterococci indicates that unacceptable levels

25 | of disease-causing organisms are present in receiving water bodies and drinking water wells.

26 | Organisms in inadequately treated wastewater and raw sewage such as bacteria, viruses,

27 |

28 |               4

1 protozoa, and other microbes can cause a number of diseases in people when they come into
2 contact with contaminated water, ranging from minor illnesses such as sore throats and diarrhea
3 to serious diseases such as gastroenteritis, dysentery, cholera, meningitis, and encephalitis.
4 Guam EPA issues weekly health advisories for 38 public beaches on Guam, which warn the
5 public about polluted waters based on elevated levels of enterococcus bacteria in the marine
6 water. These health advisories frequently apply to a majority of the public beaches on Guam.
7 For example, in the week of November 21, 2002, Guam EPA issued a health advisory for 24 of
8 38 beaches on Guam, warning the public not to swim or wade within 400 feet of the beaches and
9 advising that swimming, fishing, or playing in the contaminated water could lead to illnesses.

10      In monthly reports, GWA indicated that it had failed to comply with treatment technique
11 requirements for turbidity in its Southern System in eleven months between February 1999 and
12 August 2001. GWA also stated that it had failed to comply with the MCL for total coliforms for
13 drinking water in a distribution system in nine months between May 1999 and the present. These
14 MCL violations could have exposed the public to waterborne diseases in drinking water, and
15 resulted in frequent "boil water" notices issued to the public by GWA and Guam EPA. The
16 notices warned the users of the system to boil GWA's tap water for at least one minute to kill
17 pathogens before using the water for drinking, making ice, brushing teeth, preparing food, and
18 washing dishes.

19      Finally, GWA has failed to maintain water pressure in its public water systems and is
20 unable to keep its chlorinators in service on a regular basis. GWA's failure to maintain adequate
21 pressure in its distribution system can lead to contamination of drinking water. Guam EPA has
22 required GWA to maintain a level of 0.2 parts per million of chlorine in the distribution system
23 to disinfect the water and help ensure that it is safe for human consumption. Because of its
24 maintenance problems, GWA is frequently unable to maintain the required residual amount of
25 chlorine in the water in its distribution system. Thus, GWA not only regularly exposed the
26 people of Guam to fecal coliform bacteria in drinking water, it also failed to protect the public by

27

28      5

1 adequately disinfecting the water.

2        C.     Guam's Political Gridlock

3        EPA entered into an Administrative Order on Consent ("AOC") in August 2001 with

4 GWA and the Government of Guam that covered all of GWA's STPs. The AOC contained a

5 Finding of Violation that documented GWA's history of NPDES violations and unauthorized

6 discharges and spills. It required GWA to submit a financial plan and a compliance schedule to

7 bring its POTW into compliance with the NPDES permits and the CWA.

8        In February 2002, GWA submitted to EPA a financial plan and compliance schedule,

9 explaining how GWA would secure funds for the projects and stating when the projects would

10 occur. One month later, Guam's Governor signed Bill 282, authorizing a short-term debt of $21

11 million for GWA to implement the projects. The short-term debt was predicated on GWA's

12 ability to raise users' rates to support the issuance of a bond. In May 2002, however, the Guam

13 Legislature, overriding the Governor's veto, passed a law prohibiting GWA from raising user

14 rates for one year. As a result of this legislative moratorium on rate increases, GWA did not have

15 the financial resources to comply with the AOC, and GWA's violations of the CWA continued

16 unabated until this lawsuit was filed.

17 **III.**    **The Complaint**

18        The United States filed a complaint in this action on December 20, 2002, seeking

19 injunctive relief and the assessment of civil penalties against GWA under the CWA and the

20 SDWA. The complaint included allegations against GWA pursuant to the emergency provisions

21 of both the CWA and SDWA to address the imminent and substantial endangerment to the health

22 and welfare of persons presented by: (1) the numerous and repeated discharges of untreated and

23 inadequately treated wastewater from GWA's treatment works, resulting in elevated levels of

24 fecal coliform bacteria in both surface waters and drinking water wells on Guam; and (2) serious

25 deficiencies in GWA's public water systems, causing contaminated water to be served to the

26 public. The complaint seeks the issuance of a preliminary and permanent injunction that:

27

28                                         6

1   (i) enjoins GWA from discharging pollutants except as expressly authorized by the CWA and its
2   NPDES permits and orders GWA to undertake a program to achieve permanent, consistent
3   compliance with all the terms and conditions of the applicable NPDES permits as well as the
4   CWA and its promulgated regulations; and (ii) enjoins GWA from violating the SDWA or the
5   National Primary Drinking Water Regulations and orders GWA to undertake a program to
6   achieve permanent, consistent compliance with the SDWA and its promulgated regulations.

7          To the extent that GWA does not promptly comply with the Court's Order, the complaint
8   requests the Court to appoint a receiver to ensure and oversee that GWA immediately takes all
9   necessary measures to ensure that:  (i) its POTW is fully in compliance with the CWA and
10  applicable NPDES permits; and (ii) its public water systems fully comply with the SDWA,
11  including the MCL for total coliforms and the treatment technique for turbidity, and provide
12  potable drinking water to the people of Guam.  The complaint also seeks civil penalties pursuant
13  to the CWA and SDWA.  Finally, the complaint seeks an Order that Guam is liable, pursuant to
14  CWA Section 309(e), 33 U.S.C. § 1319(e), for payment of any judgment entered against GWA
15  under CWA Section 309 to the extent that the laws of Guam prevent GWA from raising revenues
16  needed to comply with such judgment.

17  **IV.    The Stipulated Order for Preliminary Relief**

18         After months of negotiations, the United States, the Government of Guam, and GWA were
19  able to reach an agreement on the terms of a Stipulated Order for Preliminary Relief, which the
20  United States filed with the Court on May 21, 2003.  The 41-page Stipulated Order contains a
21  comprehensive set of interim measures to address GWA's violations of the CWA and SDWA.
22  Among other things, the Stipulated Order includes a set of schedules requiring GWA to
23  implement short-term construction and rehabilitation projects as well as a broad range of
24  measures affecting GWA's management and organizational structures, operations and
25  maintenance, and financial administration.  The Stipulated Order was entered by the Court on
26  June 5, 2003.

27

28                                                 7

1   Since that time, GWA has hired an environmental compliance monitor and a chief
2   financial officer, as required by the Stipulated Order, and has submitted numerous planning
3   documents to EPA for review and approval. The long process of rehabilitating GWA's
4   dilapidated infrastructure has begun in accordance with the schedules set out in the Stipulated
5   Order.

6   In addition, GWA's management has made significant progress in cutting costs at the
7   utility, which will benefit its ratepayers. For example, GWA has cut approximately 85 positions
8   from the 350 positions on the books in 2002. Moreover, with the installation of new water
9   meters, paying customers will no longer be burdened with the production and delivery costs
10  associated with illegal connections to the GWA drinking water system. According to GWA's
11  recent budget, GWA expects to reduce operating costs from approximately $35 million in 2002 to
12  $31 million in 2004. These cost savings will allow GWA to minimize rate increases necessary for
13  critical capital improvements needed to deliver safe drinking water and to treat wastewater on
14  Guam.

15  **V.    The Impact of Bill No. 97 (COR)**

16  Bill No. 97 (COR), "An Act to Extend the Moratorium on the Guam Waterworks
17  Authority Rate Surcharge of 11.5%," was considered by the Guam Legislature on September 29,
18  2003. Bill No. 97 would prohibit GWA from raising its rates or imposing a surcharge "if such
19  increase or surcharge is intended, in whole or in part, to pay for past due obligations by GWA to
20  any vendor, including power consumption or the purchase of water from water providers." We
21  have attached a copy of this Bill for the Court's information as Attachment A.

22  The United States, GWA, and the Government of Guam spent several months crafting the
23  Stipulated Order to address the considerable structural, managerial, operational, and financial
24  problems faced by GWA. Regarding GWA's financial management, the Stipulated Order
25  obligates the Government of Guam and GWA to submit, by October 3, 2003, an Interim Financial
26  Plan that details how GWA will generate revenue. The Plan, which must include any necessary
27
28                                                      8

1    rate adjustment, shall ensure revenues are "sufficient to cover the cost of compliance activities
2    and deliverables required by this Stipulated Order for Preliminary Relief, as well as any other
3    anticipated expenses . . . *including all existing debt and expected debt service . . . .*" Stipulated
4    Order at ¶ 28 (emphasis added).  Bill No. 97 would directly conflict with the requirements of
5    Paragraph 28 of the Stipulated Order, and subject GWA and the Government of Guam to
6    stipulated penalties of $1,000 per day for the first thirty days, $2,000 per day for the following
7    thirty days, and $5,000 per day for each day thereafter.
8           The Guam PUC issued an Order on April 10, 2003, renewing its commitment to provide
9    GWA in a timely manner with adequate rate relief to enable GWA to comply with an EPA-
10   approved strategic plan to restore the utility and bring it into compliance with federal law.  The
11   payment of GWA's existing debt is a critical element of the plan to rehabilitate GWA's decrepit
12   system.  The Stipulated Order contains a complex set of schedules to implement projects to start
13   GWA on the path of rehabilitating its system.  According to current estimates, required projects
14   under the Stipulated Order will cost approximately $27 million in 2004, $20.5 million in 2005,
15   and $56.5 million in 2006.  GWA's base revenue, which is derived from its rates for providing
16   drinking water and wastewater treatment, is approximately $36 million.  Without bond financing,
17   GWA would need to pay all capital costs for the Stipulated Order's projects in the year they are
18   expended.  As a result, GWA would need to raise rates dramatically -- a 75% rate surcharge in
19   2004, a 57% surcharge in 2005, and a 157% surcharge in 2006 -- to directly fund the capital
20   improvements needed to address the drinking water and wastewater emergency currently facing
21   the people of Guam.  These types of surcharges are not feasible for ratepayers to bear.
22          An alternative way to meet these funding obligations would be by direct emergency
23   appropriations from the Guam Legislature.  Given the current fiscal crisis faced by the
24   Government of Guam, however, it is unlikely that public funding for these GWA projects will be
25   available.
26          Therefore, in order to finance the rehabilitation of its system, GWA needs to be able to
27
28                                                    9

1  issue bonds to pay for critical construction projects. In his testimony before the Legislature on
2  Bill No. 97, Simon Sanchez, Chairman of the CCU, noted that GWA does not have a bond rating
3  at this time. Mr Sanchez stated: "In order for GWA to obtain an investment quality rating, GWA
4  will need to demonstrate an ability to repay large principal and interest obligations." He also
5  added that rating agencies and lenders look for a history of independent rate actions by a PUC.

6      If Bill No. 97 becomes law, however, the Guam Legislature would completely thwart
7  GWA's efforts to establish an investment quality rating. First, GWA's ability to repay its existing
8  debt would be jeopardized. Second, the Guam Legislature would demonstrate to the investment
9  world that the statutory independence of the Guam PUC to set rates is purely illusory. The PUC's
10  written commitment on April 10, 2003 -- to provide GWA in a timely manner with adequate rate
11  relief to enable GWA to comply with an EPA-approved strategic plan -- would be rendered
12  meaningless by legislative fiat. Under these circumstances, it is unlikely that GWA would ever be
13  able to secure the bond financing necessary to meet its obligations under the Stipulated Order.

