**ANTHONY R. CAMACHO, ESQ.**
**STAFF ATTORNEY FOR THE CCU, GPA, AND GWA**
**Office No. 227, GPA Main Office, 1911 Route 16**
**Harmon, Guam, 96913**
**(671)647-9225 or 9223**

*Attorney for Defendant Guam Waterworks Authority*

FILED
DISTRICT COURT OF GUAM

OCT 0 3 2003

MARY L. M. MORAN
CLERK OF COURT

31

UNITED STATES DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CIVIL CASE NO. 02-00035 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **DEFENDANT GUAM WATERWORKS** |
| ) | **AUTHORITY'S STATUS** |
| GOVERNMENT OF GUAM, *et. al.* ) | **MEMORANDUM RE BILL 97** |
| ) | |
| _____) | |

**BACKGROUND**

**The Consent Decree in *U.S. v. Government of Guam and Guam Waterworks Authority*,**
**CV99-00102 (U.S. District Court of Guam)**

The U.S. Navy operates the U.S. Navy Public Works Center Guam (Hereafter Referred to as: "U.S. Navy") water production and distribution system on Guam. The U.S. Navy's water production and distribution system was developed, constructed, maintained, and operated by the U.S. Naval Government of Guam. Historically, the U.S. Navy's water production and distribution system on Guam was built to provide water service to both U.S. military forces and the civilian population on Guam before and after World War II. When the civilian Government of

Page 1 of 17

ORIGINAL

1  Guam replaced the U.S. Naval Government of Guam as a result of the Organic Act, the U.S.

2  Navy reserved, through a U.S. Executive Order, the U.S. Navy's water production and

3  distribution system on Guam which served all U.S. Military Forces and Dependant Housing Areas

4  on Guam. The Commanding Officer of the U.S. Navy Public Works Center Guam, pursuant to

5  his authority under 10 U.S.C. §2686, sold, and the Government of Guam, through the Public

6  Utilities Agency of Guam(Hereafter referred to as: "PUAG"), agreed to purchase excess water

7  produced by the U.S. Navy's water production and distribution system on Guam. This

8  Agreement was memorialized in writing in a Memorandum of Understanding dated June 18, 1991

9  (Hereafter Referred to as: "MOU"). The Government of Guam, through PUAG, and eventually

10 through its successor the Guam Waterworks Authority (Hereafter Referred to as: "GWA")

11 received water from the U.S. Navy's water production and distribution system on Guam from the

12 date of the MOU to the present.

13      In the early 1990s, the Government of Guam complied with the terms of the MOU and

14 paid for the water it received from the U.S. Navy's water production and distribution system on

15 Guam. However, sometime in January, 1995, the Government of Guam stopped making

16 payments under the MOU, but continued to receive water from the U.S. Navy, and the it

17 continued to bill the Government of Guam for said water. The debt owed by the Government of

18 Guam to the U.S. Navy for this water grew to approximately $10,900,000 from 1995 to 1999.

19 As a result of the accumulation of this debt, the U.S. Attorney's Office on Guam, pursuant to 28

20 U.S.C. §3001, which gives it authority to collect any debt owed to the United States or any of its

21 agencies, filed this present case to collect the money the Government of Guam owed the U.S.

22 Navy under the MOU.

Page 2 of 17

1    The Government of Guam filed a Counter-Claim alleging that the U.S. Navy does not own

2    certain real and personal property used by the U.S. Navy to produce and distribute potable water.

3    Specifically, the Government of Guam had two principal arguments to support its counter-claim.

4    First, that the U.S. Navy unlawfully reserved, under 48 U.S.C. §1421f and Executive Order No.

5    10178, 15 Fed. Reg. 7313 (1950), the U.S. Navy's water production and distribution facilities on

6    Guam. The Government of Guam's success on this argument was dependant on the Court to

7    interpreting 48 U.S.C. §4121f(b) as limiting the Federal Authority to reserve the U.S. Navy's

8    water production and distribution facilities on Guam. Second, that the Government of Guam, and

9    not the U.S. Navy, has the Riparian Rights to the water in the Fena Water Shed area, which is the

10   principal source of the water used in the U.S. Navy's water production and distribution facilities

11   on Guam. The Government of Guam's success on this argument was dependent on the Court

12   finding that the source of the water in the Fena Watershed Area came from limestone areas that

13   are outside of the hydrological boundaries of the watershed of the Fena Reservoir, and that the

14   U.S. Navy unlawfully appropriated the water. The Government of Guam's Counter-Claim was

15   hotly contested by the U.S. Navy, and if pursued by the Government of Guam, would have

16   required protracted litigation prior to final Court resolution.

