Office of the Attorney General
**Douglas B. Moylan**
Attorney General of Guam
**Civil Division**
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910 • USA
(671) 475-3324 • (671) 472-2493 (Fax)
www.guamattorneygeneral.com • law@mail.justice.gov.gu

**Attorneys for the Government of Guam**

# UNITED STATES DISTRICT COURT
# DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Civil Case No. 02-00035 |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **DEFENDANT GOVERNMENT OF** |
| ) | |
| GUAM WATERWORKS AUTHORITY ) | **GUAM'S STATUS MEMORANDUM** |
| and the GOVERNMENT OF GUAM, ) | |
| ) | **RE BILL 97** |
| Defendants. ) | |
| _____ ) | |

## BACKGROUND

**I.    The Consent Decree in *U.S. v. Government of Guam and Guam Waterworks Authority*, CV99-00102 (U.S. District Court of Guam)**

The U.S. Navy operates the U.S. Navy Public Works Center Guam (hereafter referred to as "U.S. Navy") water production and distribution system on Guam. The U.S. Navy's water production and distribution system was developed, constructed, maintained, and operated by the U.S. Naval Government of Guam. Historically, the U.S. Navy's water production and distribution system on Guam was built to provide water service to both U.S. military forces and the civilian population on Guam before and after World War II. When the

Page 1
*Defendant government of Guam Status Memorandum re: Bill 97*
District Court Civil Case No. 99-00102



civilian government of Guam replaced the U.S. Naval Government of Guam as a result of the Organic Act, the U.S. Navy reserved, through a U.S. Executive Order, the U.S. Navy's water production and distribution system on Guam which served all U.S. Military Forces and Dependant Housing Areas on Guam. The Commanding Officer of the U.S. Navy Public Works Center Guam, pursuant to his authority under 10 U.S.C.§ 2686, sold, and the government of Guam, through the Public Utilities Agency of Guam (hereinafter referred to as "PUAG"), agreed to purchase excess water produced by the U.S. Navy's water production and distribution system on Guam. This Agreement was memorialized in writing in a Memorandum of Understanding dated June 18, 1991 (hereinafter referred to as "MOU"). The government of Guam, through PUAG, and eventually through its successor the Guam Waterworks Authority (hereinafter referred to as "GWA") received water from the U.S. Navy's water production and distribution system on Guam from the date of the MOU to the present.

In the early 1990s, the government of Guam complied with the terms of the MOU and paid for the water it received from the U.S. Navy's water production and distribution system on Guam. However, sometime in January 1995, the government of Guam stopped making payments under the MOU, but continued to receive water from the U.S. Navy, and the U.S. Navy continued to bill the government of Guam for said water. The debt owed by the government of Guam to the U.S. Navy for this water grew to approximately $10,900,000 from 1995 to 1999. As a result of the accumulation of this debt, the U.S. Attorney's Office on Guam, pursuant to 28 U.S.C. § 3001, which gives it authority to collect any debt owed to the United States or any of its agencies, filed this present case to collect the money the government of Guam owed the U.S. Navy under the MOU.

The government of Guam filed a Counter-Claim alleging that the U.S. Navy did not own certain real and personal property used by the U.S. Navy to produce and distribute

potable water. Specifically, the government of Guam had two principal arguments to support its counter-claim. First, that the U.S. Navy unlawfully reserved, under 48 U.S.C. § 1421f and Executive Order No. 10178, 15 Fed. Reg. 7313 (1950), the U.S. Navy's water production and distribution facilities on Guam. The government of Guam's success on this argument was dependent on the Court interpreting 48 U.S.C. § 1421f(b) as limiting the Federal Authority to reserve the U.S. Navy's water production and distribution facilities on Guam. Second, that the government of Guam, and not the U.S. Navy, has the Riparian Rights to the water in Fena Water Shed area, which is the principal source of the water used in the U.S. Navy's water production and distribution facilities on Guam. The government of Guam's success on this argument was dependent on the Court finding that the source of the water in the Fena Water Shed area came from limestone areas that are outside of the hydrological boundaries of the watershed of the Fena Reservoir, and that the U.S. Navy unlawfully appropriated the water. The government of Guam's Counter-Claim was hotly contested by the U.S. Navy, and if pursued by the government of Guam, would have required protracted litigation prior to final Court resolution.

