**FILED**
DISTRICT COURT OF GUAM

DEC - 6 2007

JEANNE G. QUINATA
Clerk of Court



Samuel J. Taylor
Staff Attorney
Guam Waterworks Authority
578 North Marine Corps Drive
Tamuning, GU 96913
Telephone: (671) 647-7681
Facsimile: (671) 646-2335

IN THE DISTRICT COURT OF GUAM
TERRITORY OF GUAM

| | | |
|---|---|---|
| United States of America, | ) | CIVIL CASE NO. 02-00035 (D. Guam) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPLY TO THE UNITED STATES'** |
| vs. | ) | **RESPONSE TO THE GUAM** |
| | ) | **WATERWORKS AUTHORITY'S** |
| The Guam Waterworks Authority and | ) | **MOTION FOR DISPUTE** |
| The Government of Guam, | ) | **RESOLUTION** |
| | ) | |
| Defendants. | ) | |

In reply to the USEPA Response to GWA's Motion for Dispute Resolution, the Guam Waterworks Authority ("GWA") provides the following.

## 1. The Assertion By the USEPA That The Filing Was Not Timely Is Simply Incorrect.

In its November 28, 2007 response to GWA's Motion, the USEPA stated that GWA's Motion should have been filed by October 26, 2007 because the USEPA's letter notifying GWA that it was terminating the informal negotiation period was dated September 26, 2007 and thirty days thereafter was October 26, 2007.[1] USEPA Response at p. 9. This argument is misplaced because the date on the face of a document is not the date that begins the clock for the purposes of determining filing deadlines. Rather filing deadlines are determined by the date the document is received by the party against whom time is to run. In this case **GWA first received the letter on September 27, 2007.** Exhibit 1 (e-mail from Mr. Robert Mullaney to Sam Taylor, attorney for GWA dated September 27, 2007).

---

[1] Stipulated Order for Preliminary Relief – Exhibit A to GWA's Motion for Dispute Resolution.

1

ORIGINAL

The methodology for determining filing deadlines under an Order from the United States District Court of Guam is Local Rule 6.1, which indicates that time computation is controlled by Rule 6(a) of the Federal Rules of Civil Procedure ("F.R.C.P."). Rule 6(a) states that when a filing deadline falls on a Saturday, the next day to file is the next day that is not a Saturday, Sunday or legal holiday. In this instance 30 days from September 27, 2007 falls on October 27, 2007, which is a Saturday. Accordingly, GWA's Motion for Dispute Resolution did not need to be filed until Monday, October 29, 2007. GWA served the United States Attorney's Office with a filed copy of the Motion on October 29, 2007. Exhibit 2.

Moreover, under District Court of Guam Local Rule 5.1, service of process for documents subsequent to pleading is governed by Rule 5 of the F.R.C.P. which indicates that service upon an attorney for a party is effective service. Thus, given the fact that GWA served an attorney for the United States Environmental Protection Agency on the proper date, the fact that the USEPA received the document at a later date is immaterial in determining whether or not the deadline was met as the United States had been provided notice of GWA's motion.

## 2. The Issue Is Not Moot, GWA Simply Wanted To Avoid Paying Interest In The Unlikely Event It Lost Its Motion.

The United States indicated in its Response that GWA's Motion should be dismissed because there is no longer any case or controversy because GWA made the $40,000 fine payment. USEPA's Response at 10. However, what the USEPA failed to mention is that there is absolutely no provision in the Stipulated Order indicating whether or not penalties or interest on penalties is tolled during the period of time during which the dispute resolution procedures are being followed, meaning that in the event GWA lost on its motion, interest would probably have accrued. In the event the Guam Waterworks Authority prevails the USEPA can issue a check in the amount of $40,000 to GWA thereby rendering the importance of the payment meaningless. Moreover, this controversy does not center around the payment itself, rather the controversy extends to whether or not the fines can be imposed in the first place in light of the USEPA's failure to provide GWA with feedback on its ¶ 39 and ¶ 42 submissions as well as other reasons.

2

However, what is most important is that the controversy exists regardless of whether or not the payment of the fine was made. Secretary of Labor v. Spartan, 415 F.3d 82 (D.C. Cir 2005), n.1 ("… payment of the $259 fine imposed by the contested citation does not moot this case. As the Secretary observes, . . . precedent indicates that if Spartan prevails in this proceeding, the company will be able to recover the money paid to the Secretary."); *see also* Papaliolios v. Durning, 175 F.2d 73 (2nd Cir 1949) (payment of the fine does not render a case moot because of the harm that may result from non-payment during the time the case is proceeding). This case is exactly the same as the Spartan case because it is the determination by a federal agency that is the subject of the dispute with the fine merely being a by-product of the legal and factual issues surrounding the imposition of the fine. The situation in this case is no different than payment on a judgment being made pending the outcome of an appeal – the right of appeal is not disturbed by the payment as the right exists independent of the payment. Here GWA's desire to limit the interest in the event it loses the Motion should not render moot this dispute as the dispute can be adjudicated regardless of whether or not the payment is made, nor should GWA be penalized for attempting to mitigate interest penalties in the event it loses on the motion.

