Samuel J. Taylor
Staff Attorney
Guam Waterworks Authority
578 North Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 647-7681
Facsimile No.: (671) 646-2335

Attorney for the Guam Waterworks Authority

FILED
DISTRICT COURT OF GUAM
DEC - 6 2007
JEANNE G. QUINATA
Clerk of Court

# UNITED STATES DISTRICT COURT

## TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL CASE NO. 02-00035 |
| Plaintiff, | |
| vs. | **DECLARATION OF SIMON A. SANCHEZ IN SUPPORT OF DEFENDANT GWA'S REPLY TO THE UNITED STATES' RESPONSE TO DEFENDANT GWA'S MOTION FOR DISPUTE RESOLUTION** |
| GUAM WATERWORKS AUTHORITY and the GOVERNMENT OF GUAM, | |
| Defendants. | |

**ORIGINAL**

I, Simon A. Sanchez, declare as follows:

1. I am over the age of eighteen (18) years old and a lawful resident of the Territory of Guam.

2. I have been the Chairman of the Consolidated Commission on Utilities ("CCU" or "Commission") since January 2003. The CCU has policy and financial oversight over the Guam Waterworks Authority ("GWA" or "Management") and the Guam Power Authority ("GPA"), and as such I have personal knowledge of the events and facts stated herein.

3. Within a few days after being elected to the CCU in November 2002, I was contacted by the Guam U.S. Attorneys Office to discuss the possibility that the USEPA and the U.S. Attorney's office would go to federal court to place GWA in receivership for repeated violations of the Clean Water Act and the Safe Drinking Water Act by GWA prior to the creation of the CCU. I asked U.S. Attorney Mikel Schwab to consider working with the newly elected CCU to allow it to put GWA in a position to come into compliance. In early December 2002, Super Typhoon Pongsona devastated Guam. In late December 2002, GWA and the Government of Guam was sued by the U.S. government.

4. Immediately upon taking office in January 2003, the CCU and GWA embarked on the development and negotiation with USEPA of a Stipulated Order to achieve compliance with applicable federal laws. Despite years of GWA ignoring previous Notices of Violations, and despite the on-going typhoon recovery, within six months of taking office the CCU, GWA and USEPA entered into the Stipulated Order ("SO," "Original SO" or "Order") in June of 2003. The CCU and GWA were committed to bringing the utility into compliance as soon as possible by executing the Stipulated Order.

5. The original deadlines agreed upon between GWA and the USEPA for completing certain projects in the Stipulated Order were the best professional forecasts of costs and timelines that the USEPA and GWA could make at that time. The CCU and new GWA management had been in office less than six months so it was working on an Order with limited experience with GWA's system but with firm commitment to convince this Court that it was

serious about complying with the required federal water laws as quickly as possible. Both USEPA and GWA made certain assumptions about quickly obtaining financing which later proved to be erroneous. These erroneous assumptions by both parties included: (1) the financial markets would quickly loan GWA money without first seeing a sustained history of GWA raising rates and reducing costs in a manner sufficient to support loan repayment terms. GWA's poor credit history and its loss of approximately $80 million dollars over a six year period prior to the CCU required GWA to demonstrate a substantial commitment to raise the necessary monies to implement the Stipulated Order; (2) the bond rating agencies and financial markets would not want to see GWA implement the management changes necessary to increase income and substantially lower costs BEFORE they would consider any upgrade of GWA's low standing within the capital markets; (3) the Guam PUC would approve a rate increase plan that would provide GWA additional monies more quickly. (The PUC, instead, phased in rate relief over a number of years in order to minimize adverse rate shock by GWA ratepayers); and (4) GWA would not have other significant capital and operational needs (example: rising power costs which constitute almost 25% of GWA's total expenses) that had nothing to do with compliance with USEPA requirements but were nonetheless critically needed by GWA to improve service and finances and which also competed with the limited funds that eventually became available from rates and the financial markets to GWA. During the negotiations of the Order, there was no consultation with rating agencies or financial advisors as to what would be required to access financing to meet the resulting deadlines.

6. GWA and its preceding Public Utility Agency of Guam (PUAG) had never raised public financing on its own. The prior public financing for GWA capital projects was not undertaken by GWA, but rather by the Government of Guam in the late 1980's. The Government of Guam sold about $50 million worth of general obligation bonds on behalf of GWA/PUAG because those entities could not obtain financing on their own given their poor financial history. With no previous history, the CCU and new GWA management was starting from scratch with regards to GWA accessing financing on its own.