14  **VI.    Options for the Court to Consider if Bill No. 97 Becomes Law**

15          A.     This Court Can Determine that the Law Conflicts with the Remedial Scheme of the
16                 Stipulated Order.

17      In the Stipulated Order, the parties agreed that entry of the Stipulated Order "is the most
18  appropriate way to require the immediate implementation of short-term projects and initial
19  planning measures by GWA and the Government of Guam . . . to begin to address issues of
20  compliance at GWA's POTW and three public water systems." Stipulated Order at p. 3. The
21  projects required by the Stipulated Order are designed to remedy GWA's violations of federal law
22  alleged in the complaint in this action. According to Paragraph 69 of the Stipulated Order, the
23  provisions in the validly entered Stipulated Order shall apply to and are binding upon GWA, the
24  Government of Guam, and its elected officials, which imposes an obligation on Guam officials to
25  conform their conduct to federal law. Cf. Komyatti v. Bayh, 96 F.3d 955, 960 (7th Cir. 1996).
26      At the status conference, this Court noted that a valid state law cannot stand in the way of
27
28                                                  10

1  a federal court's remedial scheme if an action is essential to enforce the scheme, citing <u>Hook v.</u>
2  <u>Ariz. Dept. of Corrections</u>, 107 F.3d 1397, 1402 (9th Cir. 1997). If Bill No. 97 becomes law, the
3  Court could determine that a legislative moratorium on GWA's rate increases or surcharges would
4  directly conflict with Paragraph 28 of the Stipulated Order because it would prevent GWA and the
5  Guam PUC from ensuring that revenues are sufficient to cover the costs of repaying GWA's
6  existing debt and expected debt service. If this failure to repay existing debts makes it impossible
7  for GWA to obtain an investment quality rating to qualify for bond financing, it would seriously
8  undermine GWA's ability to comply with many of its other obligations under the Stipulated
9  Order.

10         B.      <u>This Court Can Exercise its Equitable Powers to Appoint a Receiver for GWA.</u>

11              In addition, this Court could consider placing GWA in receivership if Bill No. 97 is
12  enacted into law. In the complaint, the United States specifically requested the Court to appoint a
13  receiver if the defendants did not promptly comply with the Court's Order. This Court has the
14  authority to appoint a receiver pursuant to Fed.R.Civ.P. 66 (Receivers Appointed by Federal
15  Courts) and Local Rule 66.1 (Receivers), which is "founded in the broad range of equitable
16  powers available to [a] court to enforce and effectuate its orders and judgments." <u>U.S. v. City of</u>
17  <u>Detroit</u>, 476 F. Supp. 512, 520 (E.D. Mich. 1979). Courts have appointed receivers in a number
18  of cases involving environmental violations, including the following: <u>U.S. v. Alisal Water Corp.</u>,
19  No. C97-20099 (N.D. Cal. Apr. 9, 2002) (Safe Drinking Water Act); <u>U.S. v. Acadia Woods Add.</u>
20  <u>#2 Sewer Co.</u>, 41 F. Supp.2d 632 (W.D. La. 1999) (Clean Water Act); <u>U.S. v. Alder Creek Water</u>
21  <u>Co.</u>, 823 F.2d 343 (9th Cir. 1987) (Safe Drinking Water Act); and <u>U.S. v. City of Detroit</u>, 476 F.
22  Supp. 512 (Clean Water Act).[2] If the Guam Legislature acts to frustrate GWA's ability to comply
23  with the Stipulated Order, this Court could exercise its equitable power to appoint a receiver.

24              The authority of a receiver is extremely broad and is intended to encompass the power to
25  perform all acts necessary to achieve expeditious compliance with the federal environmental law.

26  _____

27         [2] Pursuant to GR 4.1, a copy of the <u>Alisal Water Corp.</u> case is attached as Attachment B.

28                                            11

1  Acadia Woods, 41 F. Supp.2d. at 633. This authority includes the power to manage, control,
2  convey, liquidate and deal with all items, assets, properties, and contracts. Id. It also includes the
3  authority to supervise all employees of the system, including the hiring or dismissal of public
4  employees. City of Detroit, 476 F. Supp. at 516.

5      The Stipulated Order for Preliminary Relief is an agreement that is intended to enable
6  GWA to comply with the federal SDWA and CWA and to eliminate the imminent threat to public
7  health in as expeditious a manner as feasible under the circumstances. Pursuant to this agreement
8  between the parties, GWA maintains the authority to implement these compliance measures
9  according to a specified schedule. However, the Stipulated Order is enforceable in all of its terms
10 by the Court pursuant to Paragraph 68. Thus, this Court retains continuing jurisdiction over this
11 case to exercise its broad range of equitable powers to enforce its Order.

12     If the Guam Legislature attempts to interfere with the implementation of the Stipulated
13 Order by imposing a rate moratorium on GWA, the Court could appoint a receiver to operate
14 GWA under the Court's authority. Appointing a receiver will ensure: (1) GWA will have the
15 revenue to pay its existing obligations to its vendors such as the U.S. Navy and the Guam Power
16 Authority; (2) GWA will have the ability to appropriately set rates to meet its obligations under
17 the Stipulated Order; (3) GWA will have the authority to operate independently without political
18 interference; and (4) one individual will be accountable to the Court to meet the obligations of the
19 Stipulated Order. In short, operation of the utility will no longer be held hostage by political
20 machinations. Instead, the federal receiver can concentrate on GWA's core business of providing
21 potable drinking water and treating the Island's wastewater.

22     C.    This Court Can Order the Guam Legislature to Fund the Necessary Projects.

23     The Government of Guam is a defendant in this action and a signatory to the Stipulated
24 Order. Paragraph 69 of the Stipulated Order states: "The provisions of this Stipulated Order for
25 Preliminary Relief shall apply to and be binding upon GWA, its officers, agents, employees,
26 trustees, successors, and assigns, *the Government of Guam, its elected officials*, officers, agents,

27

28                                          12

1 employees, trustees, successors, and assigns, and the United States, on behalf of EPA ."

2 (Emphasis added.) Thus, the Government of Guam is directly responsible for compliance with

3 the Stipulated Order. If the Government of Guam prevents GWA from complying with the terms

4 of the Stipulated Order, the Government of Guam could be required to pay for the capital costs.

5 This Court has the authority to order the Guam Legislature to levy taxes adequate to satisfy

6 Guam's obligations under the Stipulated Order. See Missouri v. Jenkins, 495 U.S. 33, 55 (1990).

7 **VII.    Conclusion**

8         The United States filed this action because the condition of GWA's drinking water and

9 wastewater systems pose a serious threat to the health and welfare of the people of Guam. We can

10 understand the frustrations of the public faced with a utility system that not only fouls public

11 beaches and aquifers with repeated spills of raw or inadequately treated sewage, but also

12 repeatedly fails either to deliver potable water or to provide any water at all.

13         Unfortunately, these serious problems will continue until emergency repairs are completed

14 and a master plan is developed that looks at the overall needs of GWA's system. The good news

15 is that the Stipulated Order requires GWA and the Government of Guam to make the emergency

16 repairs and prepare the master plan; GWA, the CCU, and the PUC are working diligently to

17 improve the utility. Moreover, unlike past promises to address the utility's problems, these

18 improvements are no longer subject to the vicissitudes of Guam politics. GWA and the

19 Government of Guam are required by the terms of the Stipulated Order to fund these projects and

20 complete them in a timely manner. EPA is closely monitoring compliance with the terms of the

21

22

23

24

25

26

27

28                                          13

1   Stipulated Order.  If GWA is incapable of complying with the Stipulated Order, the United States

2   will request this Court to appoint a receiver for the utility.

3

4                                          Respectfully submitted,

5

6                                          LEONARDO M. RAPADAS
                                           United States Attorney
7

8   Dated:   10/03/03                      _____
                                           MIKEL W. SCHWAB
9                                          Assistant U.S. Attorney

10                                         Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                         14

<center>CERTIFICATION</center>

I, Marie Chenery, Paralegal working in the United States Attorney's Office, hereby certify that copies of the United States' Status Report were served by facsimile and personal service to the attorneys of record at the following addresses:

Anthony R. Camacho
Staff Attorney
CCU/GPA/GWA
1911 Route 16
Harmon, GU 96913
Facsimile No. (671) 647-9224

Douglas B. Moylan
Attorney General of Guam
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, GU 96910
Facsimile No. (671) 472-2493

Dated: October 3, 2003

Marie Chenery
MARIE CHENERY
Paralegal

## TWENTY-SEVENTH GUAM LEGISLATURE
## 2003 (FIRST) Regular Session

**Bill No. 97 (COR)**

Introduced by:

Mark Forbes

AN ACT TO EXTEND THE MORATORIUM ON THE GUAM WATERWORKS AUTHORITY RATE SURCHARGE OF 11.5%.

**BE IT ENACTED BY THE PEOPLE OF GUAM:**

**Section 1. Intent.** On May 10, 2002, Public Law 26-81 was enacted, placing a one-year moratorium on the implementation of an 11.5% surcharge on water bills by the Guam Waterworks Authority. This moratorium was enacted for two reasons. The first was that economic conditions made the payment of the surcharge a hardship for many of our people. The second was that the surcharge was intended to pay for overdue power bills on the part of GWA, and not for any improvements to the water or wastewater systems of Guam. The Legislature found that the application of a surcharge upon the ratepayers of Guam, solely for the purpose of paying GWA due obligations to the GPA, was in effect making the ratepayers pay for GWA's poor management decisions.

Recently, GWA announced that it would proceed with the implementation of the 11.5% surcharge, and further, would apply the surcharge yet again towards unpaid bills on the part of GWA. The Legislature finds that conditions are unchanged from a year ago, when P.L. 26-81 became law, and the moratorium against this type of surcharge must be extended.

**Section 2.** Section 2 of Public Law 26-81 is amended to read:

"**Section 2. Abolishment of GWA's Surcharge.** GWA's eleven and one half percent (11.5%) surcharge, approved by the Public Utilities Commission ("PUC") in the PUC's decision and order dated September 13, 2001 in Docket Number 00-01, is hereby abolished for ~~the~~ **a** ~~period of the moratorium mandated by section 3 of this Act~~ **of three (3) years**."

**Section 3.** Section 3 of Public Law 26-81 is amended to read:

"**Section 3. Moratorium on All Rate Increases or New Surcharges by GWA.** There shall be a ~~one (1) year~~ **two (2) year** moratorium on any rate increase, or new or increased surcharge billed by GWA for services it provides to its customers**, if such increase or surcharge is intended, in whole or in part, to pay for past due obligations by GWA to any vendor, including power consumption or the purchase of water from water providers.**" GWA shall not bill its customers for any increase in rates or new or increased surcharge for ~~one (1) year~~ **two (2) years, if such increase or surcharge is intended, in whole or in part, to pay for past due obligations by GWA to any vendor, including power consumption or the purchase of water from water providers.**"

Attachment A

**Filed**

APR 0 9 2002

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. C97-20099 JF (EAI) |
| Plaintiff, ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| ) | |
| ALISAL WATER CORPORATION, ) ET AL., ) | |
| Defendants ) | |

## I. INTRODUCTION

Trial in the above-entitled action commenced on December 4, 2001 and concluded on January 8, 2002. On February 7, 2002, the Court issued its Memorandum of Intended Decision outlining its proposed disposition of this matter. Having reviewed Plaintiff's proposed findings of fact and conclusions of law and Defendants' objections thereto, the Court now sets forth the factual and legal basis for its Order Appointing Equitable Receiver contemplated by the Memorandum of Intended Decision and issued simultaneously herewith. Issues related to civil penalty, which will be the subject of further proceedings, will be the subject of a future Memorandum.

FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

Attachment B

1    This case, originally filed in January 1997, arises under the federal Safe Drinking Water

2    Act ("SDWA" or the "Act"), 42 U.S.C. §§ 300f, et seq., and its regulations.  The operative

3    complaint alleges violations of the SDWA by corporate defendants Alisal Water Corporation;

4    Toro Water Service, Inc.; North Monterey County Water Service, Inc.; Moss Landing Water

5    Service, Inc. (collectively, "Alisal"); and individual defendants Robert T. and Natholyn P.

6    Adcock at nine drinking water companies in Monterey County, California.  The corporate

7    defendants are public water systems which are owned, operated or controlled by Mr. and Mrs.

8    Adcock.  Their son, Tom Adcock, currently is responsible for the day-to-day operations of the

9    water systems.  Trial Transcript ("Tr.") at 1552.

10    On August 23, 2000, the Court granted summary judgment establishing defendants'

11    liability with respect to nine separate causes of action encompassing hundreds of individual

12    violations of the Act occurring in the 1990s.  United States v. Alisal Water Corp. et al., 114 F.

13    Supp. 2d 927 (N.D. Cal. 2000).   Specifically, the Court found that Defendants failed to meet the

14    Maximum Contaminant Level ("MCL") for microbiological contaminants, failed to report or

15    give public notice of the MCL failures, failed to do required repeat and increased routine

16    monitoring, failed to report the lack of repeat and increased routine monitoring as required, failed

17    to retain documents as required, and failed to test for lead and copper in their water in a timely

18    manner.  Many of the violations found by the Court involved intentional false reporting or non-

19    reporting.  Id. at 932.[1]  On November 8, 2001, the Court granted summary judgment establishing

20    the liability of the corporate defendants with respect to three additional causes of action alleging

21    further violations of the MCL for total coliform during 2000-01.  The trial addressed the

22    appropriate remedy for the adjudicated violations.

23    The Safe Drinking Water Act provides that a court may enter "such judgment as

24    protection of the public health may require, taking into consideration the time necessary to

25    comply and the availability of alternative water supplies."  See 42 U.S.C. § 300g-3(b).  As set

26    _____

27    [1]    The Court's prior opinion sets forth the citations for the various regulations violated.
     114 F. Supp. 2d at 932 n.2.

28    FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (BAI)

- 2 -

1   forth herein, in light of all the evidence presented at trial and upon review of the applicable law,

2   the Court concludes that significant equitable relief, including the appointment of a receiver for

3   certain specified purposes, is warranted in this case.

## II. DISCUSSION

A.     The Law of Receivership Supports the Imposition of Such a Remedy in this Case

6          The appointment of a receiver "represents a judicial determination that the operator of an

7   organization may be unwilling or incapable of acting in good faith toward compliance with a

8   judgment. . . . The receiver ensures certainty in the execution of a court's order." Stuart P.

9   Feldman, "Curbing the Recalcitrant Polluter: Post-Decree Judicial Agents in Environmental

10  Litigation," 18 B.C. Envtl. Aff. L. Rev. 809, 828 (1991) ("Feldman"). The authority of a court of

11  equity to impose a receivership on a chronic violator of public health laws is "founded in the

12  broad range of equitable powers available to [a] court to enforce and effectuate its orders and

13  judgments." United States v. City of Detroit, 476 F. Supp. 512, 520 (E.D. Mich. 1979).

14         A receivership is particularly appropriate where public health issues are implicated. As

15  one court explained in appointing a receiver to run a waste disposal facility, there are "differences

16  between the type of business in which the respective Defendants are involved and that of the

17  ordinary private corporation or enterprise." Ohio v. Chem-Dyne, Inc., 1980 WL 6204, 10 ELR

18  20387 (Ohio Ct. C.P., Feb. 1, 1980), aff'd in part, rev'd in part on other grounds, 1981 WL 5234

19  (Ohio Ct. of App. Oct. 28, 1981). Specifically, the court noted that "the Defendants in this case

20  are engaged in a business that definitely affects the entire community and conceivably the water

21  for this entire area . . . . [Defendant] is engaged in businesses that very definitely have a

22  widespread effect on community life and its daily operation and is affected with a public interest

23  which invokes the equity powers of the Court." Id.

24         Accordingly, several state and federal courts have imposed receiverships on

25  environmental violators, including owners and operators of public drinking water systems. See,

26  e.g., United States v. Alder Creek Water Co., 1984 WL 178394, 14 ELR 20430 (D. Or. April 23,

27  1984) (receiver appointed in SDWA case after defendant "failed to comply with a court order to

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (BAI)

- 3 -

1   lessen the health risks posed by [defendant's water systems], and to comply with the Act's

2   reporting and monitoring requirements"), aff'd, 823 F2d 343 (9th Cir. 1987); United States v.

3   Acadia Woods Add. #2 Sewer Co., 41 F. Supp.2d 632 (W.D. La. 1999) (receiver appointed to

4   run defendants' sewage treatment plants to secure compliance with CWA); City of Detroit, 476 F.

5   Supp. 512 (administrator appointed to run City's wastewater treatment plant to obtain compliance

6   with CWA); see also Town of Greenwich v. Dep't of Transp., 1979 WL 30063, 10 ELR 20178

7   (D. Conn. Nov. 7, 1979 & Jan. 21, 1980); Ohio v. Chem-Dyne Corp., 1981 WL 5234; Dep't of

8   Envtl. Prot. v. Emerson, 563 A.2d 762 (Me. 1989).[2/]

9        Courts appointing receivers focus on defendants' actual ability to manage their facilities

10  in compliance with the law. As the district court noted in City of Detroit in appointing a receiver

11  to run the city's sewage treatment plant, "[p]resent management is consumed by the demands of

12  crisis operating conditions that command priority over personnel, planning, budgeting, process

13  evaluation, and other administrative functions. As with other problems at the plant, this situation

14  feeds on itself[.]" City of Detroit, 476 F. Supp. at 517-18 (quoting consultant's report). The

15  court also focused on defendant's failure to train staff adequately, and to submit a continuing

16  training program to regulators. Id. at 517. The district court in Acadia Woods also relied in part

17  ──────────────────────────────

18  [2/]    Although in each of the cited cases a receiver was appointed only after the defendant had
    violated a court order requiring compliance, "there seems to be no reason . . . for a rigid rule

19  requiring as a prerequisite that injunctive relief have been attempted and have failed." Comment,
    "Court-Created Receivership Emerging As Remedy For Persistent Noncompliance With

20  Environmental Laws," 10 ELR 10059 (1980) ("Comment"). Rather, where public health is
    sufficiently at risk, "courts should be prepared to turn to receivership without the formality of waiting

21  for an injunction to be disregarded." Id. Another commenter has similarly suggested that "[t]here
    is no compelling reason . . . for a court to wait until severe environmental harm has transpired or a

22  defendant has flouted statutes and consent decrees before the court exercises the full scope of its
    equitable power. In the face of likely dangers to the . . . public welfare, a court may choose initially

23  and immediately to place an entity under receivership." Feldman, 18 B.C. Envtl. Aff. L. Rev. at 832.
    Cf. United States v. Midway Heights County Water Dist., 695 F.Supp. 1072, 1076 (E.D. Cal. 1988)

24  ("This court need not wait to exercise its authority [to issue an injunction] until water district
    customers have actually fallen ill from drinking Midway Heights water"). In any event, as is set forth

25  below, Defendants in this case have demonstrated a chronic pattern of resistance to and non-
    compliance with governmental efforts to regulate their corporate behavior, although this Court itself

26  has not issued an injunction.

27

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                    - 4 -

1    on defendants' failure to have "sufficient numbers of properly trained personnel to operate or to

2    adequately maintain their sewage treatment plants." <u>United States v. Acadia Woods Add . #2</u>,

3    No. 98:0687, slip op. at 12 (W.D. La. Mar 22, 1999).

4         Courts also have focused on a defendant's financial ability to comply. In appointing a

5    receiver to run defendants' sewage treatment plants in <u>Acadia Woods</u>, the court found compelling

6    the fact that "[n]either the named defendants in this proceeding nor any subsidiary corporation or

7    corporations or officers thereof have the financial ability to conduct the current business of

8    defendants in an environmentally sound manner to protect the public health or to secure the

9    necessary capital from a lending institution to do so." <u>Acadia Woods</u>, slip op. at 12.

10        A court order appointing a receiver and divesting a defendant of water companies that are

11   non-compliant appears to be well within the scope of remedies contemplated by Congress in

12   enacting the SDWA. The legislative history of the SDWA's enforcement provision, Section

13   1414, expressly states that "courts which are considering remedies in enforcement actions under

14   this section are not to apply traditional balancing principles used by equity courts. Rather, they

15   are directed to give utmost weight to the Committee's paramount objective of providing

16   maximum feasible protection of the public health . . . ." H.R. Rep. No. 93-1185, 93d Cong., 2d

17   Sess., reprinted in 1974 U.S. Code Cong. & Admin. News, 6454, 6476. Moreover, Congress

18   expressly contemplated that some small companies might not be able to comply and would be

19   forced out of business. The legislative history provides:

20        It is evident that what is a reasonable cost for a large metropolitan (or regional) public
          water system may not be reasonable for a small system which serves relatively few users.
21        The Committee believes, however, that the quality of the Nation's drinking water can only
          be upgraded if the systems which provide water to the public are organized so as to be the
22        most cost-effective. In general, this means larger systems are to be encouraged and
          smaller systems discouraged.

23   H.R. Rep. No. 93-1185, 93d Cong., 2d Sess., reprinted in 1974 U.S. Code Cong. & Admin. News

24   6454, 6470.

25        The evidence presented at trial convinces the Court that the imposition of some form of

26   receivership on the defendant water systems is unavoidable in this case. As set forth below, the

27

28   FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                        - 5 -

1    adjudicated violations are serious and include falsification of records designed to protect public

2    health; Defendants have a long history of such violations and others; Defendants have adopted an

3    inordinately combative stance against legitimate regulatory oversight and have maintained that

4    stance for more than a decade; Defendants repeatedly have failed to accept responsibility for their

5    conduct, seeking instead to shift blame to others including the regulators themselves; Defendants

6    lack the managerial competence to operate compliant drinking water systems; and Defendants

7    lack the financial wherewithal to operate compliant drinking water systems. In light of these

8    findings, the Court concludes that "the usual remedies are inadequate" and that some form of

9    receivership is necessary "to get the job done." Morgan v. McDonough, 540 F.2d 527, 533 (1st

10   Cir. 1976) (affirming appointment of receiver in non-environmental context).

11          B.      The Evidence Demonstrated That the Violations of the Act Found by the Court
                    Were Indeed Serious

12                  1.      The Violations Undermine the SDWA

13          Since the overwhelming majority of drinking water systems are never sampled by an

14   independent party, self-monitoring and truthful reporting are critical to the success of the Act in

15   that they represent the only way for the government to determine if a drinking water supply

16   system is safe. In the Matter of Anthony J. Taylor, Docket No. PWS-NJ-CFP-03, 1992 WL

17   293140 (E.P.A August 14, 1992). The former head of EPA Region IX's drinking water program,

18   William Thurston, confirmed this, testifying that self-monitoring by water systems is the primary

19   way that regulators and the public know about the quality of water. Tr. at 54. As the court in

20   United States v. City of North Adams, 1992 WL 391318, *2 , noted: "neglect in taking and

21   testing water specimens is tantamount to closing one's eyes to possible water-supply

22   contamination." The court there held that failure to monitor and analyze drinking water samples

23   was a serious violation. Id.