17   By 2003, after engaging in over three years of protracted litigation, the Government of

18   Guam, now represented by Guam's newly elected Attorney General, and GWA determined that

19   proceeding with the case would most likely require a time-consuming and expensive appeal whose

20   ultimate success was in doubt, based on the facts of the case. As a result of the foregoing, the

21   Government of Guam and GWA entered into settlement negotiations with the U.S. Navy, a

22   settlement agreement was reached, and on May 9, 2003, a Consent Decree transcribing the

Page 3 of 17

1    settlement agreement into an enforceable Court Order, was filed in the U.S. District Court of

2    Guam.  The Consent Decree requires the Government of Guam and GWA to pay $9,000,000,

3    plus interest, as set forth by 28 U.S.C. §1961(a), compounded annually, to the U.S. Navy, in

4    monthly payments of $45,000 for the first five and a half (5 1/2) years, monthly payments of

5    $132,545 for the succeeding two (2) years, and monthly payments of §264,853 for the final year

6    and two months.  Payments commenced on October 1, 2003.  Thus, pursuant to this payment

7    plan, the $9,000,000 debt owed by the Government of Guam and GWA to the U.S. Navy will be

8    paid off in approximately Nine (9) Years which will end in the year 2012.

9            As GWA was the principal party responsible for the payment of this debt to the U.S.

10   Navy, GWA sought rate relief from Guam's Public Utilities Commission (Hereafter Referred to as

11   "PUC") to pay off this debt.  Instead of imposing a new surcharge on GWA customers, on June

12   23, 2003, the PUC extended an existing 11.5% surcharge, which was established in 2001 to pay

13   off GWA's existing debt to the Guam Power Authority (Hereafter Referred to as: "GPA"), to pay

14   GWA's debt to the U.S. Navy established by the Consent Decree.

15           The U.S. Attorney's Office settled for $9,000,000 instead of the $10,900,000 it initially

16   sought when the lawsuit was filed.  In exchange for the $1,900,000 concession made by the U.S.

17   Navy, the Government of Guam and GWA agreed to dismiss their Counter-Claim with Prejudice.

18

19           On August 5, 2003, the U.S. Attorney's Office on Guam filed an Abstract of Judgement in

20   the District Court of Guam and with Guam's Department of Land Management.  Pursuant to 28

21   U.S.C. §3201, this created a lien on the real property assets that GWA owns or will acquire in the

22   future, and the lien will be extinguished when GWA pays of its debt to the U.S. Navy established

1    by the Consent Decree.

2

3    **The Stipulated Order in *U.S. v. Government of Guam and the Guam Waterworks***
4    ***Authority*, CV02-00035 (U.S. District Court of Guam)**

5    In 1950, when the civilian Government of Guam came into existence as a result of the

6    Organic Act, the drinking water and wastewater systems, which were originally built by the U.S.

7    Navy as described above, that principally served the civilian population of Guam, became the

8    property of the Government of Guam and were subsequently maintained and operated by it. As a

9    result of the foregoing, and various improvement made by the Government of Guam to its water

10   system since 1950, GWA currently owns and operates five (5) sewage treatment plants on Guam

11   that are subject to the conditions and limitations contained in National Pollutant Discharge

12   Elimination System (Hereafter Referred to as: "NPDES") Permit Nos. GU0020087, GU0020095,

13   GU0020141, and GU0020273 issued by the U.S. Environmental Protection Agency (Hereafter

14   Referred to as "USEPA") pursuant to the Federal Clean Water Act. GWA also owns and

15   operates wastewater collection and conveyance systems, including approximately seventy-five

16   (75) sewage pump stations, that transport raw sewage from their point of origin to GWA's

17   sewage treatment plants. GWA's NPDES permits require GWA to properly operate and maintain

18   all their wastewater facilities and systems in compliance with certain requirements and restrictions

19   imposed by the permits.

20   GWA owns and operates three public water systems, the northern, central, and southern

21   systems, which supply drinking water for the majority of Guam's population. GWA is required to

22   operate and maintain its drinking water systems in compliance with the Federal Safe Drinking

Page 5 of 17

1    Water Act, to include said Act's requirements concerning the maximum contaminant levels for

2    microbiological contaminants and the treatment techniques for turbidity.

3        For years, GWA was not operating its wastewater and drinking water systems in

4    compliance with the NPDES permits and the Federal Safe Drinking Water Act, and as a result of

5    these violations, the United States of America, on behalf of USEPA, filed a lawsuit against GWA

6    seeking injunctive relief and the assessment of an estimated twenty-eight $28,000,000 in civil

7    penalties against GWA under the Federal Clean Water Act and the Safe Drinking Water Act.