By 2003, after engaging in over three years of protracted litigation, the government of Guam, now represented by Guam's newly elected Attorney General, and GWA determined that proceeding with the case would most likely require a time-consuming and expensive appeal whose ultimate success was in doubt, based on the facts of the case. As a result of the foregoing, the government of Guam and GWA entered into settlement negotiations with the U.S. Navy, a settlement agreement was reached, and on May 9, 2003, a Consent Decree transcribing the settlement agreement into an enforceable Court Order, was filed in the U.S. District Court of Guam. The Consent Decree requires the government of Guam and GWA to pay $9,000,000, plus interest, as set forth by 28 U.S.C. § 1961(a), compounded annually, to the U.S. Navy, in monthly payments of $45,000 for the first five and a half (5 ½) years,

monthly payments of $132,545 for the succeeding two years, and monthly payments of $264,853 for the final year and two months. Payments commenced on October 1, 2003. Thus, pursuant to this payment plan, the $9,000,000 debt owed by the government of Guam and GWA to the U.S. Navy will be paid off in approximately nine years which will end in the year 2012.

As GWA was the principal party responsible for the payment of this debt to the U.S. Navy, GWA sought rate relief from Guam's Public Utilities Commission (hereinafter referred to as "PUC") to pay off this debt. Instead of imposing a new surcharge on GWA customers, on June 23, 2003, the PUC extended an existing 11.5% surcharge, which was established in 2001 to payoff GWA's existing debt to the Guam Power Authority (hereafter referred to as "GPA"), to pay GWA'S debt to the U.S. Navy established by the Consent Decree.

## II. The Stipulated Order in *U.S. v. Government of Guam and the Guam Waterworks Authority*, CV 02-00035 (U.S. District Court of Guam)

The United States filed a complaint in this Court on December 20, 2002, seeking injunctive relief and the assessment of civil penalties against GWA under the Federal Clean Water Act (hereafter referred to as "CWA") and the Federal State Water Drinking Water Act (hereafter referred to as "SDWA"). The complaint included allegations against GWA pursuant to the emergency provisions of both the CWA and SDWA to address the imminent and substantial endangerment to the health and welfare of persons presented by: (1) the numerous and repeated discharges of untreated and inadequately treated wastewater from GWA's treatment works, resulting in elevated levels of fecal coliform bacteria in both surface waters and drinking water wells on Guam; and (2) serious deficiencies in GWA's public water systems, causing contaminated water to be served to the public. The complaint seeks the issuance of a preliminary and permanent injunction that: (i) enjoins GWA from discharging pollutants except as expressly authorized by the CWA and its National Pollutant Discharge

Elimination System (hereafter referred as "NPDES"), permits and orders GWA to undertake a program to achieve permanent, consistent compliance with all the terms and conditions of the applicable NPDES permits as well as the CWA and its promulgated regulations; and (ii) enjoins GWA from violating the SDWA or the National Primary Drinking Water Regulations and orders GWA to undertake a program to achieve permanent, consistent compliance with the SDWA and its promulgated regulations.

To the extent that GWA does not promptly comply with the Court's Order, the complaint requests the Court to appoint a receiver to ensure and oversee that GWA immediately takes all necessary measures to ensure that: (i) its Publicly Owned Treatment Works (hereafter referred to as "POTW") is fully in compliance with the CWA and applicable NPDES permits; and (ii) its public water systems fully comply with the SDWA, including the Maximum Contaminant Level (hereinafter referred as "MCL") for total coliforms and treatment technique for turbidity, and provide potable drinking water to the people of Guam. The complaint also seeks civil penalties pursuant to the CWA and SDWA. Finally, the complaint seeks an Order that Guam is liable, pursuant to CWA § 309 (e), 33 U.S.C. § 1391(e), for payment of any judgment entered against GWA under CWA § 309 to the extent that the laws of Guam prevent GWA from raising revenues needed to comply with such judgment.

After months of negotiations, the United States, the government of Guam, and GWA were able to reach an agreement on the terms of a Stipulated Order for Preliminary Relief, which the United States filed with the Court on May 21, 2003. The 41-page Stipulated Order contains a comprehensive set of interim measures to address GWA's violations of the CWA and SDWA. Among other things, the Stipulated Order includes a set of schedules requiring GWA to implement short-term construction and rehabilitation projects as well as a broad range of measures affecting GWA's management and organizational structures, operations

and maintenance, and financial administration. The Stipulated Order was entered by the Court on June 5, 2003.