3. **The Facts Speak For Themselves – The USEPA Ignored Paragraph 2 Of the Stipulated Order.**

The USEPA asserts that GWA's Motion is not supported by the facts. USEPA's Response at 1. In that same paragraph, the USEPA goes on to further state that those same facts are undisputed. Id. Nothing could be further from the truth as the facts are exactly what is disputed in this case. GWA complied with the Stipulated Order ("SO") and submitted operational performance evaluations for the Northern and Hagåtña Sewage Treatment Plants. The USEPA failed to respond in writing to those reports in writing as required by Paragraphs 2, 39 and 42 of the Stipulated Order and GWA is entitled to relief from the fines in light of the USEPA's failure to follow the specific mandates of the SO.

3

Mike Lee, who has regulatory oversight of GWA's operations for the USEPA, indicated in his Declaration that "GWA has still not conducted the operational performance evaluation required by Paragraph 42. . ." Declaration of Mr. Lee at ¶ 7. Mr. Lee made the same representation with respect to Paragraph 39. Id. At ¶ 9. However, neither Paragraph 42, nor Paragraph 39, specifies what an operational performance evaluation must consist of. In the absence of any stated requirement under the Stipulated Order, GWA was free to conduct an evaluation and provide a report containing the elements that it thought were appropriate under the circumstances. The USEPA apparently disagreed with the content of GWA's report, but the nature of their disagreement should have been in the form of a formal written response under Paragraphs 2, 39 and 42 of the SO indicating why they disagreed with the contents of the report instead of issuing a fine.

The position of the USEPA with in its response is utterly contradictory with regard to the justification of the fine. On one hand the United States stated that the Stipulated Order must be "construed as it is written," yet on the other hand the U.S. totally ignores two very important facts: (1) that Stipulated Order is utterly silent as to what the performance evaluation must consist of; and (2) GWA's formal submissions that GWA provided to the USEPA regarding the Hagåtña and Northern District Sewage Treatment Plants must be approved or denied in writing under the specific and detailed terms of Paragraphs 39, 42, and 2. Response at 8. Thus, if this Court adopts the contradictory legal position from the U.S. Government, then there is absolutely no way for GWA to ever receive fair treatment under the Order because phantom terms not yet defined by the USEPA will apply to GWA for the purposes of implementing fines and determining compliance, but yet, the USEPA will be under no obligation to follow very specific mandates contained within the Order itself. This is truly having your cake and eating it too.

On November 16, 2007, GWA submitted a formal request for the USEPA to provide to GWA some indication about what the USEPA felt the contents of a so-called performance evaluation report should be given the fact that the SO is silent on this issue. Exhibit 3. The USEPA responded on November 27, 2007 – *a mere 11 days*. This issue is very important as it

4

proves how easy it would have been for the USEPA to have formally responded under the Stipulated Order to instruct GWA on how its filing was deficient – can you get any more arbitrary than this? Ironically, the USEPA did not finally tell GWA what the USEPA thought an Operational Performance Evaluation should consist of until 7 months after the deadline.

What is worse is that the USEPA in its Response to GWA's Motion for Dispute Resolution **completely ignored** GWA's argument about the dictates of Paragraph 2, 39 and 42 of the Stipulated Order requiring some formal response to GWA's submissions. The USEPA's lack of response on this issue is truly indicative of its complete indifference to GWA's submittals the USEPA and merely illustrates how lopsided and non-productive the relationship between the USEPA and GWA really is under the SO. Antrobus Decl. at ¶'s 4-6. Nothing could prove this point more than the GWA learning of the possibility that GWA's pending NPDES permit applications may not be granted by the USEPA even after GWA performs the repairs required under the SO – a fact GWA just learned on December 3, 2007. Antrobus Decl. at ¶ 22. GWA spent more than $30 million dollars of ratepayer funds to put in the outfalls and rehabilitate the plants only to find out the rules of the game may change mid-stream thereby causing all of GWA's ratepayers to bear the cost of the USEPA's failure to inform GWA of the "new" permit requirements which were not brought to GWA's attention during the planning / construction phase of the projects despite the USEPA's active participation during these phases. Id. at ¶'s 22-27. This issue is beyond arbitrary! Put another way, the USEPA actions are akin to DPW issuing a building permit for a house, participating at all phases of construction to build the house, and then once the person has spent a considerable sum building the house, deny the person the right to occupy it or fine them for if they try to do so – simply bizarre.

## 4. The Motion Is Consistent With The Spirit, Purpose, Intent And Terms Of The Stipulated Order.

The USEPA in its Response stated that GWA's motion is "inconsistent with the purpose of the Stipulated Order. . ." USEPA Response at p.1. How can a motion that is specifically

5

provided for under the Stipulated Order be inconsistent with the Order itself? In reality, GWA and the USEPA fundamentally disagree with the overarching purpose of the SO in that GWA views the SO as being a device to ensure compliance with the Safe Drinking Water Act and the Clean Water Act while the United States Government believes that the purpose of the SO is simply to comply with the Order regardless of whether or not GWA is operating the system in compliance with the two acts above.

The USEPA makes a feeble attempt to show this court how GWA has allegedly "failed" to comply with the Stipulated Order without providing any information in their motion about how GWA has complied with the overwhelming majority of the provisions of the SO in a timely manner. *See generally* Kemp Decl. In addition, the obstacles placed in GWA's way, including the failure of the USEPA and the Guam Environmental Protection Agency ("GEPA") to respond to plans and drawings in a timely manner, has in large part led to GWA's compliance issues under the SO.[2] *See generally* Kemp Decl, Sanchez Decl. at ¶ 14 and Antrobus Decl. at ¶ 5. However, despite the delays directly attributable to outside entities such as the USEPA and GEPA, and other notable hurdles such as GWA losing approximately $80 million dollars over the six years prior to the CCU gaining control of GWA, the company has turned around and is moving forward as evidenced by the fact that 100% of the projects required under the SO have been started and 75% of all of the required items under the SO have been completed. Kemp Decl. at ¶ 5 and Sanchez Decl. at ¶ 5.