7. Within three months following the entry of the Order in June of 2003, CCU and GWA approved a plan to raise $250 million in public financing to implement the requirements of the Stipulated Order. The amount was based on cost projections made by USEPA and GWA as

part of negotiating the Stipulated Order. Guam law requires a six month public notice to ratepayers of proposed rate increases before any filing can be formally submitted to Guam Public Utilities Commission ("PUC"). In the fall of 2003, GWA gave the legally required six (6) months notice to the public of its intention to seek a rate increase.

8. In April of 2004, the Public Utilities Commission partially granted GWA's request for a rate increase, but due to concerns of rate shock to consumers, did not grant GWA's full rate request. The first rate increase would only generate an additional $3 million per year, insufficient to float any bond financing or to complete any projects contemplated by the Order. As a result of this PUC action, GWA was not able to issue any bonds within the expected time frame because the rating agencies still needed further convincing that GWA possessed the ability to charge the higher rates, collect the revenue and position itself to repay its obligations. Nearly one year had already lapsed on the original timelines contemplated by the Stipulated Order.

9. The CCU and GWA's new management team of professionals initiated many other significant operational changes, including but not limited to the following: (1) reducing the number of personnel in the utility from a high of 424 prior to the CCU to 235, saving $4 million in annual payroll costs; (2) reducing its contractual obligations and other expenses by almost 20%; (3) ending "boil water" notices; (4) restoring inoperable water wells to increase GWA well availability to over 90%; (5) improving its Ugum water treatment plant's ability to handle high turbidity during rainy periods; (6) hiring more professional engineers, managers and a Chief Financial Officer. Some of this progress required the use of cost cuts and rate hikes to fund the improvements, further delaying the utility's ability to become credit worthy but still accomplishing system improvements demanded by the general public as well as USEPA. While the CCU and GWA were fully committed to implementing the Stipulated Order, there were many other competing needs to be addressed outside of the Order.

10. By spring 2005, additional rate hikes were granted by the PUC and GWA got the first strong indications from the bond rating agencies that it could now consider approaching the financial markets. In November 2005, twenty-nine months after the entering of the Stipulated Order and eighteen months after its first rate increase since the 90's, GWA successfully sold $104 million in bonds to begin to implement the SO capital projects. It became readily apparent

to GWA and USEPA that the project deadlines contemplated in 2003 seriously underestimated the time it would take to access the magnitude of financing needed. In recognition of this financial reality, CCU, GWA and the USEPA began a series of discussions in early 2006 which lead to amending the timelines of the original Stipulated Order to reflect the realities forced on to GWA by the capital markets. In late 2006, GWA and USEPA agreed to modify the original timelines of the 2003 Stipulated Order.

11. As GWA began the required government bidding process, it became apparent that not only were the original timelines forecast by both USEPA and GWA unrealistic, but the project costs forecast also were seriously understated. Both the USEPA and GWA estimated far lower costs for capital projects in 2003 than what bona-fide contractors were bidding in 2006 to complete the work. For example, in 2003 GWA and the USEPA both believed that the Outfall project would only cost GWA approximately $8 million, but the winning bid came in at approximately $18 million. The Hagatna Sewage Treatment Plant was projected in 2003 to cost $4 million but ended up costing $10 million. The automated meter program forecast to cost $14 million is now exceeding $16 million. This shortfall meant that bond monies that were originally planned to be used on other Order projects as well as newer projects that GWA felt was necessary to achieve further compliance with federal and local laws would not be sufficient. Guam law prohibits GWA from procuring projects without the ability to certify available funding. Thus, actual construction costs could not be determined until GWA certified it had the money (after the November 2005 bond issuance).

12. One new project, the Hågatña Pump Station was not identified by the USEPA as being necessary for compliance with the Clean Water Act and as a result it was not included in the original Stipulated Order. During the renegotiation of the Order timelines in late 2006, GWA proposed this project to better meet the intent of the original Order to insure better protection of the public and Guam's surrounding waters once the soon-to-be-complete Hagatna Sewage Treatment Plant's $10 million would come on-line earlier this year.