24          In this case, Defendants not only failed to monitor and report results of water samples, but

25   also reported numerous false results, at best with gross negligence and at worst with conscious

26   intent to deceive. Defendants continue to fail to monitor for lead and copper, as required by law.

27

28   FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                    - 6 -

1  Tr. at 954-55.  Such falsifications and failures to report were not isolated incidents.  In addition

2  to the failures to report and falsifications adjudicated by this Court on summary judgment, the

3  evidence at trial included proof of even more falsifications.  William Ray, an investigator for the

4  State of California's Environmental Laboratory Accreditation Program, testified that documents

5  found at Alisal's testing laboratory tended to support positive sample results, not the negative

6  results reported by Alisal to regulators in the mid-1990s.  Tr. at 321. Mr. Ray further testified that

7  Alisal submitted laboratory results showing that approximately fifty analyses had been

8  performed, while the supporting documentation provided by the testing laboratory demonstrated

9  that only a fraction of the reported constituents had been sampled for.  Tr. at 324-38.  In one

10  instance, incredibly, Alisal claimed some fifty results for a sample that did not even exist.  Id.

11       The evidence at trial also gave reason for concern that such falsifications may be

12  continuing.  James Hively of the Monterey Bay Aquarium Research Institute (MBARI), a

13  customer of Defendants' Moss Landing system, testified that he sampled for nine months in 2000

14  at the Moss Landing system and obtained numerous coliform positive results from both within

15  and outside of MBARI.  Tr. at 355-74.  At the same time, Alisal reported uniformly negative

16  samples for the system to regulators.  Plaintiff's Trial Exhibit ("Pl. Exh.") 106.  Alisal's results

17  for the Vierra Canyon system also were clean during this time period.  Id.  Yet, once the

18  Monterey County Health Department ("MCHD") got involved, it found widespread

19  contamination at both systems.  Tr. at 435-37; 476-77.  This contamination led to boil water

20  orders for both systems.  Only at this point did defendants' results begin to show contamination.

21  See Exh. 3, 5 to Decl. of Cheryl Hall (10/1/01).

22       Although they object to the Court drawing any adverse inferences from these facts,

23  Defendants offered no credible innocent explanation at trial for the inconsistent results.  Several

24  explanations are possible, but none of them reflects favorably on Defendants.  Either Defendants'

25  samples or their supporting documentation were tampered with, the water tested was not drawn

26  properly from the subject systems or some type of incompetence or mistake led to inaccurate

27  results.  The government's expert, Gene Reade of the State Department of Health Services

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (BAI)

- 7 -

1   ("DHS"), questioned expressly the accuracy of the Moss Landing results, Tr. at 1112-13, as did

2   Cheryl Hall of the MCHD. Tr. at 907. Mr. Reade was even more critical with respect to the

3   results from the Vierra Canyon system, stating that he could not understand, given the extreme

4   state of disrepair of the system (one of the worst he has seen), how the system did not produce a

5   single positive coliform result for years prior to the boil water order. Tr. at 1123, 1141. The

6   Court found Mr. Reade's testimony credible.

7          Defendants' unlawful and, at times, unscrupulous behavior clearly undermines the Act,

8   and, in fact, hardly could do more damage to it. Accordingly, the Court finds that the violations

9   are serious. See United States v. Smithfield Foods, Inc., 972 F. Supp. 338, 348 (E.D. Va. 1997),

10  aff'd in part, rev'd in part, 191 F.3d 516 (4th Cir. 1999) ("When a permittee falsifies DMRs

11  [pollution monitoring reports], fails to maintain supporting records, or destroys records, the

12  permittee may be covering up serious violations of effluent limitations. . . . Since the Clean

13  Water Act relies on self-reporting of permittees, such violations undermine the Act and are

14  considered serious . . ."); Hawaii's Thousand Friends v. City & Cty of Honolulu, 821 F. Supp.

15  1368, 1384 (D. Haw. 1993) (noting that the failure to report is more significant than the violation

16  because it deprives the regulatory agency critical opportunity to investigate and rectify the

17  situation).[3]/

18          2.     The Violations Have Had a Serious Impact on Users

19          The violations in this case also are serious in terms of the toll they have taken on Alisal's

20  users. The customers of the Moss Landing system were subject to a five-week boil water order

21  in 2000 because of the widespread contamination present in that system. Tr. at 439, 469. Those

22  customers included residences, educational facilities, restaurants and live-aboard boats. Tr. at

23  429-32. At the time of trial, customers of the San Jerardo system were using bottled water for all

24  _____

25  [3]/    The critical importance of timely and accurate self reporting has been highlighted and
        emphasized in a number of SDWA cases. See, e.g., United States v. Neskowin Enterprises, Inc., 10
26      Envtl. L. Rep. 20622, 20626, 1980 WL 98393 (D. Or. June 3, 1980); In re Sunbeam Water Co.,
        Docket No. 10-97-006, 1999 EPA ALJ LEXIS 79 at * 25 (October 28, 1999); In re: Leisure Valley
27      West et al., Docket No. SDWA-III-023 et al., 1999 EPA ALJ LEXIS 53 at *14 (June 25, 1999).

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                    - 8 -

1   consumption needs as a result of nitrate contamination. Tr. at 1865. Although clearly a major

2   inconvenience for these individuals, the plight of the Moss Landing and San Jerardo customers

3   pales in comparison to that of the customers of the Vierra Canyon system who were forced to

4   boil their water for ten months in 2000-01. Tr. at 909, 940.

5          The Court heard testimony from Carl Chase, a customer of the Langley Valle/Pacifico

6   system, that the water provided by Defendants on at least one occasion burned his daughter's skin

7   and was deemed undrinkable by his family. Tr. at 695, 686. There also was evidence that

8   Defendants' water, when it actually was being provided and had adequate pressure, caused

9   gastrointestinal distress and had strange colors and odors, and that these conditions persisted for

10  more than a year in the case of the Langley system and for long periods at Vierra Canyon, Buena

11  Vista, and Alco. Pl. Exh. 70, 71, 162-69, 170-76; Tr. at 634-35, 709, 424, 508, 942, 676;

12  30(b)(6) Depo. of Alisal et al. (11/3/98) at 30-34, 54.

13         3. The Violations Pose a Serious Threat to Public Health

14         Defendants' actions posed a serious health threat because they resulted in the provision

15  of water that repeatedly failed the MCL for total coliform. See 114 F. Supp. 2d at 932. Failure

16  of this MCL has been deemed serious by a number of courts. City of North Adams, 1992 WL

17  391318, *1-2 ("MCL violations for coliform bacteria are particularly grave . . . the presence of

18  coliform is an indicator of the potential existence of pathogens in water . . . These intestinal

19  microbiological organisms pose a keen threat to persons, especially the young or the elderly, who

20  ingest them. . . . Although plaintiff documented no mass outbreaks of illness, the enhanced risk

21  of disease sufficiently demonstrates the gravity of the coliform MCL violations."); see also

22  United States v. Midway Heights County Water Dist., 695 F. Supp. 1072, 1076 (E.D. Cal. 1988);

23  Neskowin Enters., Inc., 10 Envtl. L. Rep. at 20626.

24         The government submitted the testimony of Dr. Paul Berger, a toxicologist. Dr. Berger's

25  testimony indicates that the presence of total coliforms is a good indicator of the vulnerability of

26  a system to bacterial and other viral pathogens in a water supply. Written testimony of Paul

27  Berger at ¶ 14. Defects in a system's integrity that allow total coliforms to live also allow for the

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

- 9 -

1  entrance of fecal pathogens, which cause any number of diseases. Id. In Dr. Berger's opinion,

2  the data in this case suggest that the Alco, Moss Landing and Vierra Canyon systems were and

3  may still be vulnerable to fecal pathogens. Id. at ¶ 19. Moreover, the absence of evidence

4  demonstrating actual illness is not proof that such illness did not occur. Id. at ¶ 20.[4]/ According

5  to the literature relied upon by Dr. Berger, waterborne disease is greatly underreported for a

6  variety of reasons, and an incidence of waterborne disease may occur even without a

7  community's knowledge. Id. at ¶¶ 20-22. As this Court has found, instead of re-sampling and/or

8  treating water that tested positive for total coliform, or informing health department officials who

9  could take appropriate action, Defendants simply failed to report positive results or falsely

10 reported instead that the water was safe. 114 F. Supp. 2d at 932. Users thus were put at

11 additional risk.

12      Further, Defendants failed to sample their water for lead and copper contamination when

13 they were required to do so, id. at 936, and thus obtained no data which could be used to

14 determine if users were at risk from excess lead and or copper between 1994 and 1998. When

15 such sampling finally was undertaken in 1998, the copper action level was exceeded at

16 NORMCO and Vierra Canyon. Pl. Exh. 83. This is a potentially serious health issue. As the

17 government's expert, Dr. Paul Mushak, testified, copper is associated with acute and chronic

18 effects, and copper at the levels found in Defendants' water poses an unacceptable risk of liver

19 damage in infants. Tr. at 718-29.

20      The seriousness of the violations was exacerbated by Defendants' repeated letters to their

21 customers containing misleading information, including letters indicating that samples were free

22 of coliform when in fact the samples contained high levels of chlorine that likely masked the

23 presence of coliform. Tr. at 445-47; 453-54; 501. Defendants added to a potentially dangerous

24 situation at the Moss Landing and Vierra Canyon systems by publishing a letter to their

25 customers in the local newspaper in September 2000. Pl. Exh. 209. The letter intimated that the

26 ─────────────────────────

27 [4]/   In fact, there was evidence of complaints of gastrointestinal distress from Moss Landing
   users. Pl. Exh. 70, 71.

28 FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                    - 10 -

1    water in those systems was safe, even though Boil Water Orders were then in effect at the

2    systems. Customers' health could have been at risk if the customers believed the misstatements

3    and thus did not comply with the Boil Water Orders.

4              4.    Defendants Presented No Compelling Counter-Evidence
                     Regarding Seriousness of the Violations

5         Defendants did not produce any compelling evidence to contradict a finding that the

6    violations are serious. Indeed, Tom Adcock conceded that many of the violations were in fact

7    serious. Tr. at 1899-1901. As to certain months in which positive coliform samples were

8    omitted from reports submitted by Defendants to State regulators, Defendants offered the

9    explanation that perhaps these results were received late by the water systems. Tr. at 1450. In

10   addition to the fact that there is no evidence supporting this theory, the explanation is no defense

11   at all. If, after it submitted its monthly report, Alisal learned that in fact it had a number of

12   positive coliform sample results, it had an obligation to amend its report. It failed to do so. The

13   reasonable inference is that the reports were intentionally falsified, or at best that Defendants

14   knowingly permitted inaccurate reports to remain uncorrected.

15        As to the potential impact of their conduct on public health, Defendants assert that the

16   amount of copper in drinking water sanctioned by EPA essentially is too protective of human

17   health and that copper levels above the EPA limit are not harmful. Tr. at 835. However, the

18   studies upon which their expert, Dr. Becking, relies are not generally accepted in the United

19   States, and Dr. Becking's opinion recently has been rejected by the National Academy of

20   Sciences. Tr. at 835, 836-39. As to the many positive coliform samples, defendants offer nothing

21   other than their view that the absence of fecal or e coli contamination shows that the violations

22   were not serious. This claim is contradicted by Dr. Berger's unrebutted expert testimony.