8    GWA and the USEPA agreed to settle the lawsuit and on June 5, 2003, a Stipulated Order was

9    filed in the District Court of Guam transcribing the settlement agreement into an enforceable

10    Court Order. The Stipulated Order requires GWA to perform approximately $220,000,000 of

11    necessary capital improvements to its wastewater and drinking water systems to bring them into

12    compliance with the Federal Clean Water Act and the Federal Safe Drinking Water Act.

13                                  **Bill 97**

14        As stated above, on September 13, 2001, the PUC established an 11.5% surcharge for all

15    GWA ratepayers to enable GWA to retire its obligations to GPA. This surcharge was abated for

16    a period of one year by P.L. 26-81. Although this Public Law abated the surcharge for one year,

17    it appropriated over $2,000,000 to GWA to enable it to pay its obligations to GPA for the one

18    year abatement period. Further, P.L. 26-81 allowed the surcharge to automatically re-activate in

19    May, 2003. Further, as stated above, on June 23, 2003, the PUC extended the term of the

20    surcharge to enable GWA to pay for its $9,000,000 debt to the U.S. Navy established by the

21    Consent Decree in CV99-00102.

22        Bill 97, introduced by Senator Mark Forbes, is currently under consideration by the 27th

Page 6 of 17

1    Guam Legislature. The Bill states that one of the underlying justifications for P.L. 26-81's one-

2    year moratorium on the 11.5% GWA surcharge, was that the surcharge was intended to pay for

3    GWA's overdue power bills, and not for any improvements to the water or wastewater systems of

4    Guam and that the 26th Guam Legislature found this purpose, was in effect making the ratepayers

5    of Guam pay for GWA's alleged poor management decisions. Sec. 1, Bill 97. The Bill further

6    states that GWA is proceeding with the surcharge and would apply the surcharge again to GWA's

7    unpaid bills, and that the 27th Guam Legislature finds that current conditions are no different now

8    than last year when P.L. 26-81 became law, and the moratorium against the surcharge must be

9    extended. *Id.*

10          As a result of these findings, Bill 97 would abolish the surcharge for three years. Sec. 2,

11   Bill 97. Further, it would create a moratorium on any rate increase, or new or increased

12   surcharge billed by GWA if such increase or surcharge is intended, in whole or in part, to pay for

13   GWA's past due obligations to any vendor, including power consumption or the purchase of

14   water from water providers. Sec. 3, Bill 97. Also, GWA would be prevented from billing its

15   customers for any increase in rates or a new or increased surcharge for two years, if such increase

16   or surcharge is intended, in whole or in part, to pay for GWA's past due obligations to any

17   vendor, including power consumption or the purchase of water from water providers. *Id.* Unlike

18   its predecessor P.L. 26-81, Bill 97 does not appropriate any funds to GWA to enable it to pay its

19   existing debts to GPA or the U.S. Navy during the three year period the surcharge is abolished.

20          On September 27, 2003, in CV02-00035, the U.S. District Attorney's Office on Guam

21   filed a Request for a Status Conference and moved the U.S. District Court of Guam to schedule a

22   status conference and direct GWA and the Government of Guam to submit a report to the Court

Page 7 of 17

1 explaining the impact of Bill 97 and its effect on GWA's ability to pay its debt to the U.S. Navy

2 established by the Consent Decree. On September 29, 2003, the 27th Guam Legislature held a

3 public hearing on Bill 97, and the Consolidated Commission on Utilities (Hereafter Referred to as

4 "CCU") testified against the passage of Bill 97 into law. On September 30th, 2003, in CV02-

5 00035, the U.S. District Court of Guam held a status conference, granted the U.S. District

6 Attorney's Office motion, and ordered all parties, including the Government of Guam and GWA,

7 to submit briefs explaining the impact of Bill 97 on the Consent Decree in CV99-00102, and the

8 Stipulated Order in CV02-00035, and describing what alternatives are available to the Court to

9 mitigate any adverse impact that Bill 97 would have on the aforementioned orders.

10

11 **DISCUSSION**

12

13 **If passed into law, Bill 97 would prevent GWA from complying with the Consent**
14 **Decree in CV99-00102, and the Stipulated Order in CV02-00035.**

15 GWA is dependent on the surcharge to pay for its debt to the U.S. Navy established by the

16 Consent Decree in CV99-00102. GWA's only source of income is the revenue it generates from

17 billing its customers for the water service that they receive. The payments due under the Consent

18 Decree began on October 1, 2003 and GWA has not budgeted any funds to make these payments

19 other than the revenue it is lawfully entitled to generate from the surcharge.