### III. The Impact of Bill No. 97 (COR).

Bill No. 97 (COR), "An Act to Extend the Moratorium on the Guam Waterworks Authority Rate Surcharge of 11.5%," was considered by the Guam Legislature on September 29, 2003. Bill No. 97 would prohibit GWA from raising its rates or imposing a surcharge "if such increase or surcharge is intended, in whole or in part, to pay for past due obligations by GWA to any vendor, including power consumption or the purchase of water from water providers."

The United States, GWA, and the government of Guam spent several months crafting the Stipulated Order to address the considerable structural, managerial, operational, and financial problems faced by GWA. Regarding GWA's financial management, the Stipulated Order obligates the government of Guam and GWA to submit, by October 3, 2003, an Interim Financial Plan that details how GWA will generate revenue. The Plan, which must include any necessary rate adjustment, shall ensure revenues are "sufficient to cover the cost of compliance activities and deliverables required by this Stipulated Order for Preliminary Relief, as well as any other anticipated expenses... *including all existing debt and expected debt service...*" Stipulated Order at ¶28 (emphasis added). Bill No. 97 would directly conflict with the requirements of ¶28 of the Stipulated Order, and subject GWA and the government of Guam to stipulated penalties of $1,000 per day for the first thirty days, $2,000 per day for the following thirty days, and $5,000 per day for each day thereafter.

The Guam PUC issued an Order on April 10, 2003, renewing its commitment to provide GWA in a timely manner with adequate rate relief to enable GWA to comply with an EPA-approved strategic plan to restore the utility and bring it into compliance with federal law. The payment of GWA's existing debt is a critical element of the plan to rehabilitate

GWA's decrepit system. The Stipulated Order contains a complex set of schedules to implement projects to start GWA on the path of rehabilitating its system. According to current estimates, required projects under the Stipulated Order will cost approximately $27 million in 2004, $20.5 million in 2005, and $56.5 million in 2006. GWA's base revenue, which is derived from its rates for providing drinking water and wastewater treatment, is approximately $36 million. Without bond financing, GWA would need to pay all capital costs for the Stipulated Order's projects in the year they are expended. As a result, GWA would need to raise rates dramatically--a 75% rate surcharge in 2004, a 57% surcharge in 2005, and a 157% surcharge in 2006--to directly fund the capital improvements needed to address the drinking water and wastewater emergency currently facing the people of Guam. These types of surcharges are not feasible for ratepayers to bear.

An alternative way to meet these funding obligations would be by direct emergency appropriations from the Guam Legislature. Given the current fiscal crisis faced by the government of Guam, however, it is unlikely that public funding for these GWA projects will be available.

Therefore, in order to finance the rehabilitation of its system, GWA needs to be able to issue bonds to pay for critical construction projects. In his testimony before the Legislature on Bill No. 97, Simon Sanchez, Chairman of the CCU, noted that GWA does not have a bond rating at this time. Mr. Sanchez stated: "In order for GWA to obtain an investment quality rating, GWA will need to demonstrate an ability to repay large principal and interest obligations." He also added that rating agencies and lenders look for a history of independent rate actions by a PUC.

If Bill No. 97 becomes law, however the Guam Legislature would completely thwart GWA's efforts to establish an investment quality rating. First, GWA's ability to repay its existing debt would be jeopardized. Second, the Guam Legislature would demonstrate to the

investment world that the statutory independence of the Guam PUC to set rates is purely illusory. The PUC's written commitment on April 10, 2003--to provide GWA in a timely manner with adequate rate relief to enable GWA to comply with an EPA-approved strategic plan--would be rendered meaningless by legislative fiat. Under these circumstances, it is unlikely that GWA would ever be able to secure the bond financing necessary to meet its obligations under the Stipulated Order.

Should Bill No. 97 be enacted, the Court could declare it Inorganic as an impairment of the contracts embodied in the Consent Decree in CV99-00102, and the Stipulated Order in CV02-00035.

In *City of Billings v. County Water Dist. Of Billings*, 935 P.2d 246, 252 (Mont. 1997) the Supreme Court of Montana found that a state statute which replaced the Public Service Commission's (hereinafter referred to as "PSC") control over water rates with municipal control over the same, impaired a contract for the sale of water between a municipality and a water district, in violation of the Montana and U.S. Constitutions.