Ironically, what the United States Government failed to mention is that the same exact parties to this case (and lawyers) recommended to this Court that the Consolidated Commission on Utilities ("CCU") should be the entity in charge of Guam's solid waste problems given the CCU's proven track record of addressing problems at both GWA and GPA. Exhibit 4. Why? The answer is because the GWA and GPA under the CCU produced very positive results, including its performance under the SO. Id.

---

[2] Delays on the part of the USEPA, GEPA or other federal entities does not toll the timeframes set out in the SO, but yet, when asked, the USEPA denied GWA's request to have those periods of time tolled in order to place the compliance deadlines solely upon GWA's back. Antrobus Decl. at ¶'s 5 and 6.

6

If GWA and the CCU is as good as the U.S. indicates, why then issue fines? Furthermore, what is the underlying purpose of the fines? According to the USEPA, the purpose of the fines is to ensure compliance with the Order because the Order is to ensure compliance with the Clean Water Act and the Safe Drinking Water Act. USEPA Response at 1. In this case, GWA was fined for not meeting the terms of the SO despite the fact that the Hagåtña Sewage Treatment Plant was in fact meeting its NPDES permit requirements when the fine was issued and the Northern District Sewage Treatment Plant is so close to meeting those permit levels that it is a de minimis infraction at worst. Antrobus Decl at ¶'s 11 – 17. In addition, the Hagåtña Pump Station refurbishment is not required to meet the Clean Water Act or comply with the NPDES permits which means that the fines are not being made with regard to statutory compliance but for some other purpose. Antrobus Decl. at ¶'s 19 - 21. The fine is like a jockey flogging the heck out of a horse who is winning the race by a mile and only inches from the finish line.

The only minor compliance glitch noted by Mr. Lee for the Hagåtña Sewage Treatment Plant was in April of 2007. Mr. Lee's Declaration at ¶ 16. What Mr. Lee's Declaration does not show, is that **the Hagåtña Sewage Treatment Plant had been in continuous compliance for more than 5 months when the fine was levied against GWA** – an arbitrary act indeed. GWA D.R. Mtn. at Exhibit B of Exhibit C; *see also* Antrobus Decl. at ¶ 12 and Shane Decl at ¶'s 5 – 8. In addition, what the Declaration of Mr. Lee fails to show is how close the Northern District Treatment Plant is to compliance and the likelihood that GWA will meet the permit requirements if it performs the additional repairs it intends to (none of which are required by the Original Stipulated Order). Shane Decl. at ¶'s 6 and 9. Finally, Mr. Lee's statement in Paragraph 17 of his Declaration that an operational performance evaluation is necessary to determine whether the Hagåtña Sewage Treatment Plant can comply with its permit levels is simply false. Antrobus Decl. at ¶ 12. However, sewage treatment plants throughout the United States are only required to provide Discharge Monitoring Reports ("DMRs") to the USEPA for compliance determinations. Id. GWA should be held to the same standard because holding GWA to any other standard is simply capricious.

7

GWA's point is proven by the fact that Mr. Lee was able to use the DMR's to determine that the plant was out of compliance for April of 2007 (right after the plant was refurbished and during the time of initial plant shakedown) which means that he would also be able to determine if the plant was in compliance from the same exact reports. Lee Decl. at ¶ 15, *see also* Shane Decl. at ¶'s 6 – 8. Thus, the USEPA clearly had at its disposal all data necessary to determine that the plants were in compliance or so close to compliance as to render any operational performance evaluation superfluous. Instead, the USEPA chose to ignore GWA's compliance with the Clean Water Act, and fined GWA for violating the SO which proves that the USEPA is simply fining GWA without regard to compliance. Stated another way, if the SO is to ensure compliance, and GWA was in compliance, how can the USEPA issue a fine for non-compliance? Answer, it can't if compliance is really the goal of the fines – which GWA seriously doubts. Antrobus Decl at ¶ 27.

If, as the USEPA suggest, the renovation at the Hagåtña Sewer Pump Station are directly related to GWA's ability to maintain continuous compliance with NPDES permits, then how does the USEPA explain the continuous compliance of the Hagåtña Sewage Treatment Plant since May of 2007 when the pump station has not yet been repaired? Lee Decl. at 17. In reality, the Sewer Pump Station refurbishment is not necessary to meet NPDES permits, rather the upgrades are mainly related to operator safety more so than anything else as the station is dangerous to GWA employees. Shane Declaration at ¶'s 12 – 14; *see also* Antrobus Decl. at 19 and 20.

Mr. Lee also indicated that the operational failure of the sewer pump station could result in raw untreated sewage discharging directly into the water. Lee Decl. at ¶ 17. While possible, the veracity of the statement is uncertain.    Antrobus Decl. at 19. What is known, is that if the Hagåtña Sewer Pump Station has a catastrophic failure, the failure does not affect NPDES permit guidelines which regulate the effluent from a sewage treatment plant, rather the failure of the pump station would mean that the "wet well" or holding tank for the pumps would simply overflow onto the ground. Whether or not that effluent would make its way to the waters of the

8

Guam is a simple matter of gravity and whether or not GWA could execute emergency repairs before the effluent reached sufficient mass to make its way to the water. Id.