13. GWA management apprised the CCU of the issues involving bypassing the Hågatña Sewage Treatment Plant while refurbishing the Hågatña Sewage Pump Station. When GWA Management came to the CCU and informed us that they would need a by-pass project,

the CCU wanted to ensure that no sewage went out into the ocean improperly treated, that no spills occurred upstream of the sewage pump station due to work being performed on it and that the safety of the public, GWA employees and the contractor's employees would be assured. Management then informed the CCU the funding source would be from leftover bond funds. Unfortunately, as on-going projects continued and new project bids came in, it became increasingly apparent that there might not be left over bond funds for this additional project, despite its importance to carrying out the intent of the Order to protect public health.

14. Had GWA not brought the Hågatña Sewage Pump Station to the USEPA's attention, the project would not have been included in the Amended Stipulated Order. The USEPA's fine for this project is making the CCU and GWA regret bringing the project to the attention of our regulatory agency – especially since GWA was under no obligation to do so. The USEPA's fine for this project is proving to be a windfall for the federal government for a project that was not originally considered by USEPA in the original Order. Ironically, the $40,000 fine would help GWA complete a project USEPA had never considered before GWA proposed it.

15. GWA and the CCU have been committed to a fair, honest and open regulatory process and GWA's lack of protest of other fines bears out GWA's acknowledgment that it must comply with this Court's order. However, this latest fine is simply contrary to the letter, spirit and original intention of the Stipulated Order – to ensure that GWA's water and wastewater are safe for the people of Guam. The new Hågatña Sewage Pump Station project would better protect the public but GWA is being fined for proposing it and trying to implement it under circumstances that neither USEPA nor GWA and CCU foresaw in June 2003 or late 2006.

16. Unlike other local government entities that are not complying with long-standing federal court orders or Notices of Violations to comply with federal laws, GWA has kept its word to aggressively pursue compliance with applicable federal laws. A Stipulated Order was negotiated within the first six months of existence of the new CCU and new GWA management. A financing plan was completed within three months of the entry date of the order. A rate increase plan was filed, approved and implemented by the PUC and GWA. Financing was obtained and critical Order projects have been completed and are nearing completion. In four short years, GWA has completed the overwhelming majority of the Stipulated Order

administrative and capital projects. GWA is not trying to find ways not to comply with the Order. Rather GWA has been directing significant time, resources and funds towards compliance with the Clean Water Act and the Safe Drinking Water Act which has led the USEPA to declare in 2005 that GWA's water is the safest it has been in decades.

17. GWA and CCU's progress in meeting this Court's order are apparent to the US Attorneys office and USEPA, so much so that these federal parties have recommended to this Court that the CCU take over the process of closing the Ordot Dump and opening a new landfill for Guam. The CCU and GWA have demonstrated the governing and executive ability to implement the Court's orders.

18. Based upon my information and belief, the U.S. and Guam EPA also have failed in certain instances to effectively carry out its responsibilities of the Order, particularly in long delayed or incomplete responses to GWA compliance submittals and proposals. When two parties work extensively on such a large project as complying with the Order, mistakes will be made on both sides. Clearly, both parties failed to accurately forecast the timing and cost of major Order capitol projects. Unfortunately, there is no process to hold USEPA accountable for their mistakes, except by approaching this Court for relief.

19. I also believe there now is a different working relationship between GWA and USEPA since GWA filed a protest against the latest fines. The USEPA no longer appears willing to work as collaboratively with GWA, as it has prior to the latest fine. The CCU and GWA are concerned about future retaliation by the USEPA as we complete the implementation of the Order. While the Order is mandatory, it is a construct of human interaction that will generate unintended misjudgments and mistakes by BOTH parties. Unfortunately, only USEPA can fine GWA but GWA's relief can only be protected by this Court. The overwhelming assessment of facts will show that CCU and GWA have continuously worked to achieve compliance with this Court's orders, has paid fines when we are clearly at fault and has made significant progress on moving GWA into compliance with applicable federal laws. The fines in this case are unwarranted because GWA continues to move a utility with decades of poor performance and non-compliance forward in a realistic and professional manner. The USEPA

appears to wish to lump GWA in with the landfill and mental health failures of GovGuam when the facts show just the opposite.

I declare under penalty of perjury under the laws of the Territory of Guam and the United States of America that the foregoing is true and correct.

Executed this _5th_ day of December, 2007 at Tamuning, Guam.

                                               SIMON A. SANCHEZ
                                               Chairman, Consolidated
                                               Commission on Utilities