23        C.    The Evidence Demonstrated that Defendants Have a Long History of Violations

24        The evidence at trial offered voluminous, detailed proof of Defendants' fifteen year

25   history of non-compliance with drinking water laws and regulations. Although Defendants

26   showed that most of the reporting violations adjudicated by the Court occurred in the early 1990's

27

28   FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                               - 11 -

1   and that their record of compliance in this respect improved beginning in late 1994, the

2   government established that reporting violations, inaccurate test results and unreasonable delay in

3   addressing incidences of contamination characterized Defendants' management of the water

4   companies through and including the time of trial.

5           In its order granting the government's first motion for summary judgment, this Court

6   found violations by Defendants of the Total Coliform Rule ("TCR"), 40 C.F.R. Part 141 (various

7   sections), beginning in 1991. 114 F. Supp. 2d at 932. In its order granting the government's

8   second motion for summary judgment approximately a year later, the Court found that there were

9   additional violations of MCL for total coliform even after summary judgment was granted. Nov.

10  8, 2001 Order at 5.[8]/  Defendants had actual knowledge no later than 1993 of the regulation

11  requiring them to sample their drinking water for the presence of lead and copper, when they

12  received a Notice of Violation from EPA with regard to the Alco system. Tr. at 1858.

13  Nevertheless, most of Defendants' systems did not test for lead and copper until 1998. See 114

14  F. Supp. 2d at 936. Defendants admit they only did so on advice of counsel. 30(b)(6) Depo. of

15  Alisal, et al. at 79.

16          In addition to the violations adjudicated on summary judgment, there was evidence at

17  trial of the following:  in 1986, Alco failed to do required routine and repeat sampling (Pl. Exh.

18  1); in 1987, it still failed to submit required sampling (Pl. Exh. 2); in 1990, both Alco and Toro

19  failed to submit routine sample results as required (Pl. Exh. 7, 8); in 1990 and 1991, both Alco

20  and Toro failed to distribute their annual water quality reports as required (Plaintiff's Exh. 9, 11,

21  12); beginning in 1989 and through 1993, both Alco and Toro failed to monitor for organics,

22  inorganics, minerals and radioactivity (Tr. at 120-23); in 1990, neither Moss Landing nor Blackie

23  Road tested for coliform as required (Pl. Exh. 68, 69); in 1990, San Jerardo had coliform in its

24  water as found by the County (Pl. Exh. 72, 73); Wildwood's water also showed coliform in 1990

25  (Pl. Exh. 74); in 1991 and 1994, Vierra Canyon's water showed coliform as found by the County

26  ———————————————————————

27  [8]/     The November 8, 2000 Order addressed the 2000-01 MCL violations at Moss Landing
    and Vierra Canyon.

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                    - 12 -

(Pl. Exh. 75, 77); in October 1993, Toro failed to submit its monthly bacteriological samples (Pl. Exh. 31); in 1995, the County issued a Compliance Order to Langley Valle/ Pacifico for failure to provide continuous, wholesome and potable water (Pl. Exh. 79); in 1995, Toro failed to take repeat samples within the time required by law (Pl. Exh. 40); in 1995, Wildwood failed to do required follow up sampling (Pl. Exh. 107); in 1995, Defendants exceeded the allowable number of connections at Alco and Toro (a problem that has been ongoing at Alco since September 2000) (Pl. Exh. 41; Tr. at 188-90); and in 1996, the County again ordered Langley Valle/ Pacifico to address its water quality problems (Pl. Exh. 81). From 1994 until the summer of 1998, Defendants were in continuous non-compliance with the lead and copper rule. See 114 F. Supp. 2d at 936. Moreover, as Cheryl Hall of MCHD testified, Defendants are again behind on lead and copper testing for almost all of their systems, despite this Court's August 2000 Order finding Defendants liable as to Count Nine of the operative complaint, which alleges violations of the lead and copper rule. Tr. at 954-55.

Defendants' history also is notable for ongoing customer complaints about water quality: in 1990, people at Moss Landing complained about stomach problems (Pl. Exh. 70, 71); in 1993, customers at Pine Canyon complained about water quality (Pl. Exh. 76); in 1995, people at Vierra Canyon also complained about water quality (Pl. Exh. 78). As Carl Chase testified, his group of homeowners complained about water quality at Langley/Valle Pacifico from 1995 until early 1997, and again from the summer of 2000 to the summer of 2001. Pl. Exh. 162-69; 170-76. From 1994 to 1998, the County received an unusually high volume of complaints from the users at Buena Vista about water quality, water outages and water pressure. Tr. at 634-35.

The history of non-compliance continued through the late 1990s. In July of 1998, Elizabeth Karis of the MCHD advised Moss Landing to implement a cross control prevention plan to prevent the entrance of contaminants into the domestic supply. Pl. Exh. 109. As numerous witnesses testified, this still was not done by the summer of 2000, perhaps causing the Moss Landing boil water order. See, e.g., Tr. at 451-52. When the County went to look for records of the cross connection plan in 2000, for the most part such records did not exist. Tr. at

644. Additionally, in December 1999, the Vierra Canyon system failed the MCL for iron. Pl. Exh. 99. Defendants' violations of primary drinking water standards continued even during the pendency of the trial: Alisal failed the MCL for total coliform at San Jerardo in December 2001. Pl. Exh. 224, 225.

D.    Defendants Have a Demonstrated History of Combativeness with Regulators

Perhaps the most vexing aspect of this case from the Court's point of view is the manner in which Defendants have interacted with regulatory agencies over the past decade. While regulators make mistakes, and any person or entity subject to governmental regulation has the right to disagree with regulators and seek legal redress when it is appropriate to do so, Defendants' conduct, as discussed above, reflects a persistent pattern of non-compliance with the most basic responsibilities of a public utility. Accurate, timely testing and reporting and a prompt, effective response to unsafe conditions hardly are too much to ask of a provider of public drinking water.

As the evidence at trial demonstrated, Defendants typically made little or no effort to comply when their inadequate performance was pointed out to them. Rather, State and County regulators devoted years in fruitless efforts to obtain better performance from the companies.[6/] Cathy Ma of the DHS testified to repeated reminders to the companies that they needed to take routine bacteriological samples monthly, the most basic aspect of the Act's monitoring regime. Pl. Exh. 1, 2, 7, 8, 21, 31. There was similar evidence of the defendants ignoring repeated reminders to prepare and distribute annual reports to consumers and conduct chemical testing on their wells. Pl. Exh. 9, 11, 12, 15, 16, 17, 18, 22, 23. Indeed, Ms. Ma testified that in the early 1990s, the State spent on average ten hours per year on enforcement-related activities for large

---

[6/]    In California, the State DHS is the agency with primary enforcement responsibility with respect to public water systems. The DHS in turn has agreements with local primary agencies ("LPAs") under which the LPAs enforce the SDWA as to certain public water systems. One such LPA, the MCHD, has primary enforcement responsibility with respect to some of the water systems at issue in this action while the DHS retains primary enforcement responsibility with respect to others. 114 F. Supp. 2d at 930.

FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

- 14 -

1  systems. Tr. at 193-95. In contrast, it spent hundreds of hours on enforcement activities for Alco

2  and Toro in those years. Id.

3           The evidence with regard to the small, County-regulated systems is the same. Mary Ann

4  Dennis of MCHD testified that even prior to 1990, it was very difficult to work with Defendants.

5  Tr. at 404. They often failed to follow through on promised actions, and the County received a

6  high volume of complaints about the companies. Id. Further, as Ms. Dennis and Cheryl Hall

7  testified, Defendants' record in this regard has not improved. Tr. at 512, and generally 890-940.

8           Rather than comply with directives from regulators, Alisal's overarching regulatory

9  philosophy has been to litigate when challenged and to give no ground. Consequently, Alisal has

10  chosen to file several petitions for writ of mandamus strenuously opposing various citations

11  issued by the State and County. At least some of the arguments in support of these petitions

12  appear hyper-technical or even frivolous. Norman Knoll, counsel to DHS, testified that Alco

13  filed three writ petitions against the State regarding three citations issued in 1993. Written

14  testimony of N. Knoll at 3. The directives in these citations are so minimal that a company

15  interested in compliance easily could have complied and tried to do better in the future. Pl. Exh.

16  21, 22, 23. Yet, rather than comply and devote itself to providing safe water, Alisal chose to

17  fight, thus setting in motion the current lawsuit. Tr. at 172.

18           The same approach of litigation rather than cooperation can be seen by examining the

19  citation by the County regarding the 2000 Moss Landing incident. Pl. Exh. 96. The directives

20  are minimal: hire an independent sampler; have the lab send copies of results directly to the

21  County; submit a report regarding the cause of the contamination; implement a cross connection

22  control plan; cease adding unapproved chemicals to the water supply; and submit information on

23  the number of connections. Id. These requests are little more than what the law on its face

24  requires. Even Tom Adcock testified at trial that the company had no real problem with any of

25  these requests. Tr. at 1880. Yet rather than simply comply, Alisal hired an attorney to contest

26  the citation and file suit in state court, contending (contrary to established law) that Defendants

27  were entitled to a hearing on the citation before it was issued and claiming that the water at Moss

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                      - 15 -

1    Landing was not drinking water so it was acceptable to add unapproved chemicals to it. Pl. Exh.

2    100, 101. Alisal's own notice to customers stated that the water could be consumed after boiling.

3    D. Exh. 65. Indeed, the act of boiling water can serve to concentrate chemicals present in the

4    water. Tr. at 1110-11.

5         The record in this case is replete with evidence of Defendants' acts of intransigence and

6    lack of cooperation with regulators:

7    •    Every one of the citations issued by the State showed repeated, but unavailing, informal
          efforts to obtain compliance through repeated phone calls and letters that went
8         unanswered. Pl. Exh. 1, 2, 7, 21, 22, 39.

9    •    Rather than use State-approved language in a required notice to customers concerning
          the November 1992 MCL failure at Alco, the Adcocks sent a letter to Alco users with
10        misleading and false information. Tr. at 157-60.

11   •    Tom Adcock, in response to a request by the State for information concerning the number
          of service connections at Alco and Toro, delivered fifteen boxes of documents at the State
12        offices and told the State officials to figure it out. Tr. at 394-95.

13   •    Tom Adcock added a non-approved chemical to the water system at Vierra Canyon even
          though Gene Reade of DHS personally instructed him not to add the chemical – sodium
14        thiosulfate – and despite the fact that, as Mary Anne Dennis testified, one easily could
          determine that the substance was not approved for human consumption by looking on the
15        Internet. Tr. at 456-57, 1108-09.

16   •    Tom Adcock wrote a number of letters to Mary Ann Dennis with respect to her request
          that Alisal not add chemicals to the systems without permission. Pl. Exh. 91, 93, 94. As
17        Ms. Dennis testified, it seemed obvious that she was referring to substances such as the
          sodium thiosulfate, not regular disinfection after work on the system. Tr. 463-64. Ms.
18        Dennis testified that it was, and remains, typical of Tom Adcock to question the County's
          directives in this manner. Tr. at 462.
19
     •    In October 2000, Tom Adcock told Elizabeth Karis that he would fight the County on its
20        request that Alisal automate the Vierra Canyon system. Pl. Exh. 111.