20 Should Bill 97 become law and the surcharge is abolished for three (3) years, GWA will

21 only have two choices to modify its budget to comply with the payment schedule established by

22 the Consent Decree. First, GWA could terminate approximately sixty of its remaining two-

Page 8 of 17

1    hundred-sixty employees and use the saving generated from these cuts to make the payments

2    required by the Consent Decree. Second, GWA could divert funding for capitol improvement

3    projects for its water and wastewater systems and use the diverted funds to make the payments

4    required by the Consent Decree. However, if GWA resorts to either of these measures, it will

5    violate the Stipulated Order in CV02-00035.

6         The excessive termination of GWA employees will violate the Stipulated Order in CV02-

7    00035. The Stipulated Order requires GWA to reorganize itself to ensure that it is capable of

8    performing its mission and to fulfill this mandate GWA must retain a sufficient number of

9    employees to operate its drinking and wastewater systems, and to perform administrative duties.

10   Para. 9, Stipulated Order. GWA will be unable to perform its mission as required by the

11   Stipulated Order with only two hundred (employees).

12        The diversion of GWA funds set aside for capitol improvement projects will violate the

13   Stipulated Order. The only capitol improvement projects currently in GWA's budget are those

14   required by the Stipulated Order to bring GWA's drinking and wastewater systems into

15   compliance with the federal Clean Water Act and the Safe Drinking Water Act. The Stipulated

16   Order mandates that these projects be started and completed within established timetables.

17   Should Bill 97 become law and the funds set aside for these projects are diverted for the three

18   year period the surcharge is abolished, GWA will not be financially capable of starting and

19   completing the projects as required by the Stipulated Order.

20        Thus, if Bill 97 becomes law and the surcharge is abolished for three years, GWA will be

21   placed in a "Catch-22" situation. Specifically, GWA will be forced to comply with the payment

22   schedule established by the Consent Decree in CV99-00102, by violating the mandates of the

1    Stipulated Order in CV02-00035.

2         Finally, Bill 97's abolishment of the surcharge is a direct violation of the express terms of

3    the Stipulated Order in CV02-00035. Specifically, Bill 97 would prevent GWA from paying its

4    debts to GPA and the U.S. Navy and this would jeopardize GWA's ability to obtain a bond rating

5    sufficient to issue bonds to fund the capitol improvement projects required by the Stipulated

6    Order.

7         The capitol improvement projects mandated by the Stipulated Order to bring GWA's

8    drinking and wastewater systems into compliance with the federal Clean Water and Safe Drinking

9    Water Acts will cost approximately $220,000,000. The Stipulated Order recognizes that the

10   Government of Guam and GWA do not have this amount on hand to complete these projects, and

11   that GWA's current rate structure will not support the payment of this amount, or the capitol to

12   finance the issuance of bonds to obtain this amount. To remedy this fact, the Stipulated Order

13   requires GWA to create a financial plan to achieve the financial solvency necessary to obtain a

14   bond rating and subsequently issue bonds to fund the projects. A key piece of this financial plan is

15   the Stipulated Order's requirement that GWA's revenues be sufficient to cover all of its

16   operations and maintenance costs, and **utility expenses** (Bold Emphasis Added). Stipulated

17   Order, Para. III.10(6)(b), page 10, Line 8. Further, the Stipulated Order requires GWA's

18   revenues to be sufficient to pay for all of its **existing debt and expected debt service** (Bold

19   Emphasis Added). *Id.* Para. 28. GWA is currently in compliance with these requirements because

20   the surcharge is the necessary rate relief that ensures GWA's revenues are sufficient to pay for its

21   existing obligations to GPA and the U.S. Navy. Thus, if Bill 97 becomes law, its three year

22   abolishment of the surcharge is a direct violation of the aforementioned paragraphs of the

Page 10 of 17

1    Stipulated Order because without the surcharge, GWA's revenues would not be sufficient to meet

2    its obligations to GPA and the U.S. Navy.

3

4        **Should Bill 97 be passed into law, the Court has alternatives to enforce compliance**
5        **with the Consent Decree in CV99-00102, and the Stipulated Order in CV02-00035.**
6

7                                 **Bill 97 is Inorganic.**

8        Bill 97, if passed into law, would violate Guam's Organic Act.   No law impairing the

9    obligation of contracts shall be enacted.  28 U.S.C. §1421b(j) (Guam's Organic Act Bill of

10   Rights).  Here, the GWA's past due obligations to GPA and the debt to the U.S. Navy established

11   by the Consent Decree in CV99-00102 are based on valid and enforceable contracts GWA has

12   with those entities.  The surcharge is the means that GWA is using to pay its obligations under the

13   aforementioned contracts.