In determining whether such an impairment was presented by the statutes in question, the court considered whether application of the statutes to the facts in question was reasonably related to achieving the legitimate and public purposes of the statutes. The ostensible purpose of divesting the Public Service Commission of authority to regulate water rates was to avoid the undue costs and delay of PSC rate hearings. The court said:

> We point out at the outset that a heightened decree of scrutiny applies when a governmental entity is a party to the contract. See *Buckman*, 730 P.2d at 385. As we stated in *Buckman* quoting *United States Trust Co. of New York v. New Jersey* (1977), 431 U.S. 1, 25-26, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92, 111-12: "The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. *In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate [when] the State's self-interest*

*is at stake." Buckman,* 730 P.2d at 385. In *Buckman* we also stated that "[t]he severity of the impairment [to the contract] increases the level of scrutiny to which the legislation is subjected." *Buckman,* 730 P.2d at 385.

We fail to see how the application of the statutes here, ostensibly allowing the City to modify its own contractual obligations, is reasonably related to the legitimate purposes of the statutes. To justify its rate increases, the City claims that the language in the 1963 contract limiting its ability to raise the District's rates is unrealistic, and that it needs to raise revenue. Also, the City states in its brief that "[i]f the rate provision of the 1963 Contract were superseded by the PSC prior to the enactment of Sec. 69-7-101, MCA, then it stands to reason that the enactment of Sec. 69-7-101, MCA, vested the City Council with that same authority for any utility rate increases."

We do not agree with the City's argument. There is no relationship between the purpose of § 69-7-101, MCA, avoiding the undue costs and delay of PSC rate hearings, and the City's need to raise revenue (and its "need" therefore to disregard what it considers unrealistic or outdated contract language). Moreover, the City's argument that its assumption of rate control from the PSC necessarily authorizes it to modify, "supersede," or otherwise disregard its contractual obligations is flawed. Because the PSC, as overseer of rate increases prior to 1981, was able to "supersede" some of the language in the 1963 contract between the City and the District does not now ***230*** mean that the City, in assuming the PSC's power, can "supersede" language in that same contract or any other contract to which it is a party, particularly when its reasons for doing so are not related whatsoever to the purposes of the statute which transferred to it control once held by the PSC. We hold that the District has made a prima facie showing that the application in this case of statutes granting municipalities control over utility rates violates its rights under the contract clauses of the Montana and United States Constitutions. The District has sufficiently shown that the City's rate increases, pursuant to the statutes and in violation of the rate increase provisions of the 1963 contract, substantially impair the contractual relationship between the District and the City. Further, the District has sufficiently shown that the City's reasons for utilizing the authority of the statutes to override the contractual language are not reasonable related to the legitimate purposes of those statutes.

The statement of intent of Bill No. 97 (COR) provides:

**Section 1. Intent.** On May 10, 2002, Public Law 26-81 was enacted, placing a one-year moratorium on the implementation of an 11.5% surcharge on water bills by the Guam Waterworks Authority. This moratorium was enacted for two reasons. The first was that economic conditions made the payment of the surcharge a hardship for many of our people. The second was that the surcharge was intended to pay for overdue power bills on the part of

GWA, and not for any improvements to the water or wastewater systems on Guam. The Legislature found that the application of a surcharge upon the ratepayers of Guam, solely for the purpose of paying GWA due obligations to the GPA, was in effect making the ratepayers pay for GWA's poor management decisions.

Recently, GWA announced that it would proceed with the implementation of the 11.5% surcharge, and further, would apply the surcharge yet again towards unpaid bills on the part of GWA. The Legislature finds that conditions are unchanged from a year ago, when P.L. 26-81 became law, and the moratorium against this type of surcharge must be extended.

As indicated, supra, the purpose of the surcharges is to allow GWA to obtain the bond financing it needs to make the improvements called for the Consent Decree in CV99-00102, and the Stipulated Order in CV02-00035. As such, the moratorium on water rate increases which would be effected by Bill No. 97 (COR) is related to the goal of achieving improvements to water systems, inasmuch as the rate increases will allow GWA to pay past due debt, thereby enabling it to obtain bond financing for these improvements. Hence the Legislature's reasons for overriding the contractual language providing for rate increases are not reasonably related to the legitimate purposes of the statute.

28 U.S.C. § 1421b(i) provides that no law impairing the obligation of contracts shall be enacted by the Guam Legislature. Thus, once the appropriate motion for relief is made, the Court should find that the moratorium on rate measures is inorganic and void.

Dated this ___9th___ day of October 2003.

OFFICE OF THE ATTORNEY GENERAL
DOUGLAS B. MOYLAN, Attorney General

By: _____
JOSEPH A. GUTHRIE
Deputy Attorney General