In closing, based upon the reasons set forth above, GWA reiterates its protest of the fines issued by the USEPA's Penalty Demand Letter and moves this Court to set aside the fines because they are arbitrary and capricious and contrary to the spirit, intent and letter of the Stipulated Order. GWA is not trying to convince this Court that it has not missed SO deadlines, it is clear that GWA has, and when it did, GWA dutifully paid the fines without protest. However, in this case the imposition of the fines, without regard to the filings made by GWA in satisfaction of the mandates of the SO, along with the fact that the majority of the fines were levied upon the mistaken assumption that GWA was not trying to comply or out of compliance, leads one to believe that the fines may have been motivated by some other reasons other than compliance with the Clean Water Act.

One issue that has become apparent to GWA during the time that this motion has been pending is that this Court should require the parties to participate in a full and complete evidentiary hearing on this issue to allow the parties to call witnesses and fully discuss the issues that underlie this dispute as there are still many questions that remain unanswered by the USEPA as to its actions in this case. In addition, it is entirely conceivable that this Court would choose to exercise its inherent powers and allow the parties to modify the SO in a manner that is fair to both parties and not just the United States.

Respectfully submitted this 6th day of December 2007.

By: _____
Samuel J. Taylor
Attorney for Guam Waterworks Authority

9

| | |
|---|---|
| **From:** | Mullaney, Robert (ENRD) [Robert.Mullaney@usdoj.gov] |
| **Sent:** | Thursday, September 27, 2007 3:59 AM |
| **To:** | staylor@ite.net |
| **Cc:** | gpagm@ite.net; jackson.julia@epa.gov; Lee.Michael@epa.gov; Schwab, Mikel (USAGU) |
| **Subject:** | U.S. v. Guam Waterworks Authority |

**Attachments:** SFXBD0.pdf



SFXBD0.pdf (253
KB)

```
        Sam,  I have attached a pdf copy of the letter that was also faxed to you
today.  Rob


Robert D. Mullaney
U.S. Department of Justice
301 Howard Street, Suite 1050
San Francisco, CA  94105
Tel:  (415) 744-6483
Fax:  (415) 744-6476
E-mail:  robert.mullaney@usdoj.gov

 <<SFXBD0.pdf>>
```

**EXHIBIT 1**



**U.S. Department of Justice**

Environment and Natural Resources Division

*Environmental Enforcement Section*
*301 Howard Street*
*Suite 1050*
*San Francisco, CA 94105*

*Telephone (415) 744-6483*
*Facsimile (415) 744-6476*

September 26, 2007

<u>Via fax and e-mail</u>

Sam Taylor, Esq.
Guam Waterworks Authority
578 North Marine Corps Drive
Tamuning, Guam 96913

      Re:    <u>United States v. Guam Waterworks Authority and the Government of Guam</u>
              Civil Case No. 02-00035 (D. Guam)

Dear Mr. Taylor:

        On September 4, 2007, EPA demanded a stipulated penalty of $40,000 from Guam Waterworks Authority ("GWA") for violations of Paragraphs 39 and 42 of the Stipulated Order for Preliminary Relief ("Stipulated Order") entered by the Court on June 5, 2003, and as amended on October 19, 2006. In accordance with Paragraph 67 of the Stipulated Order, GWA disputed EPA's determination in a letter dated September 11, 2007, and requested informal negotiations. Representatives of the United States and GWA conferred in a conference call on September 24 (Pacific Daylight Time). This letter responds to the issues raised in GWA's September 11 letter and concludes the period of informal negotiations.

I.      Background

        The parties agreed that entry of the Stipulated Order was the most appropriate way to require the immediate implementation of short-term projects and initial planning measures by GWA to address issues of GWA's compliance with the Clean Water Act and Safe Drinking Water Act. Stipulated Order at 3. The Guam Public Utilities Commission ("PUC") issued an Order on April 10, 2003, renewing its commitment to provide GWA with adequate rate relief to enable GWA to comply with an EPA-approved strategic plan to restore the utility and to bring it into compliance with federal law. Stipulated Order, Attachment A.

        Accordingly, Paragraph 39 of the Stipulated Order required GWA to develop an interim corrective action plan and schedule to restore minimum primary treatment operational capacity to the Northern District Sewage Treatment Plant ("STP"). The interim corrective action plan was required to include a schedule for completion of the improvements in the plan by November 26, 2004, which was 540 days after entry date. In addition, GWA was required to complete a design by November 26, 2004, to fully renovate the Northern District STP to bring it into compliance with its NPDES permit requirements.

        Similarly, Paragraph 42 of the Stipulated Order required GWA to develop an interim corrective action plan and schedule to restore minimum primary treatment operational capacity to the Agana STP. The interim corrective action plan was required to include a schedule for completion of the improvements in the plan by June 5, 2005, two years after the entry date. In

addition, GWA was required to complete a design by June 5, 2005, to fully renovate the Agana STP to bring it into compliance with its NPDES permit requirements.

GWA did not meet the original compliance deadlines in Paragraphs 39 and 42 for the renovation of the Northern District and Agana STPs. EPA did not impose stipulated penalties for these violations of the Stipulated Order. Instead, the United States and GWA agreed to a modification of the Stipulated Order, which was approved by the Court on October 25, 2006. The modification required GWA to hire additional accounting and engineering support and allowed for the extension of certain compliance deadlines. In particular, Paragraph 39 now included a revised scope of work for corrective actions to restore operational capacity for the Northern District STP by the deadline of March 2, 2007, and required GWA to conduct an operational performance evaluation by May 4, 2007, to determine whether advanced primary treatment is needed to comply with NPDES permit effluent limitations. Paragraph 42 was amended to require a revised scope of work for corrective actions to restore operational capacity for the Agana STP by the deadline of March 2, 2007, and required GWA to conduct an operational performance evaluation by April 30, 2007, to determine whether advanced primary treatment is needed to comply with NPDES permit effluent limitations. GWA was also required to complete renovations at the Agana main sewer pump station by June 1, 2007.