21   •    During the boil water events at Moss Landing and Vierra Canyon, Alisal failed to include
          language requested by the County in letters Alisal sent to customers. Tr. at 445-46; 452-
22        54. As a consequence, the letters were misleading and the County was forced to post
          accurate information on a daily basis at the local post office. Id.
23
     •    Defendants published an advertisement in September 2000 in the local newspaper which
24        contained several misleading statements about this Court's summary judgment Order,
          including that the Court did not find that Alco falsified lab reports or hid violations and
25        that the Court's findings suggested paperwork violations. As Tom Adcock admitted, the
          company was involved in the drafting of this document. Pl. Exh. 209; Tr. at 1840.
26
     •    Even though Carl Chase, a customer of the Langley/Valle Pacifico system, was able to
27        identify for Alisal the amount of chlorine that needed to be kept in the system for the

28   FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                              - 16 -

water to be acceptable, Alisal did not maintain this level of chlorine, but allowed its customers to suffer with poor water quality. Tr. at 692. The best an Alco technician could do, Mr. Chase testified, was simply shrug his shoulders. Tr. at 686. Tom Adcock also instructed Mr. Chase not to talk to his technicians. Tr. at 707.

- Defendants' defiant behavior prolonged the Vierra Canyon boil water order for months. Tr. at 919-39. In Mary Ann Dennis's view, the Vierra Canyon contamination event should have been resolved within two months, not the ten months it took. Tr. at 506.

- Even though the County had told Alisal in the early fall what was required for the Vierra Canyon Boil Water Order to be lifted and the chlorination permit to be granted, Tom Adcock continued to write letters asking that the order be lifted when these conditions had not been met. Tr. at 919-39. At the same time, the company failed to communicate with Ms. Hall about what it was doing to resolve the problem. Tr. at 9924.

- Alisal failed to instruct its sampler to take chlorine residual readings at Vierra Canyon even though, as Mary Ann Dennis testified, this issue had repeatedly been raised to the company. Tr. at 501-04.

- The report of the independent engineer concerning the Vierra Canyon contamination event that was requested by the County in October 2000 was not provided until May 2001, despite the fact that it was completed by the engineer in December 2000. Tr. at 926, 937.

- Alco failed to make diligent efforts to communicate to its customers about the status of the boil water orders. The County received complaints from users at Moss Landing that they were not told of the initiation of the boil water order, and from users at Vierra Canyon that they did not know of the lifting of that order. Tr. at 941, 448.

- Regarding San Jerardo, Alisal could have and should have taken a proactive approach to the impending nitrate MCL failure by seeking permission to dig a new well or install treatment. Tr. at 670-73. Rather, Alisal allowed the MCL to be violated, thereby necessitating the provision of bottled water. Id.

- Alisal corresponded with regulators and paid bills on behalf of the tiny El Camino Real system for ten years, never hinting that it did not own the system until August 2001, when it learned the MCL for nitrates has been exceeded, at which time it claimed it had no connection to the system. Tr. at 949-52.

The only times that the regulators were able to get timely compliance from Defendants were when threats were made that would have had an immediate impact on Alisal's bottom line. The State was able to get the chemical test results it had been seeking for three years within 72 hours when it threatened to shut down one of Defendants' wells in June 1994. Tr. at 169-70. The State was able to get information on service connections at Alco in 1995 when it imposed a moratorium on new connections. Tr. at 188-89. With these dramatic exceptions, Defendants'

FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

- 17 -

1  record of cooperation with regulators' legitimate requests is dismal.[2]/

2           E.  Defendants Repeatedly Have Failed to Accept Responsibility for Their Conduct

3           Defendants' approach at trial, as it appears to have been for more than ten years, was

4  either to minimize the significance of their own conduct or to blame the situation on the

5  regulators.  For example, Patricia Adcock testified that it was Alisal's lawyer, not herself or

6  anyone else connected with the companies, who drafted the letter to Alisal's customers that

7  mischaracterized this Court's summary judgment Order.  Tr. at 1457.  Yet Defendants admit that

8  they reviewed the advertisement before it was published.  Tr. at 1840.

9           Mrs. Adcock suggested that the County was responsible for Alisal's chronic non-

10  compliance since it did not keep the company adequately apprised of regulatory developments.

11  Of course, it is Alisal that is charged with that responsibility.  Emery Mining Corp. v. Secretary

12  of Labor, 744 F.2d 1411, 1416 (10th Cir. 1984).  Notwithstanding that responsibility, Mrs.

13  Adcock testified that she never read the text of the SDWA or its implementing regulations.  Tr. at

14  1485.

15           Defendants also suggest that the County was  responsible for the fact that the Vierra

16  Canyon boil water order was not lifted for ten months.  See generally testimony of Tom Adcock.

17  The evidence clearly showed, however, that the system was responsible for the fact that Order

18  extending for as long as it did.

19           Defendants' theories are not supported by the evidence.  Virtually all of the state and

20  county regulatory personnel who testified at trial described how difficult it was to obtain the most

21  basic cooperation from Defendants, how the amount of time they devoted to dealing with

22  problems related to these water companies far exceeded the time they were required to spend

23

24  [2]/      The duration and extent of Defendants' history of non-compliance leads the Court to
25  conclude that the drastic remedy of a receivership is not only justified but also necessary.  There is
    very little in the record which would suggest that Defendants reasonably could be relied upon to
26  change their entire corporate culture simply because this Court issued an injunction.  In fact,
    Defendants' evident misunderstanding of the significance of this Court's order granting the
27  government's motion for summary judgment very much suggests the opposite.

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                              - 18 -

1   overseeing other utilities under their jurisdiction and how defendants typically tended to take
2   matters into their own hands rather than work with regulators. There was no credible evidence
3   that any regulatory agency was overzealous or exceeded its authority in its dealings with
4   Defendants. To the contrary, the evidence showed that in virtually every instance, the regulators
5   made extensive efforts to resolve matters informally with Defendants before taking any official
6   action and sought only minimal sanctions when they did take action. Defendants responded with
7   objections and litigation. The federal government became involved only when local regulators
8   concluded after years of frustration that they lacked sufficient resources to obtain compliance.
9   Tr. at 172.
10          Given an opportunity at trial to reflect on Defendants' past performance, Patricia Adcock
11  neither took responsibility nor expressed any regret for any past conduct. One might have
12  expected her to testify that she ordered a top-to-bottom review of sampling protocols to ensure
13  that such events did not re-occur. No such testimony was forthcoming. Tr. at 1498-1505. To his
14  credit, Thomas Adcock acknowledged that a number of the violations which occurred in the early
15  1990's were serious in nature and that both the administration and physical infrastructure of
16  defendants' companies require significant modernization. Tr. at 1812-15; 1899-1900. Even he,
17  however, appeared to suggest that Defendants' more recent difficulties at Moss Landing, Vierra
18  Canyon and San Jerardo were the result of unreasonable regulatory demands rather than any
19  serious failing on the part of management. See generally Testimony of Tom Adcock. The Court
20  found the evidence as to actual responsibility for these unfortunate events to be compelling and
21  strongly supportive of the government's position.
22          In short, it is impossible to consider the evidence presented before and at trial and not
23  reach the conclusion that Defendants simply do not appreciate the seriousness of the conduct for
24  which they have been found legally responsible.[8/]
25
26  _____
    [8/]     One only can speculate as to whether the present proceedings would have been necessary had
27  Defendants directed the hundreds of thousands of dollars they apparently have spent litigating their
    disputes with regulatory agencies to improving the infrastructure of the water systems.
28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                        - 19 -

F.    <u>Defendants Lack Sufficient Managerial Competence to Comply with the Act</u>

The evidence at trial shows that Defendants lack the managerial resources and expertise to manage effectively the numerous water systems for which they are responsible, especially the smaller ones. By way of example, there was evidence of the following:

- The contamination of virtually all the systems with bacteria at levels that violated the MCL.

- The failure to prevent dangerous cross connections at Moss Landing despite the fact that the company has two certified water system operators. Tr. at 1100-1106.

- The failure of Defendants' testing to show the true condition of the water at Moss Landing and Vierra Canyon. Tr. at 436, 906-07.

- The failure of Tom Adcock to explain either the contamination or the fact that there was chlorine in the water at Moss Landing. Tr. at 439.

- The failure of Tom Adcock to realize the dangers in adding sodium thiosulfate to the water supply at Moss Landing. Tr. at 1109-10.

- The poor conditions at Moss Landing and Vierra Canyon during the boil water orders, including: a frog present in one of the storage tanks at Moss Landing; holes in the roofs of tanks at the Vierra Canyon system; vegetation growing in tank vents; the failure of Tom Adcock, Jr. to know which tanks were in service at Moss Landing, or how to collect a sample from a storage tank. Tr. at 1094-98, 1123; 910-12.

- The pumphouse at Moss Landing overflowed water because of known defects in the system that management did not fix. Tr. at 891-93.

- No one at the company realized that the well head samples from Moss Landing were showing high chlorine residuals and that, therefore, something was clearly wrong with them. Tr. at 1113-1115; Tr. at 902-03.

- Tom Adcock spent weeks using improper methods to disinfect the tanks and wells at Vierra Canyon but failed to close-up the system to prevent additional contaminants from infiltrating or re-contaminating the system. Tr. at 1124-30, 1136-38.

- Alisal's incompetence needlessly prolonged the boil water order at Vierra Canyon. Gene Reade testified that it typically takes 3-4 weeks to resolve a contamination event like the one at Vierra Canyon and that Tom Adcock's failure to disinfect the system properly prolonged the boil water order. Tr. at 506, 1140, 1143.

- Defendants' incompetence also has resulted in the current nitrate problems

FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

- 20 -

at the San Jerardo system. Cheryl Hall and Elizabeth Karis both testified that a responsible water purveyor would not have allowed the system to worsen to the point where customers were forced to use bottled water. Rather, a responsible operator would have begun the process of digging a new well once the nitrate concentrations in the water began approaching the MCL. Tr. at 670-73, 946-48.

- Cheryl Hall and Mary Ann Dennis both compared Alisal unfavorably to the other public utilities they oversee in Monterey County. Tr. at 509, 955-56.

- Brian McKeown, the United States' expert, testified that the list of things that need to be done to repair and upgrade the Alisal systems demonstrates a lack of proper operation and maintenance. Tr. at 1038-39.

- Both Brian McKeown and Gene Reade testified to a lack of confidence that Defendants have the managerial competence to prevent future violations. Tr. at 1036, 1062-64; 1140-41, 1143. As Mr. McKeown put it, Alisal does not have the human resources necessary to implement the plan required to attain compliance. Tr. at 1062-64.

The Court found no credible evidence disputing these incidences of managerial incompetence.

G. Defendants Lack Sufficient Financial Resources to Comply with the Act

The evidence at trial demonstrates that Defendants lack the financial wherewithal to operate their systems in a manner which will ensure the protection of public health. The evidence is that Alisal needs to invest some $8.3 million over the next five years to bring its systems into full compliance with the law and $750,000 just within the next 12 months. Tr. at 1035, 1058-1060; Pl. Exh. 206, 207A. This is work that is necessary simply to get the water systems into compliance with applicable drinking water regulations. Tr. at 803. As Lynn Putnam of the engineering firm of Black & Veatch, which conducted a comprehensive audit of Defendants' facilities, testified, all the work her firm recommends needs to be done or future non-compliance will likely result. Tr. at 805-06. Indeed, Ms. Putnam testified that it would not be sound management to ignore the capital improvement program recommended by Black & Veatch. Tr. at 806.