14       Bill 97's prohibition against GWA imposing rates or surcharges to make payments under

15   those contracts and to other vendors with valid contracts with GWA acts as a substantial and

16   prejudicial impairment of the property rights guaranteed by Guam Organic Act's Bill of Rights.

17   Thus, once the appropriate motion for relief is made, the Court should find that the

18   aforementioned prohibition is inorganic and void.

19

20       **Federal Case Law Prohibits the Guam Legislature from undermining**
21       **the Federal Court's Consent**
22       **Decree in CV99-00102, and the Stipulated Order in CV02-00035.**

23       Bill 97 is premised on a mistake in fact.  The Bill assumes that "The Legislature finds that

24   conditions are unchanged from a year ago, when P.L. 26-81 [the Legislature's one year

                                 Page 11 of  17

1  moratorium on the surcharge] became law.." Bill 97, Sec. 1.  Conditions have substantially

2  changed from one year ago in that the Federal U.S. District Court of Guam has rendered the

3  Consent Decree in CV99-00102, and the Stipulated Order in CV02-00035 and the Government of

4  Guam, which includes the 27th Guam Legislature, and GWA are required to comply with the

5  mandates established in those Court Orders.

6         As stated above, if Bill 97 is passed into law, GWA will not be able to comply with the

7  Consent Decree in CV99-00102 and the Stipulated Order in CV02-00035.  It is a well settled

8  principal of Federalism that a valid state law cannot stand in the way of a Federal Court's remedial

9  scheme if the state law impairs any action essential to enforce the scheme.  *Hook v. Arizona*

10  *Department of Corrections*, 107 F.3d 1397, 1402 (9th Cir. 1997).  Thus, once the appropriate

11  motion is made, the Court should find that the law resulting from Bill 97 is an unlawful bar to the

12  U.S. District Court of Guam's enforcement of its remedial schemes set forth in the Consent

13  Decree in CV99-00102 and the Stipulated Order in CV02-00035.

14

15              **Bill 97 violates the Doctrine of Separation of Powers because the**
16              **Guam Legislature is unlawfully interfering with the PUC's**
17                    **Independent Utility Rate Making Authority.**

18         Should Bill 97 be passed into law, the 27th Guam Legislature would violate the doctrine of

19  Separation of Powers.  The separation of powers doctrine exists to prevent the abuses that can

20  flow from centralization of power.  *In Re Request of Governor Carl T.C. Gutierrez, Relative to*

21  *the Organicity and Constitutionality of Public Law 26-35,* 2002 Guam 1, ¶33 (Supreme Court of

22  Guam, (February 7, 2002).  Further, the concentration of the separately delineated powers in the

23  hands of one branch of government may justly be pronounced the very definition of tyranny.  *Id.*

Page 12 of 17

1  Under the Separation of Powers Doctrine, one branch of government is prohibited from either

2  delegating its enumerated powers to another branch of government or aggrandizing its powers by

3  reserving for itself the powers given to another branch. *Santos v. Calvo*, CV80-0223A (D.Guam

4  App. Div. Aug. 11, 1982).

5  Here, should Bill 97 be passed into law, the 27th Guam Legislature will be aggrandizing its

6  powers by usurping the power of the PUC to set utility rates. In 1989, the PUC was reestablished

7  under Guam Law as a rate making authority, independent of the Executive Branch, to satisfy a

8  Federal condition for merging Guam and the U.S. Navy's electrical power and transmission assets

9  and for the U.S. Military forces on Guam to become customers of GPA. The U.S. Congress,

10  determined that the establishment of the PUC was necessary to prevent the Guam Legislature's

11  historical interference with utility rate setting. PUC Resolution dated September 24, 2003 and

12  *U.S. House of Representatives Conference Report 98-1159*, page 253. Thus, under Guam Law,

13  the PUC is the only governmental body authorized to establish utility rates, and the Federal

14  Government required the PUC's existence to end the Guam Legislature's historical interference

15  utility rates.

16  Here, the PUC lawfully exercised its independent rate making authority by establishing the

17  surcharge to pay GWA's obligations to GPA, and then extending the term of the surcharge to

18  ensure GWA would have sufficient revenue to make the payments required by the Consent

19  Decree in CV99-00102. The 27th Guam Legislature is attempting to usurp this authority by

20  abolishing the surcharge for three years. The PUC has determined that, should Bill 97 be passed

21  into law, the Government of Guam and GWA would breach their commitments to the U.S.