II.     Violations of the Stipulated Order

     A.     Paragraph 39 violations

On March 2, 2007, GWA submitted a certification letter to EPA regarding its work. GWA stated that it had successfully completed its renovation work under Paragraph 39. GWA specifically stated:

> GWA is now monitoring the performance of the restored facility and will evaluate it to determine if any process adjustments may be needed in order to meet the NPDES permit. GWA is on schedule to complete this work by the May 4, 2007 compliance date.

On May 4, 2007, GWA submitted a second certification letter to EPA regarding its Paragraph 39 obligations. GWA's May 4 letter called into question whether it had successfully completed its renovation work, which was supposed to be completed by March 2, 2007, by stating that this work had been completed "with the exception of five of the six sludge pumps and half of the aerated grit removal system." These sludge pumps were now listed as a "planned action." Moreover, GWA acknowledged that funding originally earmarked to install sludge pumps -- as specifically contemplated in Paragraph 39 -- "was diverted to ensure that GWA is maintaining adequate reserve funds in order to comply with the Stipulated Order and bond covenant requirements." May 4 letter at 4.

Instead of conducting the operational performance evaluation required by Paragraph 39, GWA stated:

> Since GWA is still working to complete mechanical repairs, GWA does not believe that the requirements for additional treatment can be properly assessed until additional sludge pumps have been procured and plant operations have been fully optimized and assessed.

GWA has still not conducted the operational performance evaluation required by Paragraph 39.

In sum, GWA states that it has not completed the renovation of the Northern District STP, apparently due to its failure to procure funds necessary for the renovation. Moreover, GWA has determined not to conduct an operational performance evaluation until it can complete these renovations.

### B.     Paragraph 42 violations

On March 2, 2007, GWA submitted a certification letter to EPA regarding its work. GWA stated that the renovation work required by Paragraph 42 had been completed, and that it was proceeding with the operational performance evaluation of the STP performance. GWA noted that it would perform additional monitoring to collect sufficient information to properly evaluate the system by the April 30 compliance date. In addition, GWA expected the Agana main sewer pump station ("SPS") to be completed on schedule.

In a second certification letter submitted on April 30, 2007, however, GWA did not submit an operational performance evaluation. Instead, GWA stated that it did "not believe that two months of operation are adequate to fully optimize and assess the treatment capabilities of the newly rehabilitated treatment plant." GWA has still not conducted the operational performance evaluation required by Paragraph 42.

Regarding the Agana SPS, GWA submitted a letter to EPA on July 24, 2007, stating that it had not met the compliance date of June 1 for completion of the SPS. Evidently, GWA had planned to use certain bypass pumps to allow the SPS work to proceed but the pumps were not adequate to handle the incoming flow. GWA indicated that it was having difficulty obtaining to procure the necessary pumps.

In sum, GWA stated that it lacked the funds to purchase pumps that would have allowed required renovation work on the SPS to proceed. GWA has never conducted the operational performance evaluation required by Paragraph 42.

### III.     Stipulated Penalties under the Stipulated Order

As indicated by EPA's letter dated September 4, 2007, stipulated penalties of $298,000 had accrued for GWA's violations of Paragraphs 39 and 42 as of August 30, 2007. Stipulated penalties of $4,000 per day will continue to accrue until the final date of completion of these requirements. Pursuant to Paragraph 56 of the Stipulated Order, EPA agreed to reduce the amount of stipulated penalties owed to it and imposed a penalty of $40,000 for these violations as of August 30, 2007.

GWA has alleged that a demand for stipulated penalties is not appropriate because EPA did not approve or disapprove GWA's submittals under Paragraphs 39 and 42. However, Paragraph 54 of the Stipulated Order states unequivocally that: "Stipulated penalties shall begin to accrue on the date after performance is due and shall continue to accrue through the final date of completion even if no notice of the violation is sent to Defendants." GWA is responsible for submitting an operational performance evaluation under Paragraphs 39 and 42 and cannot ignore the Stipulated Order and unilaterally determine that it "does not believe that additional testing is necessary to determine whether the treatment plants meet their federal permits." September 11, 2007 letter at 6. Moreover, due to its purported inability to finance the work, GWA has failed to complete renovation work within the compliance deadlines established by Paragraphs 39 and 42.

Sam Taylor, Esq.
Guam Waterworks Authority
Page 4

    We have carefully reviewed GWA's September 11, 2007 letter and have concluded that
the stipulated penalty of $40,000 is justified. GWA failed to comply with deadlines in
Paragraphs 39 and 42 that had been extended at GWA's request in the October 2006
modification of the Stipulated Order. Accordingly, this letter terminates the period of informal
negotiations. EPA's determination that GWA owes $40,000 in stipulated penalties shall stand
unless Defendants file a motion with the Court for dispute resolution pursuant to Paragraph 68
within 30 days of today. Pursuant to Paragraph 55 of the Stipulated Order, GWA's payment of
the stipulated penalty of $40,000 to the United States is due by October 4, 2007.


    Please call me at (415) 744-6483 if you have any questions.