Robert Harris, the government's accounting expert whom the Court found credible, testified that Defendants do not have anything approaching the financial wherewithal to invest

FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAJ)

- 21 -

1  the amount of money contemplated by Black & Veatch. Indeed, Alisal as of Dec. 30, 2000, was

2  in the unusual situation of having negative working capital, meaning that the companies have

3  little, if any, ability to meet their current financial obligations. Tr. at 1181, 1185-86; Pl. Exh.

4  180. That negative working capital position is in excess of $3 million. Tr. at 1186. Alisal has

5  approximately $5,000-$6,000 in cash. Id. There is no excess money going into the bank. Tr. at

6  1192-93. The money the company generates in revenues is all accounted for with no money left

7  over for savings. Tr. at 1193. In fact, there is no "extra money" that could be spent on additional

8  projects. Tr. at 1194. Mr. Harris further testified that the company has net annual cash flow of

9  only $54,433. Tr. at 1196. This cash flow, Mr. Harris testified, is insufficient for Alisal to stay

10  current on its obligations given its large working capital deficit. Tr. at 1196. As Mr. Harris

11  testified, there simply is no extra money to make the capital improvements recommended by

12  Black & Veatch. Tr. at 1194.

13          While certain capital expenditures theoretically could be reimbursed in the future by the

14  through general rate increases approved by the California Public Utility Commission ("PUC") ,

15  the fact remains that Alisal will need to borrow substantial funds in the short term to get its

16  systems up to par. Tr. at 1203. As Patricia Adcock testified in her September 2001 deposition,

17  Alisal's need to borrow money is ongoing, as the PUC sometimes takes as long as two years to

18  approve a general rate increase. Patricia Adcock Depo. (9/7/01) at 119. And as Marino

19  Rodriguez, Alisal's comptroller, testified, the PUC does not approve rate increases until after the

20  improvement for which reimbursement is sought has been made. Tr. at 1366.

21          The inescapable conclusion is that Alisal, in both the immediate and intermediate future,

22  will continue to need to find sources of funding independent of any general rate increase

23  ultimately approved by the PUC. The evidence is that Alisal will not be able to do so. As

24  Patricia Adcock herself testified at her September 2001, deposition, given Alisal's dire financial

25  straits, banks will no longer lend money to the companies. Patricia Adcock Depo. (9/7/01) at

26  112-13.

27          Mr. Rodriguez asserted that Alisal can not only pay all its debts, including $3 million

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

- 22 -

1   owed to plaintiffs in unrelated litigation, but also can fund any needed improvements. This

2   assertion is belied by the evidence, including Mrs. Adcock's deposition testimony that the utilities

3   do not have the money to pay the $3 million judgment, let alone any other debts and cost of

4   improvements, and that Alisal's stock is worthless. Tr. at 1378-79; Patricia Adcock Depo.

5   (9/7/01) at 87-88.   The Court also heard uncontroverted evidence from Mr. Harris that neither

6   the Adcocks individually nor the Trusts into which they transferred various assets have sufficient

7   funds to contribute to the necessary capital improvements. Tr. at 1205-07; Pl. Exh. 180.

8                                 **III. EQUITABLE RELIEF**

9         Defendants note appropriately that the appointment of a receiver is a drastic remedy and

10   that the Court must consider carefully whether a less drastic remedy would be sufficient to

11   protect public health. The Court has considered several alternatives, including not ordering any

12   equitable relief at all. The evidence at trial, however, suggests powerfully that significant

13   equitable relief, including the appointment of a receiver for certain specified purposes, is

14   warranted here.

15         The Court concludes that to maintain the status quo, that is, to allow Defendants to

16   continue to operate all of the water companies without judicial oversight, would be a total

17   abdication of its judicial responsibility. This is readily apparent in light of the fact that even after

18   numerous citations and orders were issued to defendants by state and local authorities, and even

19   after this Court granted summary judgment with respect to more than 200 violations of the Act,

20   significant violations of the Act continued. Indeed, further serious violations occurred even

21   during trial. The seriousness, duration and willfulness of Defendants' non-compliance with legal

22   requirements are evidence of a corporate culture which simply "doesn't get it," in which both

23   regulations and regulators are seen as an inconvenience rather than a means of protecting the

24   public. Moreover, as noted above, the evidence shows that Defendants lack the managerial

25   resources and expertise to manage effectively the numerous water systems for which they are

26   responsible, especially the smaller ones.

27         While Defendants argue that the near absence of alleged violations between late 1994 and

28   FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

1    1998 shows that Tom Adcock's assumption of day-today management of the companies has

2    improved greatly the companies' compliance with the law, the protracted boil orders at Vierra

3    Canyon and Moss Landing happened on Tom Adcock's watch. The testimony as to those very

4    recent events reflected many of the same patterns of denial, minimization, blaming others and

5    simply not getting things done that characterized the tenure of the senior Adcocks. Although it

6    was impressed with Tom Adcock's sincerity and has no doubt that his subjective intent is to do

7    the right thing, the Court concludes that under present circumstances Defendants lack both the

8    managerial and financial wherewithal to operate in a manner which will ensure the protection of

9    public health.

10        The Court has considered carefully and at length whether it should limit its grant of relief

11   to an injunction requiring Defendants to implement some or all of the recommendations of the

12   Black & Veatch report. While this option is tempting because it would be less drastic and less

13   administratively cumbersome than a receivership, the evidence supports the conclusion that

14   ultimately it would be ineffective. As noted earlier, Defendants clearly lack the financial

15   resources to implement the Black & Veatch recommendations. There was no credible evidence

16   that at any time in the near future they could borrow enough money to fund the recommended

17   improvements or that they could count on regulatory approval of a rate increase to pay back

18   lenders. The smaller water systems in particular suffer from basic, chronic, physical

19   inadequacies, correction of which will require an immediate and significant infusion of funds.

20        The Court appreciates and respects the decades of hard work the Adcock family has

21   devoted to its water companies. But the Court has the responsibility in this case of crafting a

22   remedy that is protective of public health, and this responsibility necessarily takes preeminence

23   over all other considerations. Although not binding on this Court, California's expressed public

24   policy regarding small troubled water systems is relevant to the case before the Court. Section

25   855 of the Cal. Public Utilities Code expressly provides for the appointment of a receiver to run a

26   water utility where the water utility is "unable or unwilling to adequately serve its ratepayers."

27   That clearly is the case here. The Court concludes that some form of receivership is necessary in

28   FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

- 24 -

1  this case to protect public health and to effectuate the purposes of the SDWA.[9]/

2       At the close of trial, the Court raised <u>sua sponte</u> the possibility of a partial divestiture

3  which would permit defendants to continue to operate Alco, their one mid-sized system, while

4  being required to sell the others. The Court believes that there are a number of bases in the

5  record for such a disposition. First, the most severe recent violations have occurred in smaller

6  systems such as Vierra Canyon, Moss Landing and San Jerardo. By contrast, the Alco system

7  has operated for the most part without incident since Tom Adcock assumed <u>de facto</u> management

8  of the companies. Second, despite the fact that Alco serves many more customers than any of the

9  other systems, the immediate capital improvements recommended by Black & Veatch with

10  respect to Alco are relatively modest; in contrast, the cost of improving small systems such

11  Normco, San Jerardo and Vierra Canyon in each instance is more than double that associated

12  with Alco. <u>See</u> Pl. Exh. 207A.[10]/ Third, to the extent that deficiencies in management are one of

13  the sources of Defendants' continuing inability to meet their legal obligations, it is logical to

14  conclude that managing one mid-sized water company will be easier than trying to manage a far-

15  flung empire of small ones. Finally, such a remedy would be less drastic than the full divestiture

16

17  [9]/    Also relevant is the testimony of defendants' PUC expert, Carl Danner, who testified that it
18  is the current policy of the PUC to seek to facilitate the sale of small, troubled water systems to
    larger, more reputable water companies. Tr. at 1337-38; Pl. Exh. 219. That is because, as Mr.
19  Danner testified, the California Legislature has found, as codified at Section 2719 of the Pub. Utility
    Code, that public water systems are faced with the need to replace or upgrade infrastructure to meet
20  increasingly stringent safe drinking water laws; and because increasing amounts of capital are
    required to finance the necessary investment in public water system infrastructure; and because
21  economies of scale are achievable in the operation of public water systems. Tr. at 1336-37; Pl. Exh
    218. As Mr. Danner further testified, the PUC has recognized that larger companies can bring more
22  resources to bear in emergency situations; have greater management and operational expertise; and
    have greater access to funding for infrastructure needs than do small troubled systems. Tr. at 1331-
23  33; Pl. Exh. 218.
24

25  [10]/    The Court acknowledges, as the government points out, that Black & Veatch recommends
    additional capital improvements to the Alco system which could cost as much as $2.7 million.
26  However, if Defendants prove that they are capable of managing this single system effectively, the
    prospects of their raising the necessary funds either through financing or rate increases within the
27  time frames recommended by Black & Veatch would appear to be less speculative.

28  FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (BAI)

1    requested by the government while at the same time having some realistic prospect of success in

2    ensuring that the public receives safe drinking water.

3        The Order Appointing Equitable Receiver issued herewith provides for:

4        1. An injunction requiring Defendants to implement the recommendations of the Black &

5    Veatch report with respect to Alco, forthwith as to those items designated by the United States'

6    expert, Brian McKeown, as "immediate" needs and within the recommended time frames as to

7    all remaining items;[11]/

8        2. Appointment of a receiver, to be compensated by Defendants, to assume management

9    of all of the water systems with the exception of Alco;

10       3. An order instructing the receiver to assess the feasibility of selling all of the water

11   systems other than Alco either separately or in combination and to report the results of such

12   assessment to the parties and to the Court;

13       4. An order instructing the receiver, either personally or with the assistance of a retained

14   expert to be compensated by Defendants, to monitor Defendants' compliance with both the

15   injunction and all applicable laws and regulations and to report the results of such monitoring to

16   the parties and to the Court; and

17       5. An order reserving the Court's jurisdiction to enter such further orders as are

18   appropriate in the event that some or all of the water systems other than Alco cannot be sold,

19   considering inter alia defendants' compliance with the injunction and with their legal obligations

20   generally.

21       The Court has given serious thought to the government's proposal that the Court order

22   immediate divestiture of all of the water companies.  It should be obvious from the foregoing

23   discussion that the Court believes that Defendants' conduct as shown by the evidence fully

24   _____

25   [11]/    Defendants argue that PUC approval will be required for some or all of these improvements.
     As the government correctly notes in its motion to strike Defendants' objections, there is no
26   evidence in the trial record which would enable the Court to assess this argument.  Obviously, if
     regulatory requirements of the PUC or any other agency constrain Defendants' ability to comply with
27   this Court's orders, the Court will take such requirements into account in overseeing Defendants'
     compliance.
28   FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

                                        - 26 -

1   justifies such a step. The Court nonetheless is constrained by the case law and by general

2   principles of equity to explore the effectiveness of a less drastic remedy. The disposition

3   outlined above addresses immediately the most dysfunctional elements of Defendants'

4   operations, the small water systems, while giving Defendants a clear opportunity to demonstrate

5   that they can operate at least one water system in compliance with the law. Should the

6   disposition prove to be impracticable, either because the smaller systems cannot be sold unless

7   they are "packaged" with Alco or because Defendants cannot or do not comply with the

8   injunction or their legal obligations, the Court retains the ability to order full divestiture, and it

9   will not hesitate to do so should circumstances warrant.