22  District Court of Guam and the United States of America in the Consent Decree and the

Page 13 of 17

1    Stipulated Order. PUC's September 24, 2003 Resolution. Further, the PUC has determined that,

2    should Bill 97 become law, the consequent inability of GWA to pay its debt to GPA would put

3    GPA in jeopardy of bond default at a critical juncture in its relationship with financial rating

4    agencies. *Id.*

5        Neither Bill 97, nor any of the testimony presented during the Bill's public hearing on

6    September 29, 2003, demonstrate any overriding constitutional need that would justify the Bill's

7    disruptive impact. Bill's specious finding that GWA ratepayers should not be penalized for past

8    mismanagement by the surcharge, is not supported by law. Assuming *arguendo* that all the

9    allegations of GWA's past mismanagement were true, said mismanagement does not excuse

10   GWA's contractual liability to GPA and the U.S. Navy. Absolutely no proof of any kind was

11   presented showing that GWA did not in fact use the electrical service or the U.S. Navy water that

12   it was billed for, or that the contractual agreements between GWA or the U.S. Navy were

13   unenforceable. Thus, should Bill 97 become law, the Court should find, once the appropriate

14   motion is made, that the law's impingement on the PUC's rate making authority would be an

15   impermissible violation of the separation of powers doctrine.

16

17      **The Court may hold any Government of Guam Officials, to include the Elected**
18      **Officials of the 27th Guam Legislature, in Contempt for their failure to**
19      **comply with the mandates set forth in the Consent Decree in CV99-00102 and the**
20      **Stipulated Order in CV02-00035.**

21       Federal District Courts have the inherent authority and duty to protect and effectuate their

22   judgements and to punish disobedience of or resistance to their lawful orders or decrees. *Morales*

23   *Feliciano v. Rosello Gonzalez,* 124 F.Supp.2d 774 (D.Puerto Rico, 2000). Further, Federal

Page 14 of  17

1     Courts have the authority to punish contempt whether the sanctioned conduct is before the court

2     or beyond it. *In Re Orthopedic "Bone Screw" Products Liability Litigation,* 132 F.3d 152 (3d

3     Cir., 1997). Here, as stated above, the 27th Guam Legislature is a part of the Government of

4     Guam, which is party to CV99-00102 and CV02-00035. Further, the Consent Decree and the

5     Stipulated Order in those respective cases are as binding on the Guam Legislature as they are on

6     the rest of the Government of Guam and GWA. As stated above, should Bill 97 become law, the

7     law would violate the express provisions of the Stipulated Order CV02-00035. Thus, by passing

8     the three year abolishment of the surcharge into law, the 27th Guam Legislature would be in direct

9     violation of a valid and enforceable Federal Court Order, and its members, despite the fact that

10    they are elected state officials, will be subject to contempt sanctions imposed upon them for their

11    disobedience and resistance to said Federal Court Orders.

12          It should be noted that during the public hearing on Bill 97, the CCU, through the

13    testimony it presented, placed the 27th Guam Legislature on notice that the passage of Bill 97 into

14    law would result in violations of the Federal Court Orders. Further, as evidenced by the Letters

15    from Senator Jesse Anderson Lujan attached as Exhibits A and B herein, some Senators, most

16    notably Senator Lujan, are aware of the Judgement in CV99-00102 and the Federal Lien on

17    GWA's assets that resulted from it. Further, as evidenced by said letters, GWA anticipates that

18    there may be an attempt to distort the facts and record in CV99-00102 and CV02-00035. In

19    CV99-00102, the facts and record concern valid and enforceable debts the Government of Guam

20    and GWA owe to the U.S. Navy for water the U.S. Navy did not have to provide to the people of

21    Guam. In CV02-00035, the facts and record concern the Government of Guam and GWA's

22    responsibility to develop and maintain its water and wastewater systems to comply with the

Page 15 of 17

1   Federal Clean Water Acts and Safe Drinking Water Acts.

2   Neither case concerns "injustices and deprivation of private property rights by one federal

3   agency or another," or the "fair treatment from the Navy and all other federal agencies insofar as

4   our native lands are concerned." Further, neither case concerns a "half-baked" or ill thought out

5   settlements. If the Court must exercise its contempt powers to enforce its remedial schemes in

6   either CV99-00102 or CV02-00035, any sanctioned party must be reminded that the remedial

7   schemes established by the Court Order are long term solutions that will result in a financially

8   stable GWA which provides safe drinking water to the residents of Guam and protects Guam, its

9   people, and surrounding oceans, and any U.S. Military presence or build-up on Guam, from

10   bacteriological contamination from sewage.

11

12                                **CONCLUSION**

13   Based on the foregoing, should Bill 97 become law, it would result in violations of the

14   Consent Decree in CV99-00102 and the Stipulated Order in CV02-00035. To address these

15   violations, the Court may strike down the law, after the appropriate motion is made, on the

16   grounds that it is Inorganic, it undermines a federal remedial scheme imposed by Court Order, it is

17   an unlawful violation of the doctrine of separation of powers, and the Court has the broad

18   discretion to sanction the 27th Guam Legislature, or any of its elected officials, for disobeying or

19   ///

20   ///

21   ///

22   ///

resting the federal remedial schemes imposed by the Consent Decree in CV99-00102 and the

Stipulated Order in CV02-00035.