                                        Sincerely,

                                        Robert D. Mullaney
                                        Robert D. Mullaney
                                        Trial Attorney


cc:    John Benavente, P.E. (GWA)
       Mikel Schwab, Assistant U.S. Attorney
       Julia Jackson, Esq. (EPA)

Samuel J. Taylor
Staff Attorney
Guam Waterworks Authority
578 North Marine Corps Drive
Tamuning, GU 96913

Telephone: (671) 647-7681
Facsimile: (671) 646-2335

**US Attorney's Office
Districts of Guam & NMI**

OCT 29 2007 3:45

Time _____
Receiving name _____
Date keyed in Dbase _____
Entered into Dbase by: _____

**FILED**
DISTRICT COURT OF GUAM

OCT 29 2007

**JEANNE G. QUINATA
Clerk of Court**

## IN THE DISTRICT COURT OF GUAM
### TERRITORY OF GUAM

United States of America,

               Plaintiff,

          vs.



The Guam Waterworks Authority and
The Government of Guam


             Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL CASE NO. 02 00035 (D. Guam)

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF THE
GUAM WATERWORKS
AUTHORITY'S MOTION FOR
DISPUTE RESOLUTION**

OCT 3 0 2007
3:17
ATTORNEY OF OFFICE

## I. <u>BACKGROUND</u>

Approximately four years ago the United States of America filed a civil action against the Guam Waterworks Authority ("GWA") and the Government of Guam seeking injunctive relief, the appointment of a receiver for the Guam Waterworks Authority as well as the assessment of civil penalties for GWA' violations of the Clean Water Act, 33 U.S.C. §§ 1251 – 1387 (the "CWA"), and the Safe Drinking Water Act, 42 U.S.C. §§ 300f - 300j-26 (the "SDWA"). On June 5, 2003, the United States, the Government of Guam and the Guam Waterworks Authority entered into a Preliminary Order for Stipulated Relief wherein the parties agreed that the entry of the Stipulated Order was the most appropriate way to have GWA implement short-term projects

# EXHIBIT 2



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION IX
75 Hawthorne Street
San Francisco, CA 94105

**November 27, 2007**

Paul J. Kemp
Assistance General Manager for Compliance and Safety
Guam Waterworks Authority
P.O. Box 3010
Hagatna, Guam 96921

Re:     Agana and Northern District STPs Operational Performance Evaluations
        Stipulated Order Paragraphs 39 and 42

Dear Mr. Kemp:

        This is a response to your letter dated November 16, 2007, requesting EPA to advise
GWA on the type of information needed to satisfy the requirements of paragraphs 39 and 42 of
the Stipulated Order (SO).

        The operational performance evaluation (OPE) should be of sufficient nature to determine
whether the sewage treatment plants can comply with current NPDES permit effluent limitations
and whether there is a need for advance primary treatment. The OPE shall include, but not
limited to, the following:

1. Sampling of the influent and effluent for flow, BOD, TSS, and settleable solids. Influent and
effluent BOD, TSS and settleable solids for each of the primary clarifiers should be performed to
determine the performance of each unit to ensure units are performing as expected based on their
design characteristics and loadings. Flow measurement should correlate with BOD and TSS
monitoring.

2. Sampling frequencies should be sufficient to determine the performance of each unit process
and the quality of combined effluent. It is recommended that the sampling frequency be
performed anywhere from three times per week to daily. Sampling may need to be adjusted
based on evaluation of results during the performance evaluation period.

3. As per the SO, the OPE would be performed over a two month period.

4. Sampling should be 24 hour composites and located to ensure that representative samples are
collected. All sampling locations should be identified and noted on a facility diagram.

5. All sampling results should be presented in a table that clearly shows the performance
characteristics of the unit processes, treatment plant overall and comparison to NDPES permit
effluent limitations. For the final effluent BOD and TSS, both concentrations and mass loadings

**EXHIBIT 3**

should be determined and compared to NPDES permit effluent limitations. Percent removal BOD and TSS should also be determined and included with the final results. Data from Discharge Monitoring Reports (DMR) should also be used as part of the OPE and to support the determination.

6. If the treatment plant is having difficulty meeting NPDES permit effluent limitations and the primary clarifiers are performing satisfactorily, then GWA may need to evaluate other treatment process as they may be contributing to the facility's inability to comply with permit effluent limitations.

Based on the OPE results, GWA shall submit a determination, in writing, supported with the OPE results/data, that the treatment plant is either able or not able to meet current NPDES permit effluent limitations (primary treatment) requirements.

If, based on the OPE results, it is determined that the treatment plant can meet current NPDES permit effluent limitations and no additional treatment is needed, then GWA has satisfied paragraphs 39 and 42. If it is determined that advanced primary treatment is needed, GWA shall include a schedule for any necessary design work and installation of a advance primary treatment system.

If you have any questions, please contact me at 415-972-3769 or at lee.michael@epa.gov.

Sincerely,

Michael J. Lee
Pacific Islands Office

cc:     J. Benavente, GWA
        D. Antrobus, GWA
        L. Crisostomo, GEPA
        M. Minas, GEPA



# GUAM WATERWORKS AUTHORITY
### Good Water Always
578 N. Marine Corps Drive, Tamuning, GU 96913-4111
Phone: (671) 647-2605  Fax: (671) 646-2335

November 16, 2007

Michael J. Lee
**Manager, Pacific Islands Office (CMD-6)**
U. S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

Dear Mike,

Pursuant to further compliance to the **STIPULATED ORDER FOR PRELIMINARY RELIEF;
CIVIL CASE No. 02-00035** as amended, The Guam Waterworks Authority herewith presents A
request under Paragraph 2 for acceptance, approval or disapproval or GWA's submittals made
on items numbered: 39 and 42, Performance Evaluations of Hagåtña and Northern District
STP's.