10

11   Dated: _____  _____

12                                         JEREMY FOGEL

                                             United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW, C97-20099 JF (EAI)

- 27 -

Filed

APR 0 9 2002

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )      CASE NO. C97-20099 JF (EAI)
                                    )
          v.                        )      ORDER APPOINTING EQUITABLE RECEIVER
                                    )
ALISAL WATER CORPORATION,           )
ET AL.                              )
                                    )
                                    )
          Defendants.               )
                                    )

          Having conducted a bench trial in the above-entitled matter on December 4-7, 2001,

December 18-20, 2001, and January 7-8, 2002, to determine the appropriate relief in this case;

having considered the pre-trial and post-trial briefs submitted by the parties as well as Plaintiff's

proposed form of order and Defendants' objections thereto; in light of Defendants' lengthy

history of failing to provide healthful drinking water in compliance with the Safe Drinking Water

Act ("Act"), 42 U.S.C. § 300f et seq. and the clear potential for imminent violations of the Act by

the Defendants in the future; because of the failure of less drastic remedies to secure Defendants'

compliance with the Act in the past; in view of the broad range of equitable powers available to

this Court to enforce and effectuate its orders and judgments; and good cause therefore

appearing, the Court hereby ORDERS that a Receiver be appointed to assume management of

1    the following drinking water systems owned and operated by Defendants (collectively, "The

2    Water Systems"): Toro Water Service, Inc.; Moss Landing Water Service, Inc.; North Monterey

3    County Water Service, Inc.; Blackie Road Water System # 18; San Jerardo Water System; Vierra

4    Canyon Water System; Langley/Valle Pacifico Water System; and Buena Vista Water System.

5    The Defendants shall maintain control of Alco Water Service ("Alco") which, for purposes of

6    this Order, is not considered part of The Water Systems. The Receiver shall, however, have

7    certain monitoring responsibilities with respect to Alco as described below.

8           The legal and factual basis for this Order is set forth with particularity in the Court's

9    Findings of Fact and Conclusions of Law issued simultaneously herewith.

10                   I. **General Powers, Authorities and Duties of the Receiver**

11          A. Pending an investigation of the feasibility of selling The Water Systems, the Receiver

12   shall have the following powers, authorities and duties with respect to management of The Water

13   Systems, consistent with applicable laws and regulations, including any requirements of the

14   California Public Utilities Commission (PUC):

15              1. To pay and collect bills; to incur debt; to hire necessary assistants, consultants,

16   contractors, attorneys and engineering firms; to hire and fire personnel; and to acquire and repair

17   capital equipment.

18              2. In his or her discretion, to perform all acts deemed necessary to achieve and

19   maintain, as expeditiously as possible, full compliance with the Act and with all other applicable

20   laws and regulations, including but not limited to the following: to sell and convey corporate

21   property as necessary to manage The Water Systems; to impose lawful charges for water service

22   upon customers of all The Water Systems and to collect such charges; to apply to the PUC for

23   rate increases on a temporary and/or permanent basis, as appropriate; and to manage, control,

24   convey, liquidate, and deal with all items, assets, properties, contracts, and other matters incident

25   to his or her responsibilities. Nothing herein, however, authorizes the Receiver to sell any of The

26   Water Systems without further Order of the Court.

27              3. To have full and complete access to the personnel, books, records, electronic

28   databases and facilities of The Water Systems and to make such items available to any

- 2 -

1  consultants, accountants, attorneys or other such persons employed by the Receiver.

2      4. To consult with personnel of the United States Environmental Protection

3  Agency with respect to any aspect of management, planning, and operation of The Water

4  Systems, and to secure technical advice or assistance from such personnel for the purpose of

5  assuring compliance with the Act and all other applicable laws and regulations.

6      B. The Receiver shall submit monthly operating reports to this Court and to the parties

7  which reports shall contain all financial information for The Water Systems, including an

8  accounting of any fees drawn by the Receiver, and all receipts, disbursements, debts and claims

9  of the receivership over the reporting period; as well as all information related to the Receiver's

10  efforts to bring The Water Systems into, and to maintain, compliance with the Act and all other

11  applicable laws and regulations..

12      C. The Receiver shall promptly mail notice of the general terms of this receivership to all

13  customers of The Water Systems.

14      In addition to discharging the foregoing duties with respect to The Water Systems, the

15  Receiver, either personally or with the assistance of any retained consultants or experts, also shall

16  monitor Alco's compliance with the requirements of this Order, as set forth below, and with all

17  applicable laws and regulations. The Receiver shall submit monthly operating reports to this

18  Court and to the parties setting forth the results of such monitoring.

19      The Receiver shall not be personally liable for any act done in compliance with this

20  Order. The Court will defer the question of whether the Receiver should be required to furnish a

21  bond pending a review of the qualifications of the Receiver.

22      All assets of The Water Systems shall be subject to the receivership. No person may file

23  any action or enforce or create any lien, or cause to be issued, served, or levied any summons,

24  subpoena, attachment, or writ of execution against the Receiver or any property subject to the

25  receivership without first obtaining Court approval upon motion with notice to the Receiver and

26  the Attorney General. Any legal procedure described herein commenced without prior Court

27  approval is void except as to a bona fide purchaser for value and without notice to the

28  receivership. No person without notice of the receivership shall incur any liability for

- 3 -

1  commencing or maintaining any legal procedure described by this paragraph.

2      Within three (3) weeks of his or her appointment, the Receiver shall report to the Court

3  and to the parties whether in the Receiver's judgment the receivership as established by this

4  Order is practicable or whether, given the interrelationship between The Water Systems and

5  Alco, or for any other reason, the receivership as established by this Order is ineffectual and/or in

6  need of revision.  To the extent the Receiver concludes that the receivership impracticable, either

7  wholly or in part, the Receiver's report to the Court and to the parties shall set forth the reasons

8  for this conclusion and suggest amendments to this Order addressing the Receiver's concerns.

9  **II.  Specific Powers, Authorities and Duties of the Receiver in Assessing the Feasibility of Selling The Water Systems**

10

11      The Receiver shall immediately assess the feasibility of selling The Water Systems and

12  shall have the additional specific powers, authorities and duties in doing so:

13      A.  To determine whether The Water Systems, either separately or in combination,

14  realistically can be sold to a water purveyor with: (1) a demonstrated history of compliance with

15  the Act; and (2) sufficient financial resources to implement the capital improvements and other

16  measures recommended by the engineering firm Black & Veatch in that firm's October, 2001,

17  reports on The Water Systems, a copy of which will be made available to and kept in the

18  possession of the Receiver.

19      B.  To hire any attorneys, or other agents, as reasonably are necessary in the Receiver's

20  judgment to assist in assessing the feasibility of effecting a sale of The Water Systems, either

21  separately or in combination.

22      C.  To make public, by usual and customary means, the potential availability of The

23  Water Systems for purchase.  The Receiver shall inform any person making an inquiry regarding

24  a possible purchase of The Water Systems that the assessment of the feasibility of such a sale is

25  being conducted pursuant to this Order and provide that person with a copy of this Order.  The

26  Receiver also shall offer to furnish to all prospective buyers, subject to customary assurances of

27  confidentiality and any applicable laws or regulations, all information and documents relating to

28  The Water Systems customarily provided in a due diligence process except for information or

- 4 -

documents that are subject to the attorney-client or work-product privileges. The Receiver shall make available such information to the United States at the same time that such information is made available to any other person.

D. To permit prospective buyers to make inspections of the physical facilities of The Water Systems and to have reasonable access to personnel; to any and all environmental, zoning, and other permit documents and information; and to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E. Not later than sixty (60) days after his or her appointment, the Receiver shall file with the Court and the parties a report setting forth the Receiver's findings with respect to the feasibility of accomplishing a sale as required by this Order. To the extent that such report contains information that the Receiver deems confidential, such report shall not be filed in the public docket of the Court. Such report shall include the name, address, and telephone number of each person who expressed an interest in acquiring The Water Systems and shall describe in detail each contact with each such person.

### III. Requirements Applicable to Alco

Alco is ordered to comply, and the Receiver shall monitor Alco's compliance, with the following provisions, subject to all applicable laws and regulations, including any requirements of the PUC:

A. Alco shall implement forthwith those items from the Black & Veatch report designated by the government's expert, Brian McKeown, as "immediate" needs and within ninety (90) days shall present to the Receiver a plan for implementation of the remaining items within the time frames recommended by Black & Veatch.

B. Alco is enjoined from making any distributions to shareholders while this Order remains in effect. Alco is further enjoined from making any extraordinary expenditures while this Order remains in effect, including the repayment of debt to shareholders.

### IV. Requirements Applicable to the Adcocks

A. Robert T. Adcock, Natholyn P. Adcock, Thomas R. Adcock and Lynette Adcock (collectively, "The Adcocks") shall provide the Receiver with access to all records of account,

- 5 -

1  including names, addresses, and amounts owed for water service, records of payment history, and

2  record cards of each customer of each of The Water Systems. The Adcocks further shall provide

3  the Receiver with access to all cash or cash-type assets on hand, all keys, instruments of title,

4  records and pass books of bank accounts, all supplies, all monitoring equipment, and all other

5  equipment or other items employed in the operation of The Water Systems, including tools and

6  motor vehicles.

7       B. The Adcocks shall use their best efforts to assist the Receiver in the performance of

8  his or her duties. The Adcocks are hereby enjoined, restrained and prohibited from interfering in

9  any way with the Receiver in the discharge of his duties.

10       C. The Receiver shall have discretion to determine whether and to what extent the

11  Adcocks are involved in the day-to-day operation of The Water Systems.

12       D. The Adcocks shall cooperate with and assist the Receiver to the extent necessary and

13  appropriate to permit the Receiver to carry out his or her responsibilities under this Order.

14       E. The Adcocks shall not acquire any new interest, financial or otherwise, in any "public

15  water system" as that term is defined under the Act, 42 U.S.C. § 300f(4), without the express

16  permission of this Court.

### V. Compensation

17

18       Defendants shall be responsible for compensation of the Receiver and of any and all

19  persons employed by the Receiver in carrying out the provisions of this Order. The amount of

20  compensation shall be fixed by the Court upon written application by the Receiver with notice to

21  the parties. In determining any request for allocation of responsibility for the Receiver's

22  compensation among the several Defendants, the Court will consider inter alia any applicable

23  laws or regulations, including any requirements of the PUC.

### VI. Retention of Jurisdiction

24

25       A. This Court retains jurisdiction to enter such further orders as are appropriate in the

26  event that some or all of The Water Systems cannot be sold and as necessary to effectuate the

27  purposes of the Receivership.

28       B. This Court retains jurisdiction to enable any party subject to this Order to apply to this

- 6 -

1 Court at any time for further orders and directions as may be necessary or appropriate to carry out

2 or construe this Order, to modify any of its provisions, to enforce compliance, and to punish

3 violations of its provisions.

### VII. Expiration of Order

5      This Order shall expire upon the termination of the Receivership created

6 hereunder, or two years from the date of this Order, whichever is sooner, unless the Order is

7 extended by the Court.

Dated: _4-10 02_

JEREMY FOGEL
United States District Judge

- 7 -