**RESPECTFULLY SUBMITTED** this 3rd day of October, 2003 by:

_____

ANTHONY R. CAMACHO, ESQ.
Staff Attorney for the CCU, GPA, and GWA

## CERTIFICATION

I, Lou Sablan, Board Secretary for Guam's Consolidated Commission on Utilities hereby

certifies that copies of the Defendant Guam Waterworks Authority's Status Memorandum Re Bill

97 were served via facsimile and personal service to the attorneys of record at the following

addresses:

| | |
|---|---|
| Douglas B. Moylan | Mikel W. Schwab |
| Attorney General of Guam | Assistant United States Attorney |
| Guam Judicial Center, Suite 2-200E | Suite 500, Sirena Plaza |
| 120 West O'Brien Drive | 108 Herman Cortez |
| Agana, Guam 96910 | Agana, Guam, 96910 |
| Fax No. (671)472-2493 | Fax No. (671)472-7332 |

**DATED** this 3d day of October, 2003 by:

_____

LOU SABLAN

Page 17 of 17

THE OFFICE OF THE HONORABLE
Jesse Anderson Lujan
Senator, 27th Guam Legislature
Assistant Minority Whip
Chairman Sub-Committee on "Open Skies"

September 30, 2003

Mr. Simon Sanchez
Chairman
Consolidated Commission on Utilities
P.O. Box 21929
GMF, Guam 96921

Dear Mr. Sanchez:

In the public hearing on 9/29/03 at the legislative hearing room, in response to my inquiry bout the impact of the Federal Lien on all GWA property, you responded that I was misinformed. You stated that no such lien exists implying that I was misstating the facts.

As it turns out, I conducted some brief research to further confirm my facts. I enclose a copy of an Abstract of Judgment, recorded at the Department of Land Management and the District Court of Guam, that does in fact place a lien on all GWA property. As you should know, this lien may severely handicap Guam's ability and flexibility to privatize GWA. It also places all our water resources at risk of being taken away from the people of Guam. For these reasons I stated that this was a half-baked settlement that you consented to even when you apparently had substantial grounds to contest the amounts claimed as owing and that has placed all our water resources at such terrible risk.

Your misleading statements in the legislative hearing room were either intended or deceive the Senators and public present, or you are completely uninformed of the impact of your actions as CCU chairman. Both instances do a terrible disservice to the people of Guam and do incredible damage to us all.

Moreover, you now owe to the people of Guam to clarify your misstatements and to set the record straight and to do so promptly,

Sincerely,

Jesse Anderson Lujan
Senator

Cc: Governor of Guam, All Senators, All CCU members, All Media

"EXHIBT A"

Island of Guam, Government of Guam
Department of Land Management Office of The Recorder

**678254**

File for record is Instrument No. ___
the year 20 __05__ Month __08__ Day __07__ Time __10:02__
DE-OFFICIO
Recording Fee ___ Receipt No. ___

*Jane Yamasaki*

Deputy Recorder

FILED
DISTRICT COURT OF GUAM

AUG -5 2003

MARY L. M. MORAN
CLERK OF COURT

# ABSTRACT OF JUDGMENT

### Notice

Pursuant to Title 28, United States Code, Section 3201, this judgment, upon the filing of this abstract in the manner in which notice of tax lien would be filed under paragraphs (1) and (2) of 26 U.S.C. §6323(f), creates a lien on all real property of the defendant(s) and has priority over all other liens or encumbrances which are perfected later in time. The lien created by this section is effective, unless satisfied, for a period of 20 years and may be renewed by filing a notice of renewal. If such notice of renewal is filed before the expiration of the 20 year period to prevent the expiration of the lien and the court approves the renewal, the lien shall relate back to the date the judgment is filed.

| Names and Addresses of Parties against whom judgments have been obtained | Names of Parties in whose favor judgments have been obtained |
|---|---|
| GOVERNMENT OF GUAM GUAM WATERWORKS AUTHORITY P.O. Box 3010 Hagåtña, Guam 96932 | UNITED STATES OF AMERICA CIV 99-00102 |

| Amount of Judgment | Names of Creditors' Attorneys | When Docketed |
|---|---|---|
| ,000,000.00 + 1.25% int. | UNITED STATES ATTORNEY SIRENA PLAZA, SUITE 500 108 HERNAN CORTEZ AVENUE HAGATNA, GUAM 96910-5059 | 05/09/2003 (EOD 05/12/2003) |

| UNITED STATES OF AMERICA, | CLERK'S OFFICE | U.S. DISTRICT COURT FOR THE DISTRICT OF GUAM SS. |
|---|---|---|

I hereby certify that the annexed
instrument is a true copy of
original on file in my office.
ATTEST: CLERK OF COURT
District Court of Guam
Territory of Guam

By: ___ Deputy Clerk

I CERTIFY, That the foregoing is a correct Abstract of Judgment entered or registered by this Court.