## CERTIFICATION STATEMENT

I certify under penalty of law that I have examined and am familiar with the information
submitted in this document and all attachments and that this document and its attachments
were prepared either by me personally or under my direction or supervision in a manner
designed to ensure that qualified and knowledgeable personnel properly gathered and
presented the information contained therein.  I further certify, based on my personal
knowledge or on my inquiry of those individuals immediately responsible for obtaining the
information, that the information is true, accurate, and complete.  I am aware that there are
significant penalties for submitting false information, including the possibility of fines and
imprisonment for knowing and willful submission of a materially false statement.

_Paul J. Kemp_

_____

**PAUL J. KEMP, M. S.**
Assistant General Manager for Compliance and Safety

**November 16, 2007**
**Date**

CC:   Barry Pollock, Region 9, USEPA
Lorilee T. Crisostomo, Guam EPA
Manuel Minas, Guam EPA
Angel Marquez, Guam EPA
Benny Cruz, Guam EPA
Consolidated Commission of Utilities
     Simon Sanchez
     Benigno M. Polomo
     Gloria Nelson
     Eloy Hara
     Bernadette Lou Sablan
     Art Perez
     Heidi Ballendorf
     Yvonne M. Cruz
     Doris J. Young
GWA IGM
GWA Chief Engineer
GWA CFO
GWA AGM A&C
GWA AGM P&T
GWA AGM C&D
GWA AGM C&S
GWA Legal Counsel
Veolia Water PMC
     Rick Unpingco
     Cathy Manglona
Attorney General of Guam
Office of the Public Auditor
Public Utilities Commission
File



# GUAM WATERWORKS AUTHORITY
### Good Water Always
578 N. Marine Corps Drive, Tamuning, GU 96913-4111
Phone: (671) 647-2605  Fax: (671) 646-2335

November 16, 2007

Michael J. Lee
Manager, Pacific Islands Office (CMD-6)
U. S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

Dear Mike,

Under Paragraphs 39 and 42 of the stipulated order, GWA is required to complete an operational performance evaluation "to determine whether advanced primary treatment is needed to comply with NPDES permit effluent limitations". As submitted on May 04, 2007, we completed our evaluation and concluded that advanced primary treatment is not necessary at either plant in order to meet permit requirements. We believe that subsequent treatment results as documented in Discharge Monitoring Reports validate our conclusion.

It is clear from recent communications that USEPA is of the opinion that we have not to date satisfied the requirement to complete a performance evaluation. Consequently, we request that you please advise GWA what specific information and/or performance evaluation would be necessary to satisfy the requirement and demonstrate that advanced primary treatment is not required in order meet NPDES permit limitations.

Respectfully Submitted,

_____

PAUL J. KEMP, M. S.
Assistant General Manager for Compliance and Safety

November 16, 2007
Date

# ORIGINAL

1  RONALD J. TENPAS
   Acting Assistant Attorney General
2  Environment & Natural Resources Division
   ROBERT D. MULLANEY
3  Environmental Enforcement Section
   United States Department of Justice
4  301 Howard Street, Suite 1050
   San Francisco, California 94105
5  Tel: (415) 744-6483
   Fax: (415) 744-6476
6
   LEONARDO M. RAPADAS
7  United States Attorney
   MIKEL SCHWAB
8  Assistant United States Attorney
   Suite 500, Sirena Plaza
9  108 Hernan Cortez
   Hagåtña, Guam 96910
10 Tel: (671) 472-7332
   Fax: (671) 472-7215
11
   Attorneys for United States of America
12

**FILED**
DISTRICT COURT OF GUAM

NOV - 9 2007

JEANNE G. QUINATA
Clerk of Court

13            IN THE UNITED STATES DISTRICT COURT

14                  FOR THE TERRITORY OF GUAM

15

16

17
   UNITED STATES OF AMERICA,        )    CIVIL CASE NO. 02-00022
18                                   )
                   Plaintiff,        )    UNITED STATES' REPLY
19                                   )    BRIEF IN RESPONSE TO STATUS
            v.                       )    HEARING
20                                   )
                                     )
21 GOVERNMENT OF GUAM,               )     Date: November 20, 2007
                                     )     Time: 9:00 a.m.
22                 Defendant.        )     Judge Tydingco-Gatewood
                                     )
23

24

25

26

27

28
                                     **EXHIBIT 4**

1 flexibility to adjust the landfill's footprint if, although not currently foreseeable, slight

2 adjustments to the current footprint are warranted. Id. Therefore, GovGuam's acquisition of the

3 land for the Layon landfill could start immediately and should be regarded as an independent

4 activity that is not tied to the completion of the hydrogeological study. Id.

5      Furthermore, after review of the scope of the project for the hydrogeological study and

6 after discussions with DPW, Guam EPA, and the study's contractor, EPA concluded that the

7 study would aid in finalizing the landfill's components, which are defined in the study objectives Page 6 of 9

8 as the following tasks: (1) to establish design depths of the landfill; (2) to identify if a sub-drain

9 system is needed; and (3) to design the sub-drain system (if needed). Id. at ¶ 10. However, the

10 outcomes of the study have no foreseeable impact on the footprint of the new landfill. Id.