Date, **AUG -5 2003**

MARY L.M. MORAN, Clerk.

By: __/s/ Renee M. Martinez__, Deputy Clerk.

678254



THE OFFICE OF THE HONORABLE
**Jesse Anderson Lujan**
Senator, 27th Guam Legislature
Assistant Minority Whip
Chairman Sub-Committee on "Open Skies"

October 2, 2003

Mr. Simon Sanchez
Chairman
Consolidated Commission on Utilities
P.O. Box 21929
GMF, Guam 96921

Dear Mr. Sanchez:

I received an undated letter from you on September 30th, 2003 regarding my concerns over the current federal lien you authorized on all GWA assets.

Your ignorance of the fact that your actions had resulted in a lien on all GWA assets speaks for itself in confirming the half baked character of your handling of the Navy claims against GWA. It leaves me and many other citizens of our community to wonder what other matters of similar or graver importance you were not aware of in promoting and sponsoring this settlement and lien on all our water resources. This is especially grave since the lien is almost two months old and I was aware of it, and you, a central participant and sponsor, were not.

With this background of negligence in mind I would like to respond to some of the broad assertions in your undated letter.

First and foremost, I find it distasteful that you are now trying to "pass the buck" for the settlement and lien on all GWA assets to everyone else in the process, when you previously took central credit for it. While a federal judge oversees any settlement in litigation he or she does not tell the parties what to include in it. While attorneys do ensure that their client's interests are protected in a settlement agreement, it stands with the client to define what those interests are, and to stand firm in protecting critical interests. You were representing the people of Guam in sponsoring this settlement and lien on all our water resources, and should have insisted on protecting our critical interests. You failed to do so.

For more than five decades our people have suffered untold injustices and deprivation of their private property rights by one federal agency or another. The litany of these grievances is too long to list and too well known to all of us for you to be ignorant of them too. One of those long-standing grievances has been the failure and refusal of the terms of the federal Organic Act Passed in 1950. I find it at least mildly improper for you to assert, in your undated letter, that a federal judge would casually brush off these claims even before hearing all the evidence of their validity. And, even more improper to suggest that Attorney Howard Trapp, a counsel of exceedingly high repute, would provide firm conclusions of the probability of success on appeal even before the case has been fully presented and ruled on by the court. But, despite all these



"EXHIBIT B"

legal issues, there was a more fundamentally important issue at stake in this settlement. That issue was our long-standing demand for fair treatment from the Navy and all other federal agencies insofar as our native lands are concerned. Instead, you have led the charge to legitimize much questionable behavior, and undermined the hard and difficult work of so many who have come before you who have yearned for, and fought for, justice in these matters. Now, we must also pay a "past due" bill of over nine million dollars ($9,000,000.000) Compounding this insult with further injury we will also be required to pay for future water use that is ours by our birthright.

I also take issue with the flippant and cavalier way in which you dismiss the significance of the federal lien you sponsored on all our water resources. This lien will impede our ability to privatize in a way that promotes the lowest rate structure for our people Contrary to your assertion, I have never advocated that we place one government owed utility monopoly with another privately owned one. I have instead promoted what I call "competitive utilities". In the case of GWA, that means privatizing by selling the water production facilities to at least three (3) different private companies who will compete against each other for water customers. These companies or any other future comers should be allowed to develop their own water production facilities. With respect to the main distribution lines, they can be managed by a private company under a management agreement with rates for their use to be set by the CCU subject to PUC approval. In that way these private companies, and any others who may wish to participate, can solicit customers on a competitive basis. It is through competition that we can get lower rates In this way we do not have to go into debt to the tune of over two hundred million dollars ($200,000,000 00) before we can start the process of obtaining a more efficient, reliable, and low cost water supply through privatization. By selling these water production facilities we also encourage any private purchasers to maximize their investments in what they will own in perpetuity.

Your attempt to incur huge debts, stick us with the bill, and then find complaint and plaint private companies to "manage" these asset smacks of empire building. You should stop now.

Sincerely,

Jesse Anderson Lujan
Senator

cc  Governor of Guam
    All Senators
    Guam Chamber of Commerce
    Members of CCU
    All media