11 Accordingly, GovGuam has no reason to wait for conclusion of the study to commence the

12 condemnation action. The Court should not allow GovGuam to excuse its inactivity based on

13 this study.

14      GovGuam also argues that it should be given 120 days after the formation of the new

15 solid waste public corporation to initiate condemnation, as the Report originally recommended.

16 The United States proposed that this time period be shortened to 60 days after entry of the

17 Court's Order to take into account that the Magistrate's Report was filed 4 months ago.

18 Moreover, unless the Guam Legislature amends Public Law 29-19, GovGuam will need to obtain

19 the Layon site before it can expend any funds on site-specific preparation, design work, or

20 mitigation relating to the site. Therefore, the Court should require GovGuam, within 60 days

21 after entry of the Court's Order, to either negotiate the acquisition of the Layon site or to initiate

22 an eminent domain proceeding to acquire the site.

23 V.   **The Court Should Adopt the Report's Recommendation Requiring CCU's Oversight of the New Solid Waste Public Corporation.**

25      In concurrence with the Guam PUC and the United States, the Magistrate Judge

26 recommended that GovGuam propose legislation to reconstitute DPW's Solid Waste

28      5

1  Management division as a public corporation subject to the oversight of the CCU. Report at 28.

2  GovGuam objects to oversight by the CCU and would prefer to have a modified version of the

3  status quo: a solid waste public corporation subject to a new Board appointed by the Governor.

4  GovGuam presents the issue of CCU oversight as if the concept were solely attributable to the

5  United States, and argues, based on <u>Stone</u>, that the Court should defer to GovGuam's policy

6  decision. However, GovGuam's reliance on <u>Stone</u> is misplaced. In that case, the Ninth Circuit

7  specifically noted that "federalism concerns do not prevent a federal court from enforcing a

8  consent decree to which state officials have consented." <u>Stone</u>, 968 F.2d at 862 n. 20. The

9  United States supports the Magistrate Judge's recommendation of CCU oversight, which is

10 solidly justified, based not only on the experiences, observations, and recommendations of

11 Guam's regulatory agencies, but also on the track record of CCU.

12       More than a year ago, the Guam Public Utilities Board ("PUC") sought implementation

13 of the following recommendation for DPW's Solid Waste Management ("SWM") division: "[I]t

14 is critical that the legislation recommended in the audit report be implemented . . . *paramount of*

15 *which is the recommendation that SWM be reconstituted as a public corporation under the*

16 *governance of the Consolidated Commission on Utilities.*" PUC Order, Docket 06-2, September

17 28, 2006 (emphasis in original); <u>see</u> U.S. Subm. of Authorities (filed 1-31-07), Exh. 9 at 1. In

18 addition, the Guam EPA, in its September 2006 Guam Integrated Solid Waste Management Plan,

19 also recommended that solid waste management should be transferred to a public corporation

20 under CCU's oversight. Arora Decl., Exh. 2 at 21-22. Finally, the Guam Office of the Public

21 Auditor, in its August 2007 Performance Audit of DPW's Commercial Tipping Fees, stated its

22 "agreement with PUC's rationale to realign DPW's SWM division as a public corporation under

23 the auspices of the CCU." OPA Report No. 07-08 (August 2007) at 17 (see Court Document

24 #138). Therefore, Guam's regulatory agencies, which are most familiar with DPW's operations

25 and solid waste management issues on Guam, uniformly supported CCU's oversight of the new

26 solid waste public corporation. The Magistrate's recommendation is derived from and consistent

27

28                         6

1  with the well-founded views of Guam's own regulatory agencies.

2        In his Report, the Magistrate Judge stated that the reconstitution of SWM as a public

3  corporation was intended to "address its organizational deficits, to improve the quality of SWM's

4  services to its residential customers, and to establish a reliable billing and collection system – all

5  of which are critical prerequisites for obtaining the bond financing necessary to pay for the

6  Consent Decree projects." Report at 28. All of the problems of SWM noted by the Magistrate

7  Judge – its organizational deficits, the poor quality of its service, and its inadequate billing and Page 8 of 9

8  collection service – occurred and continue to occur while SWM is in its present organizational

9  form. The United States continues to support the Magistrate Judge's recommendation as an

10  appropriate and necessary response to the current crisis in solid waste management on Guam.

11        In contrast to the new, untested board proposed by GovGuam, the CCU has a proven

12  track record in its oversight of GWA and GPA, which are both Guam public corporations. The

13  CCU's oversight experience would be directly relevant to its proposed role in this case. For

14  example, while subject to CCU's oversight, GWA not only had to manage its compliance with

15  this Court's Stipulated Order for Preliminary Relief in <u>United States v. Guam Waterworks</u>

16  <u>Authority and Government of Guam</u>, Civ. No. 02-00035, it also had to raise funds for

17  compliance through the issuance of bonds. As an autonomous elected body, the CCU would be

18  in a better position to apply its independent judgment to issues affecting solid waste disposal

19  operations on Guam, and to reach decisions about policies, rates, tipping fees, and

20  personnel/contractor needs that are operationally driven rather than politically driven.

21  VI.    **Conclusion**

22        For the reasons stated herein, the United States requests the Court to adopt the Magistrate

23  Judge's Report and Recommendation, as modified in accordance with recommendations in our

24  supplemental brief, as an Order of this Court. The people of Guam, especially the residents in

25  the vicinity of the Ordot Dump, deserve to see their government take immediate and concrete

26

27

28                                                 7